# IN RE JOSEPH W., JR., ET AL.*

Superior Court, Child Protection Session at Middletown
Docket Nos. L15-CP05-008039-A, L15-CP06-008191-A

* Thus entitled in accordance with General Statutes §§ 46b-124, 46b-142, 45a-715 (B), and Practice Book § 32a-7. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and only upon order of the Superior Court.

Affirmed. *In re Joseph W.*, 146 Conn. App. 468, 78 A.3d 276 (2013).

1

Memorandum filed March 11, 2013

*Tammy Nguyen-O'Dowd*, assistant attorney general, for the petitioner.

*Sam Christodlous*, for the respondent father.

*Brian Chizinski*, for the respondent mother.

*Geraldine Menn*, for the minor children.

KELLER, J. This is a trial on matters ordered consolidated by the court, *Epstein, J.*, on September 14, 2012, concerning Joseph W., Jr. (Joseph), born July 18, 2005, and Daniel W., born July 20, 2006, to respondent mother, Karin H. and respondent father, Joseph W., Sr.

On July 21, 2005, the petitioner, the Commissioner of the Department of Children and Families (department), filed a petition alleging that the minor child, Joseph W., is neglected. On July 24, 2006, a second petition was filed alleging that the minor child, Daniel W., is neglected.

On December 10, 2007, pursuant to General Statutes § 17a-112 et seq., the petitioner filed petitions to terminate the parental rights of Karin H. and Joseph W. as to their children, Joseph and Daniel W.

Under General Statutes § 17a-112 (*l*), a petition for termination of parental rights may be tried at the same time as a neglect petition. That section provides as follows: "Any petition brought by the Commissioner of

Children and Families to the Superior Court, pursuant to subsection (a) of section 46b-129, may be accompanied by or, *upon motion by the petitioner*, consolidated with a petition for termination of parental rights filed in accordance with this section with respect to such child. Notice of the hearing on such petitions shall be given in accordance with sections 45a-716 and 45a-717. The Superior Court, after hearing, in accordance with the provisions of subsection (i) or (j) of this section, may, in lieu of granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45a-717." (Emphasis added.)

Practice Book § 35a-3, captioned "Coterminous Petitions," provides as follows: "When coterminous petitions are filed, the judicial authority first determines by a fair preponderance of the evidence whether the child or youth is neglected, uncared for or dependent; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination of parental rights is in the best interests of the child or youth by clear and convincing evidence. If the judicial authority determines that termination grounds do not exist or termination of parental rights is not in the best interests of the child or youth, then the judicial authority may consider by a fair preponderance of the evidence any of the dispositional alternatives available under the neglect, uncared for or dependent petition."

On July 3, 2012, mother filed a motion to resume visitation with the children. On August 3, 2012, father filed a motion to resume visitation and a motion to vacate the orders of temporary custody regarding Joseph and Daniel. In addition to consolidating the neglect and termination petitions for trial, Judge Epstein also ordered the hearings on these three

motions consolidated with the trial on the neglect and termination petitions.

Both the mother and the father were duly notified of the filing of the petitions. The court is aware of no other proceeding pending in any other court regarding the custody of these two children. Neither parent claims Native American affiliation and the requirements of the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq., are not applicable.

The court has jurisdiction.

Trial was held over six days, December 3, 4, 5, 6, 10, and 11, 2012. These trial dates were selected well ahead of time, after counsel for the mother requested a continuance of trial dates previously set for October 2012. Mother did not attend the trial after the first day, December 3, 2012, and did not indicate to the court or her attorney any reason for her absence. Neither she nor her attorney requested a continuance. The memorandum of hearing for an in-court proceeding on September 14, 2012, indicates mother was present in court when the trial dates were established. The court determined to proceed in mother's absence. Her attorney remained present and participated throughout the trial.[1]

The court has fully considered the criteria set forth in the relevant statutes, as well as the credible and relevant evidence, applicable case law, demeanor and credibility of the witnesses and arguments of the parties in reaching the decisions reflected and the orders issued in this memorandum. After due consideration, the court adjudicates the children neglected, terminates the parents' parental rights in Joseph and Daniel W., denies the

---

[1] See *In re Jason M.*, 140 Conn. App. 708, 718, 59 A.3d 902 (2013) (no due process violation when mother in termination of parental rights case had notice of trial dates and voluntarily and deliberately absented herself from trial).

parents' motions for visitation and denies the father's motion to vacate the orders of temporary custody.

## I

### PROCEDURAL HISTORY

On July 21, 2005, the petitioner sought and obtained an ex parte order of temporary custody (OTC) from the court regarding Joseph when he was three days old. A neglect petition was simultaneously filed, alleging predictive neglect, which requires proof that it was more likely than not that, if Joseph had remained in the care of either mother or father, or both parents, he would have been "denied proper care and attention physically, educationally, emotionally or morally." See *In re Joseph W.*, 305 Conn. 633, 648–49, 46 A.3d 59 (2012).

On August 5, 2005, after a contested hearing, the OTC regarding Joseph was sustained by the court, *Taylor, J.* The court found that Joseph was in immediate physical danger from his surroundings and that immediate removal from his surroundings was necessary to insure his safety. See General Statutes § 46b-129 (b). Pursuant to General Statutes § 46b-129 (c) (6), the court ordered preliminary specific steps prepared for each of the respondent parents, which were signed by each parent on August 17, 2005. (Exhibits 9 and 10.)

On July 24, 2006, the petitioner sought and obtained an ex parte OTC from the court regarding Daniel W. when he was four days old. A neglect petition was simultaneously filed, alleging predictive neglect on the basis that Daniel would be denied proper care and attention physically, educationally, emotionally or morally and would be permitted to live under conditions, associations and circumstances injurious to his well-being.

On August 11, 2006, the OTC for Daniel was scheduled for a contested hearing. Prior to the commencement

of the hearing, the parents agreed to sustain the OTC, which was based on the finding that Daniel was in immediate physical danger from his surroundings and that immediate removal from his surroundings was necessary to insure his safety. On that same date, the court, *Bear, J.*, ordered preliminary specific steps for each of the parents, which they both signed. (Exhibits 11 and 12.)

On August 2, 2007, pursuant to an agreement, mother entered a written plea of nolo contendere in both neglect petitions on the basis of predictive neglect. The respondent father stood silent. The court, *Wilson J.*, canvassed mother as to her nolo plea and adjudicated both children neglected on the conditions injurious ground.[2] Judge Wilson also committed both children to the care and custody of the petitioner.

On November 28, 2007, father filed a motion to open the neglect adjudication and disposition in both cases, claiming that he was entitled to enter a plea and contest the neglect petitions, even if he was not a custodial parent at the time of the filing of the neglect petitions. In his request to open the judgments and seek a neglect trial, father "expressly stated that '[t]his is not a case where the father is simply contesting whether or not he himself committed any overt act which gave rise to any form of neglect. [The] [f]ather has made it abundantly clear that he contests whether the children can in *any way* be deemed neglected . . . .' " (Emphasis in original.) *In re Joseph W.*, 301 Conn. 245, 262, 21 A.3d 723 (2011). "At the August 2, 2007 neglect hearing, the father had stated that '[w]e never abused nor

_____

[2] The "conditions injurious" ground for neglect, however, was not alleged in Joseph's petition and never added by oral or written amendment. See Transcript, August 2, 2007. (Exhibit 57.) Accordingly, this court is considering only the "denied proper care ground" in making its determination on Joseph's neglect petition. Daniel's neglect petition alleges both the "denied proper care" and "conditions injurious" grounds.

neglected our children. Our children were taken away at birth on a prediction.' The father did not make a claim that, although the mother had neglected the children, he had not." Id., n.17.

On December 10, 2007, the petitioner filed termination of parental rights petitions as to both children, alleging failure to rehabilitate pursuant to General Statutes § 17a-112 (j) (3) (B) (ii) as grounds for termination of the parental rights of both respondents. In addition the petitioner alleged the ground of failure to rehabilitate pursuant to General Statutes § 17a-112 (j) (3) (E) as to mother.[3]

On October 1, 2008, the court, *Olear, J.,* terminated the respondents' parental rights to both children based on § 17a-112 (j) (3) (B) (i) for both mother and father and § 17a-112 (j) (3) (E) for mother.[4] The respondents appealed.

---

[3] The termination petitions have been amended several times. A motion for a technical amendment to the petitions, granted without objection on December 6, 2012, establishes the operative termination grounds for purposes of this trial, which are identical to the grounds originally alleged on December 10, 2007. As a result of the reversal of the trial court's October 28, 2011 decision finding predictive neglect, the department is unable to allege the failure to rehabilitate ground under General Statutes § 17a-112 (j) (3) (B) (i) because that ground for termination requires a prior adjudication of neglect. See *In re Joseph W.,* supra, 301 Conn. 246. On January 17, 2013, the department filed another motion for a technical amendment to check the boxes on the first page of the petitions to allege the department made reasonable efforts to locate the mother and father. See General Statutes § 17a-112 (j) (1). This motion was granted by agreement on January 18, 2013.

[4] On the first day of the 2008 termination of parental rights trial, the court, *Olear, J.,* granted the petitioner's motion to amend the termination petitions to allege the § 17a-112 (j) (3) (B) (i) ground as to both parents, rather than the initially alleged § 17a-112 (j) (3) (B) (ii) ground, after finding that the father was a noncustodial parent at the time of the filing of the neglect petition and denying his request to open the neglect judgments. On November 28, 2011, the petitioner filed a motion to amend the termination of parental rights petitions to allege ground (B) (i), rather than ground (B) (ii) as to both respondents. On February 15, 2012, the court, *Bentivegna, J.,* granted this motion.

On June 28, 2011, the Supreme Court affirmed the Appellate Court's decision to reverse the trial court's judgment terminating the respondents' parental rights. See *In re Joseph W.*, supra, 301 Conn. 245. The case was reversed and remanded for a new trial on both the neglect and termination petitions. The court concluded that the prior neglect adjudications had to be opened because the trial court, having found that the father did not stand silent at the neglect hearing or waive his right to enter a plea, should have unconditionally granted the father's motion to open the adjudications of neglect and allowed father to contest those adjudications and consequent dispositions, regardless of whether he was a custodial parent. Because the trial court, *Olear, J.*, had expressly relied on the prior 2007 neglect adjudications in rendering its termination judgments, and because those neglect adjudications had to be opened, the Supreme Court determined that there was no longer any basis for upholding the trial court's termination of parental rights judgments, since they had been premised on the existence of the now invalidated prior neglect adjudications. Id., 266–67.

On August 26, 2011, mother filed a motion for visitation to resume visits with the children. On September 12, 2011, the attorney for the children filed a motion to consolidate mother's motion for visitation with the retrial of the neglect and termination petitions.

On September 19, 2011, father filed a motion to bifurcate the trial of the neglect and termination petitions. Mother filed a similar motion on September 21, 2011. On September 21, 2011, the court, *Bentivegna, J.*, consolidated for trial the neglect petitions, motions to review permanency plans and motions for visitation, and bifurcated the termination petitions for a later trial.

On September 26, 2011, father filed a motion for visitation requesting that visits between him and the children resume pending the outcome of the termination

petitions. This motion also was ordered consolidated with the pending neglect trial.

On October 28, 2011, the court, *Bentivegna, J.*, issued a decision adjudicating the children neglected and committing them to the care and custody of the petitioner. Judge Bentivegna also approved permanency plans for termination of parental rights and adoption and denied both parents' motions to resume visitation. The respondents filed appeals only from the trial court's adjudications of neglect and dispositions of commitment. They did not appeal the denial of their motions for visitation.

On April 17, 2012, the court, *Bentivegna, J.*, after a contested trial, terminated the mother's and father's parental rights. Mother and father appealed this decision.

On June 28, 2012, the Supreme Court reversed Judge Bentivegna's October 28, 2011 decision regarding the neglect adjudications and commitments of the children. See *In re Joseph W.*, supra, 305 Conn. 633.

On June 29, 2012, father filed a motion to vacate the orders of temporary custody, to which the petitioner filed an objection on August 21, 2012.

On July 6, 2012, mother filed a motion for visitation, to which the petitioner filed an objection on August 21, 2012.

On August 3, 2012, the court, *Upson, J.*, granted mother's motion to vacate Judge Bentivegna's judgments of April 17, 2012, terminating mother's parental rights. Two days later, on August 3, 2012, Judge Upson granted a similar motion filed by the father and vacated the judgments terminating father's parental rights.

On August 3, 2012, father filed a motion for visitation, to which petitioner filed an objection on August 21, 2012.

On August 3, 2012, both respondents filed a motion to bifurcate the two children's matters, to which petitioner filed an objection on August 21, 2012.

On August 3, 2012, both respondents filed motions to have the cases transferred to a different Department of Children and Families regional office, to which petitioner objected on August 21, 2012.

On August 3, 2012, mother and father filed a motion to have the pending matters heard in a different regional court, to which petitioner objected on August 21, 2012.

On August 21, 2012, petitioner filed a motion to amend the neglect and termination of parental rights petitions, which included substantive amendments to the summaries of facts contained in those petitions.

On September 14, 2012, the court, *Epstein, J.*, denied parents' motions to (1) transfer the cases to a different department office; (2) transfer the cases to a different regional court; and (3) bifurcate the two children's matters for trial. Judge Epstein also denied petitioner's motion to amend all four petitions, but granted petitioner's motion to consolidate the trial of the neglect and termination of parental rights petitions with the hearings on the father's motion to vacate the order of temporary custody and both parents' motions for visitation.

On the first day of trial, December 3, 2012, the court denied the parents' written requests, filed and dated December 3, 2012, to require that American with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., coordinators for the department and the judicial branch be present throughout the trial.[5] The parents claimed that the removal of their children from their custody constituted discrimination against them on the basis of

---

[5] These requests, not in proper motion form, were filed by the respondents themselves, not by their attorneys, and the parents, not their attorneys, argued the points raised in the parents' letters.

their perceived disabilities, and that their lawyers were ineffective in positing their ADA defenses. Neither parent made an offer of proof as to a claimed disability under the ADA definitions, or raised any issue as to his or her competency to stand trial. There was no request for the appointment of a guardian ad litem. Mother stated, "I have never had a disability in my life." Father stated, "I claim no disability." Father also claimed the ADA was being violated based on his association with a disabled person, the mother.

The respondents had made similar requests to Judge Bentivegna at the beginning of the October 2011 trial on the neglect petitions. Judge Bentivegna denied them. On appeal, the Supreme Court upheld Judge Bentivegna's decision denying such motions. The Supreme Court, citing *In re Anthony B.*, 54 Conn. App. 463, 735 A.2d 893 (1999), ruled that claimed ADA violations are not a defense to neglect or termination proceedings, and that there is no authority for the proposition that the ADA requires trial courts to provide disabled parents with ADA coordinators during child protection proceedings to assist them in defending the case, because the ADA does not create special obligations in either termination or neglect proceedings.[6] See *In re Joseph W.*, supra, 305 Conn. 650–53.

## II

## FACTUAL FINDINGS

At trial, the petitioner presented the testimony of fourteen witnesses and introduced fifty-eight exhibits.

---

[6] In arguing its objection to the ADA motions, the department introduced documentation with extensive findings and reconsiderations revealing that the respondents had not prevailed on similar claims of ADA violations against the department that they had raised in administrative proceedings before the department and the Commission on Human Rights and Opportunities (CHRO) in 2008 and 2009. Both respondents were less than candid with the court when it inquired if they had ever pursued their ADA claims in an administrative proceeding or separate legal action. They stated they did not know how to do so, but both were advised of their rights to pursue their

The petitioner's witnesses were: department social workers Kathy Dayner, Pamela Lucier and Raegan Horvay; Jamelle Bonello of the Northwest Center Parent Aide program in Torrington; Elizabeth Nulty of the Center for Children With Special Needs; Dr. Richard Sadler, psychiatrist; Dr. Stephen Humphrey, clinical psychologist; Dr. Warren Corson III, clinical psychologist; Dr. Brett Steinberg, neuropsychologist; Dr. Logan Greene, neuropsychologist; Joseph Futschik of the Family Intervention Center; Maria Coutant Skinner of the McCall Foundation Family Enrichment Services program, formerly known as the Parent Education and Assessment Services (PEAS) program; Michael Harte of the All Point program, formerly known as the Delta-T supervised visitation program; and Cathy S., the foster mother of Joseph and Daniel. Mother, father and the children's attorney called no witnesses and introduced no exhibits. The credible and relevant evidence admitted at trial, including the items judicially noticed by the court,[7] supports the finding of the following facts.

## A

## Mother, Karin H.

Mother, Karin H., is forty-five years old. She is the youngest of three children born to parents who emigrated from Germany. Mother describes her relationship with her siblings as good and recalls that her

claims by further appeals by the CHRO in its Merit Assessment Reviews and its rejections of their requests for reconsideration. (Exhibits 59-63.)

[7] During trial, the court indicated it was taking judicial notice of all facts requested by the petitioner in her motion for judicial notice, dated November 30, 2012, court memoranda of hearing and prior court orders, including all specific steps, and the filing dates and allegations of the various pleadings in the children's files. A court can take judicial notice of court records for their existence, content and legal effect. See C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) §§ 2.3.4 (d) and 2.4.2. The court also indicated it would take judicial notice of any written or transcribed decisions pertaining to mother's older daughter, Kristina H., including *In re Kristina H.,* Superior Court, judicial district of Litchfield, Juvenile Matters at Torrington, Docket No. L15-CP-02-007724A (April 1 and 2, 2004) (*Goldstein, J.*), which adjudicated Kristina neglected and committed her to the department, and

childhood was happy. She does not report abuse of any kind by her parents. Starting at a young age, mother remembers always feeling ill. She went to the school nurse frequently with complaints of headaches and stomachaches, and would often miss school or leave school early. At the age of five, while jumping from stairs at the family's home, she fell back and struck her head. She also hit her head when she fell off the monkey bars in kindergarten, but an X ray revealed no injuries. Mother recounts that, while growing up, she was always nervous and tired. She did not enjoy school and was more interested in the social aspects.

In high school, mother experienced a significant medical emergency when a brain tumor was discovered after she experienced a seizure. She remembers having frequent headaches and, the night before the seizure, flu-like symptoms. The next morning, she did not wake up until her sister prodded her. She then began to seize and started to bang her head on the wall. She was taken to the emergency room, where she reportedly ran out of the hospital without any clothing. She was later told that she was swearing at anyone who tried to stop her. Mother underwent surgery to remove an egg-sized tumor. She stated to the department, during the pendency of the case pertaining to her daughter, Kristina H., that except for the need on one occasion after high school to drain fluid from the right frontal lobe area, she had not had any further treatment or assessment of this medical condition since her recovery from surgery. She indicated she was advised no further medical follow up was needed.

Mother's parents were told by the medical professionals that the seizure may have been drug induced. Mother

the subsequent termination of parental rights decision, *In re Kristina H.*, Superior Court, judicial district of Middlesex, Child Protection Session at Middletown, Docket No. L15-CP02-007724-A (January 17, 2007) (*Bear, J.*). No party posed any objection to the court taking judicial notice of these items.

admits that she had been using Dexatrim and marijuana prior to the seizure. She had used Dexatrim for years in an attempt to control her weight. In high school, she tried marijuana, beer, mixed drinks and speed. The speed was to keep her awake, as she always had problems being sleepy and tired. Mother never treated for substance abuse and she denies drug use after high school.

After recovering from her brain surgery, mother completed high school and began a medical assistant course at the Academy for Business Careers in Hamden, Connecticut. Mother finished the medical administrative assistant course in July 1987. She began an externship at Connecticut Eye Associates in Waterbury following her graduation, but stayed there for only a month. She then took a full-time job at the office of a Dr. Rubenstein in Watertown, but did not do well at the second job because she was always tired. Working full-time was too much for her, and she was fired after three months. Mother then found employment as a medical assistant at a walk-in clinic in Prospect and worked there for two years until she was fired because she did not change the paper on the examination table.

Mother then began to attend Mattatuck Community College to pursue a nursing degree, but the college would not accept her core courses from high school. The fact that she would have to repeat course work was too overwhelming and discouraging for mother. Her sister was now married and living in Hawaii, so mother left school and went to Hawaii.

Upon returning to Connecticut from Hawaii, mother decided to go back to community college and took a few courses. She missed many classes due to her inability to get out of bed on time. She left school again. Despite several subsequent efforts, she has never been able to obtain a college degree.

Mother's next job was with a dermatologist in Waterbury. She reported that for some reason, the staff in that office complained to the doctor about her and they all threatened to quit if the doctor did not fire her. She next worked for two years at an internist's office in New Haven, then left to take a job with a podiatrist in Naugatuck. She was fired from this job after two days due to poor typing skills. She then returned to the office of the internist, but either quit or was fired. She subsequently took a job with a Dr. Robbins in Middletown. Mother worked for Robbins for the next three years, but left the job because she claimed Robbins was romantically interested in her and stalked her. While working for Robbins, mother had a car accident on Interstate 691 on the way home from work. She says she nodded off in the car and collided with a light fixture. She suffered no major injuries, but the car was totaled.

Mother then began to work at Medibar Medical, a cardiac monitoring company in New Haven. After one year, she relocated to Florida for a job with the same company because her former boyfriend, a medical student, had moved there. They broke up when she learned he had been unfaithful. While working at Medibar Medical in Florida, mother frequently was very tired and had trouble getting to work on time. The office manager had mother examined by a neurologist, who found no brain abnormality, but referred mother to a psychologist for stress-related issues. The neurologist also suggested she take a vacation. Mother asked for three days off to go to a concert in New York, but Medibar gave her a pink slip and told her she needed more than three days off to deal with her issues. She returned to Connecticut, working for a short time as a receptionist at Industrial Health Care, but she was fired because she was late every day and questioned the doctors' diagnoses of patients.

In 1994, mother visited her sister in Colorado and stayed for almost a year, working as a waitress at a gas station restaurant. She could not find any work in the medical field in Colorado, but did obtain an X ray certification. When her sister asked her to leave, mother had to return to Connecticut and learned her certification was not transferable. She had to move in with her parents, where she has stayed since, except during periods when she was living with boyfriends.

Mother obtained brief employment as a phlebotomist at Burt Medical Laboratory in Waterbury, but was fired after six months because she could not get to work in the morning. The day she was fired, she recalls her cat died and her father buried the cat against her wishes. She claims she heard the cat meowing that night, and to this day, she is tortured thinking the cat was buried alive. Although she had determined the cat was no longer breathing before he was interred, mother later thought perhaps the cat had been "just meditating."

After a series of temporary and short-lived jobs, mother went to work at a chiropractor's office doing physiotherapy on patients. She was fired after six months for always being late. She claims she was unable to collect unemployment because the chiropractor lied at the unemployment hearing. At this point, mother became very reliant on her parents. Eventually, she found work as a cashier and a swimming pool salesperson. She tried to return to community college, but did not finish the semester.

A job at Greater Waterbury Management Resources placed her with a physicians' group. She worked in a pediatrician's office one day a week, doing paperwork and taking vital signs. This job lasted for one year, but mother believes she gained considerable pediatric medical knowledge as a result of this part-time employment. Her next job, at a doctor's office in Waterbury,

lasted two days because they did not feel she worked hard enough. She then worked several jobs at gas station convenience stores. She was fired from one for being late. Mother stated they never should have put her on the morning shift. A job at a Patco gas station and convenience store in Thomaston ended when her hours were cut. Mother claims that a younger woman employee was given some of mother's scheduled hours because the young woman was having a relationship with the CEO of the Patco Corporation. Mother's last known employment was in 2007. She held two part-time jobs, one at a local McDonald's and another at a convenience store in Bristol.

Mother reports ten miscarriages and five terminated pregnancies, although she has never been married or engaged. Her first pregnancy occurred at age sixteen. She has had several serious relationships that did not work out. Two of her boyfriends impregnated her twice, but neither married her. She does not believe she should use other forms of birth control, noting that it is the man's responsibility to use a condom.

The persistent tiredness mother has experienced, which has caused her to lose her employment on many occasions, is, at least in part, attributable to narcolepsy, with which mother was diagnosed in 1995 after her auto accident. A court-ordered sleep study at the University of Connecticut Health Center (UConn) in 2004 confirmed the earlier diagnosis of narcolepsy. Mother has never taken the prescribed medication or followed recommended routines to address her narcolepsy. She thinks the use of caffeine is sufficient. Dr. Daniel McNally, the director of the UConn Sleep Clinic, indicated that narcolepsy cannot be properly managed with caffeine. Mother also has been diagnosed with a thyroid problem, but has refused to take the prescribed thyroid medication regularly.

In March 2002, mother learned she was pregnant with her daughter, Kristina, and decided to continue this pregnancy because she was already thirty-five and might not have the chance to have another child. Due to her age, the pregnancy was considered high risk. During an ultrasound performed when she was four months pregnant, mother was advised she was having a girl. She claims she and the maternal grandmother bought girl's clothing and decorated the baby's room at home for a girl. She also claims that during the ultrasound, she saw two silhouettes and began to think she was having twins, although the doctor told her that was not the case.

Mother reported she began to take her thyroid medication during the pregnancy, but not in the manner prescribed. She ate primarily watermelon during her pregnancy with Kristina and avoided protein because, she stated, "Everybody knows that the baby doesn't put weight on until the last month, so I decided I did not have to eat protein until the last month, but I did not make it to the last month." When it was suggested to mother that babies grow and develop throughout the entire pregnancy, mother replied, "I'm in the medical field. I know how these things go."

As the pregnancy progressed, mother developed edema and high blood pressure. At a second ultrasound, mother said she distinctly saw two skulls on the ultrasound. Again, the doctor told her she was not having twins. At the hospital, mother reported she was hearing two heartbeats on the fetal monitor.

Kristina was born premature on October 14, 2002, with complex medical needs, signs of intrauterine growth retardation, low birth weight, placental insufficiency and feeding issues. The baby had to spend time in the neonatal intensive care unit.

Soon after the birth, the department received a referral from St. Mary's Hospital in Waterbury indicating that mother's mental health presentation impaired her ability to safely parent her infant child. On October 11, 2002, during a diaper change, mother asked a nurse several times whether Kristina was a boy. The nurse repeatedly showed mother the baby's anatomy, but mother still thought she saw a penis and testicles. During feeding time, mother repeatedly told a nurse, "Stop feeding the baby—she's not hungry," although the baby was feeding well. Even after reassuring mother the baby was not being overfed, mother made the same demand. Mother read the baby's monitor and said the baby's heart was stressed. She stated she knew how to detect abnormal rhythm. Mother was reassured and given information on what the monitor actually said. Later that evening, mother told a nurse, "I have had five terminations. After my last pap smear, I felt them pop open my cervix and go into my uterus. At home, I delivered a brain . . . white spongy material . . . . Later in the year 2000, I felt pregnant despite many negative pregnancy tests. I felt the baby grow for over six months. I later felt my water break and went to the ER. They told me I wasn't pregnant. When I got pregnant this time, I was happy because I could deliver whatever was left over in my uterus from the last pregnancy. I felt my placenta was strong enough to support both. I heard two heartbeats in the doctor's office and I felt the doctors were going to surprise me with twins at delivery. I now feel this is the older baby because her hands are wrinkled and old. I don't know where the other baby is. I could still be pregnant. I'm glad I delivered early because my placenta started to break down because it was supporting two. I have narcolepsy. Every time I lay down I pass out . . . ."

When hospital personnel discussed birth control with mother, she stated she did not know why fetuses could

not be placed into other women, but they are not, and that is why she needs to have abortions. She also stated she does not believe in condoms because she gets pregnant from them as well. Advised to discuss methods of birth control with her physician, mother said, "I don't need help. I need to just be careful."

Kristina, at eight days of age, was removed from mother's care under a ninety-six hour hold on October 22, 2002. The department immediately sought an OTC and filed a neglect petition. The OTC was sustained on November 8, 2002, on the ground of immediate physical danger, and preliminary specific steps were issued for mother to reunify with Kristina. Kristina was subsequently adjudicated neglected and committed to the department. Mother denies the bizarre behaviors and statements noted by hospital personnel, but on January 23, 2003, mother told a department worker that mother still thought she had been pregnant with twins, and, during her testimony at the neglect trial regarding Kristina, mother stated that "it's still up in the air" as to whether she had given birth to twins. She later spoke about her belief that the child she gave birth to in October 2002, unlike Kristina, did not have a hemangioma on her stomach. Mother stated she "wouldn't put it past the hospital" to have taken the baby without a birthmark who was originally presented to her and offer that child for adoption, leaving her with only Kristina.

Mother reported that all of her pregnancy terminations were during the first trimester and she always signed consent forms to allow research, including embryo transplantation. She hoped that "some of my embryos have been adopted." When asked by the department worker if she thought that any of her aborted fetuses had somehow developed into viable pregnancies and resulted in live birth, mother said she did not know, but that the consents she signed listed

embryo transplantation as a possibility, and so she believes this may have happened.

In December 2002, mother engaged in a court-ordered psychological evaluation with a neuropsychologist, Dr. Diana Badillo-Martinez. Badillo-Martinez recommended a comprehensive neurological evaluation and individual counseling for mother to gain insight into mother's behaviors, such as her statements to others that do not convey her intended meaning. Badillo-Martinez also indicated that mother's impulse control, capacity to plan and ability to delay gratification also needed to be addressed. Mother refused to participate in a comprehensive neurological exam.

The maternal grandparents were offered by mother as a placement resource for Kristina, and later considered as a resource for Joseph. The department investigated these grandparents, but determined that they had no recognition of their daughter's mental health issues and therefore, did not constitute a safe placement resource for the children. The department offered the grandparents visits from the inception of Kristina's case, but they chose not to visit her for the first thirteen months of her life. Mother indicated that the maternal grandmother was too angry with the department to visit. The maternal grandmother later demonstrated inappropriate behavior in the presence of Kristina and Joseph during some visits. Consequently, mother had no realistic family supports during the months after Kristina's birth. No one other than the department was encouraging her to comply with the court's requirements for reunification.

During visits with Kristina observed by Kathy Dayner, the assigned department worker, mother frequently insisted she detected illnesses and the need for medication for Kristina despite the lack of any observable symptoms. Mother showed an ongoing reluctance to

feed Kristina until she was a toddler. Mother would withhold the bottle or food and not let Kristina finish what she was eating. An ongoing theme in play or when reading stories was mother's presentation of frightening themes to the child, such as telling her things that would hurt her and how she should be afraid of them. During one visit in 2003, mother stated to the department worker and Kristina's father, "Her crying bothers you a lot more than it does me. I love to hear her cry. I love it. Crying is good for her. My mother told me that." During another visit on February 6, 2003, when Kristina was just three months old, mother said to the baby, "Yes, you're crying because of me. I had to wake you up because I love you so much."

Kristina's pediatrician, Dr. Karen Dettmer, reported that mother was argumentative with the doctor's staff, insisting that her daughter's temperature be taken at every visit, even though the appointments were all well-child visits and the doctor explained it was not necessary.

On February 15, 2003, approximately three months after Kristina's birth, mother participated in a court-ordered psychiatric evaluation with Dr. Richard Sadler. The written report on that evaluation, dated February 15, 2003, is in evidence. (Exhibit 21.) Sadler, an expert and clinician in child and adult psychiatry, who has performed approximately 1500 forensic psychiatric evaluations for Connecticut juvenile courts, testified at trial. His evaluation consisted of a face-to-face interview with mother, who provided him with a "remarkable and often peculiarly detailed report of her sequence of employment and relationships," and a review of court records. Sadler later conducted an interactional evaluation of mother and Kristina and provided a written report dated September 27, 2003. (Exhibit 22.)

Sadler was careful to review with mother the records provided to him because he wanted to insure their accuracy. He found that mother did not adequately address the reports, such as those from the nurses at St. Mary's Hospital, and that mother's own explanations for her behavior were not plausible or reasonable. During the interview, Sadler reiterated to mother, "There were five different people, some of them not connected with each other, who misunderstood you in dramatic ways." Mother replied, "That's why I said it that way. I wanted to see how they heard it, and I did. They could have said something to me. Just 'cause something doesn't sound right, doesn't mean you separate a mother and a child." Sadler asked, "With so many different people having similar impressions of you, could it have something to do with you?" Mother stated, "No, they clearly lied."

Sadler noted that mother discounts professionals' opinions. Her opinion is what determines her actions, in spite of repeated recommendations from a wide range of professionals over a substantial period of time indicating how mother needed to address her issues.

Mother repeated her concerns to Sadler about Kristina's coughing and sneezing. She was outraged that her daughter had a cold. She contemptuously derided her daughter's pediatrician for attempting to assert that it was normal for a child to have a cold. She asserted that her daughter never would have had a cold if she had been in her own home. She said she and her boyfriend change clothes "for inside and outside" to reduce germs. "We wash our hands. We know these things. We're German, germ-free. I shouldn't be making jokes. This whole thing is nuts. I'm so mad I could kill someone. I wouldn't. That's a figure of speech. I wouldn't. If that nurse was a bug I'd stomp on it." She then demonstrated a stomping motion.

In his report dated February 15, 2003, Sadler wrote: "[The mother's] inability to accept reassurance regarding her child's health and her failures to notice her child's emotional or physical state are characteristics that are of even greater concern regarding her ability to meet Kristina's needs. These peculiar and unjustified thoughts reflect [the mother's] exceedingly fragile and exceedingly stressed perceptions that she is not capable of adequately caring for the child whom she delivered. [The mother] has frequently expressed that there is some problem with her child or that there is some physical defect in herself or her child. [The mother] has frequently contributed to a distressed state in her child. *She has suggested dangerous or even potentially lethal interventions for Kristina.* These each indicate a pervasive discomfort with her child, her role as a mother and a disruption in the mother-child relationship.

"The descriptions of [the mother's] care of her infant during her frequent visits suggests a consistent pattern of her misunderstanding and mishandling her infant in a manner which strongly suggests a lack of empathy, lack of understanding, failure to accept instruction, and a denial of the overt state of her infant. No suggestion that [the mother] has learned more appropriate parenting techniques, has formed a better understanding of or has developed any indications of an improving relationship with her child was presented. As [the mother] has moved from the acute distress and discomfort of the immediate post-partum period into her current physically settled and apparently emotionally settled state, she has demonstrated no better ability to care for or even to identify correctly her child's most simple and basic needs. . . .

"[The mother] is quite clear and comfortable with her persistent assessment that she has no emotional problem, no personality problem, no interpersonal

problem and no need for psychiatric treatment. [The mother] has perceived herself as interacting with others who, for their own pathological reasons, have distorted the truth and caused her trouble through no fault of her own. [The mother] has no awareness that her own functioning has in any way impaired her ability to parent her child. She has no recognition of the impairments which have been described regarding her own functioning and her childcare. . . .

"Because of her psychiatric condition, [the mother] has a serious deficit in her ability to understand and empathize with another person. [The mother], on the basis of this evaluation, would not be predicted to be able to reliably care for a child. [The mother] has demonstrated no ability to alter her behaviors with or without understanding the reason, in order to become a more comfortable, effective, or understanding caretaker for her child. In my opinion, the prognosis for [the mother] to develop abilities in the future that she has shown no indication of beginning to develop after extended efforts is exceedingly poor. [The mother] has demonstrated a many years long pattern of disputing professional opinions and showing no discomfort regarding the accuracy of her own medical diagnoses even when disputed by a physician."

On September 27, 2003, Sadler observed a visit between Kristina and the mother. He concluded that mother "has continued to show serious impairments in the parent-child relationship," and that he had "great concern as to [the mother's] ability to resolve these parenting deficits." Sadler wrote: "In the context of my previous psychiatric evaluation of [mother], and my observation of the parent-child interaction one year following the child's removal from her mother's care, I remain quite concerned regarding [mother's] ability to adequately provide for Kristina's needs. In my opinion,

there is a persistent theme demonstrated of an emotional distance between the mother and her child that cannot be simply attributed to the enforced separation of mother and child over the past year. . . . Kristina interacted with her mother in a manner quite similar to the other toys . . . [mother] did not distinguish herself beyond being the most interesting and complex toy in the room. . . . [Mother] did not offer the reciprocal acknowledgment of her daughter's activities that are crucial to the development of, particularly at Kristina's current age, a secure sense of self and a secure sense of being reliably cared for, protected and recognized by her mother. Perfect nutrition, perfect hygiene, an appropriate schedule but without an experience of mirrored and reciprocated acknowledgment of the infant's emotions and personal responses would result, eventually, in an emotionally damaged youth and adult."

Sadler diagnosed mother with a schizotypal personality disorder: "[A] consistent, chronic, stable and functionally impairing style of interaction that is demonstrated across multiple areas of functioning that has persisted throughout adolescence into adulthood. This disorder was characterized by unusual, disjointed, peculiar but not psychotic distortions of thinking, understanding and interpersonal relationships."

In his evaluation, Sadler concluded that mother was unable to meet, even in a minimally adequate way, Kristina's needs. She had not begun to show parental competence. He opined that there was no need for further assessments of mother's condition because treatment of an unacknowledged personality disorder was difficult, and mother had demonstrated no ability to change her functioning on the basis of reasoning, advice, counseling, coaching or even the threat of the loss of a job or the loss of her child. He did not believe medication would provide any significant benefit to mother and that her impairments revealed a consistent and persistent

disability that was not abating as mother moved further from the post-partum period. Sadler recommended that prior to a reunification of mother and child, mother would need to demonstrate an adequate understanding of the difficulties previously demonstrated by her and demonstrate a functional ability to provide more coherent, consistent, empathic and effective childcare. Even during the very limited periods of time that mother had been asked to care for the child, she had not begun to show such competence.

At trial, Sadler testified, similarly, that a personality disorder is a relatively fixed, stable condition, a characteristic way of interacting with the world in a variety of different settings that is dysfunctional. Mother, he testified, fits this diagnosis because she has a long history of difficulties in her relationships and problems with achieving intimacy. She misinterprets relatively trivial events in a major way and responds with odd behaviors. Sadler indicated persons with personality disorders are difficult to treat because they often do not recognize their impairment. Medication is not usually helpful, although sometimes it can help, and could be worth trying. Such persons will insist they are just fine, and don't know what the trouble with other people is.

Sadler recommended that mother receive psychotherapy by someone completely knowledgeable of her history in order to assist mother in potentially gaining insight into why other people perceive her behaviors as concerning. During his testimony, he disagreed with other experts' opinions, rendered subsequent to his, that mother's attention deficit hyperactivity disorder (ADHD) was at the core of her problems, or that treating it would significantly improve her personality disorder. Sadler did not believe that the tumor surgically removed when mother was age sixteen contributed to the development of her mental disorder. He opined that mother could not reliably care for a child and the prognosis

for improving her often frightening behaviors was poor. He noted that if mother were free to implement some of her bizarre ideas regarding childcare, it would be harmful to the child. She would propose and insist on interventions that could be harmful and she would refuse to accept objections or suggestions from medical providers. For example, mother was detecting symptoms when no one else observed them. Sadler concluded his testimony by indicating that his prior opinion that mother's prognosis was "exceedingly poor" in 2003 would be reinforced if mother still had not recognized her impairments and addressed them.

One week after Sadler's evaluation of mother, on October 4, 2003, mother wrote a letter to then Governor Rowland, alleging that "legalized kidnapping was taking place" in Connecticut, and referring to a "chain of conspiracy." She stated that she intended to take "federal crime solving action." At about this time, mother also contacted the Waterbury police department to complain that the St. Mary's Hospital nurses lied about her mental condition at the time of Kristina's birth, causing Kristina's removal.

On March 1, 2004, mother was observed to be, and admitted to, videotaping Kristina's foster home. She told the department worker that she sat in her car across the street watching the foster home every Thursday. She claimed she was only doing it to have pictures for "Krissy's scrapbook."

The trial on Kristina's neglect petition, consolidated with the mother's motion to vacate the OTC, did not finish until nearly a year and a half after the date of the child's removal. On March 15, 2004, the court, *Goldstein, J.*, adjudicated Kristina neglected and uncared for and committed her to the care and control of the department. In his oral articulation of his decision on that neglect petition, which he issued over the course

of two days on the record on April 1 and 2, 2004, Judge Goldstein fully considered Sadler's evaluation and concluded that prior to any reunification, the mother must demonstrate an understanding of her past difficulties and demonstrate a much higher level of child care abilities. He denied mother's motion to vacate the OTC. He also issued specific steps for mother, including an increase in the number of her visits and individual therapy. He ordered an evaluation of her narcolepsy and a parent aide. See *In re Kristina H.*, Superior Court, judicial district of Litchfield, Juvenile Matters at Torrington, Docket No. L15-CP02-007724A (April 1 and April 2, 2004) (*Goldstein, J.*).

Although the department referred mother to multiple resources and providers from November 2002 until the trial on the termination petition in January 2007 regarding Kristina, mother did not successfully engage in individual counseling. As predicted by Sadler, because of her personality disorder, she was resistant to therapy. Counseling services for mother were recommended by Dr. Diane Badillo-Martinez, a psychologist, following her court-ordered evaluation of mother in December 2002. The department referred mother to multiple resources for counseling, including Family Services of Greater Waterbury, Northwest Center for Families and Mental Health, Catholic Family Services and Wheeler Clinic, but she failed to benefit from any of these services.

After Kristina's commitment in March 2004, mother was referred to Dr. Heather Toll, an individual therapist. Toll told the department in September 2004 that mother was unwilling to follow clinical recommendations Toll had made, specifically the use of psychotropic medication. Toll stated that mother has difficulty comprehending the world and "fills in the blanks herself, which is how she gets herself in trouble." Toll indicated she had worked hard to have mother accept the idea of using

medication, because mother cannot improve her functioning without anti-psychotic medicines, but mother had become resolute in her refusal to consider the idea. Toll felt mother's refusal reflected her paranoia and poor judgment. Mother stopped seeing Toll in April 2005 when Toll went on personal leave. Mother told the department that it was she who wanted to use medication once reviewed by a psychiatrist. She also stated, "How much longer do I have to see Dr. Toll? All I do is sit and talk to her about the weather. I could do that with Joe." Mother felt Toll was not helping her. She did not maintain treatment with the next provider recommended to her, the Family Intervention Center, and was discharged for lack of attendance in November 2005. She also failed to cooperate with medication management services with Dr. Marie DiTomasso at the Family Intervention Center.

On August 3, 2004, mother participated in a court-ordered sleep study evaluation at the University of Connecticut by Dr. Daniel McNally, Director of the Sleep Disorder Center. The department paid for this study. McNally's reports, dated July 2 and November 23, 2004, diagnosing mother with narcolepsy, are in evidence. (Exhibits 52 and 53.)

During this evaluation, mother described sleeping about twelve hours per day. She also described sleepiness coming every few hours throughout the course of the day. She awakens typically between 9 and 11 a.m. and feels tired immediately upon awakening. Other concerning symptoms, which began when mother was approximately thirty years old, were persuasive episodes of cataplexy triggered by laughter or eating, including some buckling of the knees, blurred vision and full-fledged collapse. McNally reported that narcolepsy is a lifelong disorder. Although individuals with narcolepsy often learn to cope better with their disease as they grow older and become used to it, McNally

opined that the disease does not spontaneously remit. Narcolepsy includes excessive daytime sleepiness, often in dramatic sleep attacks which may be of short duration but nonetheless interfere with activities throughout the day. It also often includes other phenomena such as sudden attacks of muscle weakness that are cataplexy, paralysis going into or emerging from sleep, or dream content intruding into the waking state.

McNally concluded that his findings on the combination of studies on mother were unequivocal in providing a diagnosis of narcolepsy. Mother's severe narcolepsy can occur in many settings where it makes the activities of daily personal life or business life difficult. Individuals with narcolepsy have difficulty maintaining alertness and activities such as driving to school or work. McNally noted that activities that require strict attention can be dangerous for an untreated patient, but narcolepsy symptoms can be controlled with treatment and patients can lead a normal life. McNally indicated mother requires a treatment program that includes aspects of education, medication, driving restrictions and sleep/nap routines. Mother needed to understand that she has this illness, and her behavior can be improved if she pays attention to good habits and consistent use of medication. Mother required a strictly maintained schedule of sleep and awake times, a consistent schedule of physical activities and exercise, and care that potentially hazardous activities are not performed during times when she may be less alert. It is very important that a medication regimen be worked out with a physician experienced in this area, and that the patient be committed to following through with that physician to accurately report the good and bad features of the medications used, comply with the other behavioral therapies proposed, and accurately convey sleepiness and other symptoms. The patient must willingly participate in finding the best regimen networks for

her. The patient needs to understand that there will not be a cure, but that the ability to function and enjoy life can be regained.

Mother told the department that McNally referred her to a local physician for specific treatment and continuing care related to the narcolepsy. He recommended she see Dr. Polnitsky, a respiratory physician in Waterbury. Mother saw Polnitsky, but indicated she preferred to have her chosen psychiatrist, Dr. Jeremy August, follow her narcolepsy treatment. Both doctors told her she would need to begin to regulate her sleep by taking one twenty-minute nap per day. She repeatedly told the department that was "impossible" for her to do. She also was told to go to sleep at night at the same time and wake up at the same time every day, but she said this was something she also could not do. Mother never followed the medical recommendations for treatment of her narcolepsy, despite continuing to be at risk for incidents like her 1995 automobile accident as a result of her falling asleep, her need for income and the difficulties she always had in many aspects of life with getting up and getting to work, appointments and visits with her children on time. Mother was prescribed narcolepsy medication, Provigil, but she did not take it consistently and refused to provide the department with a release so it could determine the proper way of taking Provigil. There is no evidence that mother has since received or is currently receiving any treatment for her narcolepsy with a medical professional. She thinks she treats her condition adequately with caffeine or the "natural way."

On November 17, 2004, mother engaged in a psychiatric evaluation with Dr. August, who reported: "I personally think that Karin would benefit from psychotherapy, but she was reluctant to do so because she did not want to be labeled as being a 'mental case,' and said

'it was hard enough to be taken seriously, without every-one thinking you're weird and seeing a psychiatrist.' "

In December 2004, mother told the department she had been prescribed medication by August that would help her trust others. However, she could not recall the name of the medication, which was Abilify, a classified antipsychotic drug. Despite stating she is unhappy most of the time and wanted medication to help with those feelings, she only took the drug for about one week. Mother indicated she believed August prescribed an atypical medication, rather than an anti-depressant because of money. In January 2006, Dr. Logan L. Green, after conducting a neuropsychological evaluation of mother, noted in his report, (Exhibit 27), that August, "although disagreeing with a Cluster Z Axis II [personality disorder] diagnosis, offered [mother] medication that has often been found to be useful in patients with . . . diagnoses . . . that involve schizotypal and para-noid presentations." August stopped seeing mother in December 2004, as he was no longer willing to accept her state medical insurance.

For a number of years prior to the birth of Kristina and thereafter, through to the conclusion of the trial on the termination of parental rights petition for her daughter in January 2007, mother did not maintain steady employment and was often unemployed. Her interpersonal difficulties and her sleep disorder often affected her work. She also did not have her own residence. At various times, she resided with her parents, with Kristina's father, or with Joseph W., the father of Joseph and Daniel. She clearly became involved in a serious relationship with father sometime in 2004. In April 2005, the month Kristina's termination of parental rights petition was filed, and just three months before Joseph was born, mother was staying at father's home. In violation of her specific step in Kristina's case to keep her whereabouts known to the department,

mother refused to provide father's address to the department before Joseph was born.

Between February and June 2005, mother was obviously pregnant with Joseph, but she refused to confirm the pregnancy to the department and consistently denied she was pregnant. She finally admitted it to social worker Dayner when she could no longer conceal the obvious. On May 24, 2005, mother told Dr. Maria D. Tomasso, a psychiatrist at the Waterbury Family Intervention Center, that she had been in her new relationship with father for about a year and her plans were to buy a house and have another child with him. On June 28, 2005, Dr. Cynthia Ronan, mother's obstetrician, confirmed that mother was pregnant with a due date of July 8, 2005. Ronan reported to the department that mother had cancelled two previously scheduled caesarian sections for June 24 and June 27, 2005, at the Griffin Hospital in Derby. Ronan also reported that mother told her on June 27, 2005, that she was canceling her second appointment because she couldn't take it anymore and was planning to pack her bags and head west. Mother indicated she would have the baby along the way. Ronan indicated that mother stated she did not want to have the baby, but was unable to terminate the pregnancy because she had been too far along. Ronan disclosed that mother told Ronan's office staff that Kristina was in her custody, but that her daughter was not her biological child, as the hospital had switched babies at Kristina's birth. Ronan expressed serious concerns for the safety of the unborn child due to mother's mental health. Ronan also indicated that father, Joseph W., had attended prenatal appointments with mother. Ronan described him as "unstable as Karin." Father once declined to listen to the fetal heartbeat because he felt it was "too intimate."

In an attempt to avoid department involvement when their expected child was born, mother and father left

Connecticut against medical advice when mother, then thirty-eight years old with a history of high risk pregnancy factors, including edema and high blood pressure, was thirty-nine weeks pregnant and past her scheduled delivery date. Her caesarian sections were cancelled a week earlier. The couple traveled around the country for approximately three weeks, driving father's twenty year old car, with no established plans for medical care, employment, housing or delivery of the child. On July 2, 2005, the department was informed by Griffin Hospital in Derby that mother was in Indianapolis, Indiana and had requested her medical records be sent to Wishard Health Services (Wishard).

On July 5, 2005, Ronan confirmed to the department that mother's medical records were sent to Wishard. Sabrina Quigley, a social worker at Wishard, confirmed to the department that mother attended a prenatal appointment on July 2, 2005, but failed to return for a second prenatal appointment scheduled for July 8, 2005. Quigley described mother's presentation as "bizarre." Mother gave birth to Joseph on July 18, 2005, in Scranton, Pennsylvania, while the couple was attempting to pass through that state. Joseph was born at forty-two weeks gestation.

On July 20, 2005, Lisa Kanavy from Child Protective Services in Lackawanna County, Pennsylvania, contacted the department, indicating that her agency had received a referral from Moses Taylor Hospital with respect to mother and the birth of a baby boy on July 18. A fetal heartbeat was not detectable just prior to the delivery. Father was present with mother at the hospital. Mother was reported as presenting as "bizarre." Both parents were providing vague and inaccurate information with respect to their residency and plan for care of the child. Both parents had misinformed the Pennsylvania authorities that they were living in

Waterbury. At that time, father maintained a condominium in Waterbury, but Dayner already had ascertained that it did not appear to have been occupied for quite some time. Mother had no other known residence of her own in Waterbury. On July 21, 2005, a hospital social worker reported to the department that mother was "as bizarre as ever." Mother had provided inaccurate information with respect to her financial status and housing situation, indicating she was building a mansion in Alabama and had secured a pediatrician in that state. Both parents claimed they had traveled to Alabama after leaving Connecticut. Hospital nursing staff contacted the named pediatrician in Alabama, who had no knowledge of the parents.

Joseph was removed from the custody of mother and father by Pennsylvania authorities, who did not want to maintain jurisdiction, as the parents were Connecticut residents. On July 21, 2005, the State of Pennsylvania secured an emergency protective custody order for Joseph from a Pennsylvania court, which indicated that custody of the child would be assumed by the State of Connecticut once a custody order was secured from a Connecticut court. On July 21, 2005, the department filed a motion for temporary custody and a neglect petition for Joseph in the Superior Court for Juvenile Matters at Torrington. On July 21, 2005, the Torrington court granted the OTC and Joseph was placed in a department-licensed foster home following his transfer from Pennsylvania authorities.

When mother was asked by the department what her plans had been regarding living out of state after delivering Joseph, she indicated her intended plan was to live in Alabama with father and the baby. Later on, in 2007, she told Coutant Skinner, her parenting program coordinator, that she was having difficulty saving for her own apartment, and would rather move in with father as they had planned before the department

became involved with Joseph. She was asked if her plan was to leave Kristina in Connecticut and have no further involvement with her daughter. She indicated that she would have commuted to Connecticut weekly for visits with Kristina, driving herself while father stayed in Alabama with baby Joseph, despite previously indicating she was advised not to drive for longer than twenty minutes at a time due to her narcolepsy.

The parents were back in Connecticut by July 22, 2005. Dayner attempted to interview mother and father on July 21, 2005, but father refused to speak to her, even to provide minimal information like an address or contact phone numbers, and he also attempted to prevent mother from talking. At the preliminary OTC hearing on July 26, 2005, both parents entered pro forma denials to the allegations in Joseph's neglect petition and requested a contested OTC hearing. A contested hearing took place on August 5, 2005, and the court, *Taylor, J.*, sustained the OTC, finding that returning Joseph to the care of the parents would place him in imminent danger of physical harm.

Preliminary specific steps for Joseph were issued for mother and father by the Torrington juvenile court on August 17, 2005. Both of them entered their signatures on the specific steps form, below an advisement that provides: "As the above-named respondent, I hereby agree to cooperate with the above conditions approved and ordered by the court and recognize that noncompliance with these steps results in modification of the existing order or disposition. I acknowledge that failure to achieve these specific steps will increase the chance that a petition may be filed to terminate my parental rights permanently so that my child may be placed in adoption. . . ."

Mother probably didn't need this sobering reminder; the termination petition for Kristina had been filed on

April 30, 2005. After Joseph's birth, despite mother's lack of progress with the specific steps set for Kristina, the department began to make reasonable efforts toward reunification for mother and father with Joseph.

After Joseph's removal, mother stated that father could be reached through the answering machine she had in a room at her parents' house. The department asked father how he could be reached directly, but he would not respond. Mother responded for him, saying calls and letters were to go to her parents' home. She stated that she called in to the machine to get her messages, an indication that she was not always staying at her parents' home at that time. Mother's parents stated to the department that their daughter was going to marry father and that they had purchased a home together. The home they referred to is described in the department records as a duplex with three separate apartments in Thomaston. Father lived in one area, and his grandmother and mother in the other two. Father and his mother jointly owned the building. Department personnel indicated in January 2006 that it was known that mother continued to reside in father's home in Thomaston, as her vehicle was observed on a daily basis, both in the early morning as well as during the night, parked in the driveway of the Thomaston home. There was no direct or immediately reliable way to contact either mother or father.

After Joseph's birth, mother and father were provided with two, two-hour visits weekly, supervised at the department office in Torrington. Supervision was either by case aides Evelyn Bodor or Carl Hoyt. Dayner also would supervise in the event either case aide was unavailable. All department staff supervising the visits observed that mother continued to behave inappropriately, as she had during Kristina's visits. She was observed to hold the bottle in Joseph's mouth tipped, so that no formula was in the nipple and available to

the baby. Father was observed to tilt the bottle so that the formula would enter the nipple, only to have mother tip it back again and make the formula unavailable. This happened repeatedly, with mother eventually saying she was "trying to stimulate the roof of his mouth with the nipple." Father would stop intervening and never fully attempted to correct this odd behavior, which could easily frustrate and upset any baby. For several visits, father refused to speak openly with mother, communicating with her by hand signals and whispering in her ear. For the first few visits, he did not speak even to Joseph, and had to be advised that he needed to speak to his child during visits. He then spoke in an inaudible voice the majority of the time. The couple often was observed arguing about matters pertaining to the care of the baby or whether to leave the door to the visitation room open or shut. Mother would frequently roll her eyes and make loud sounds of exasperation after father whispered something to her or gave her a hand signal.

On January 12, 2006, when the weather was mild, mother stated the baby needed a hat on as she "always needed a hat when I was his age. I used to take my blanket and tie it around my head like a turban." Clearly, tying a blanket around one's head cannot be done by a six month old child. At the end of this same visit, she told the case aide to be sure not to put a hat on Joseph's head because "it makes him sweat." During this same visit, mother stated that the baby was dehydrated "and needed electrolytes." She also stated the baby had diarrhea, but he did not.

Mother's odd behaviors also included saying the baby was "not really sleeping. He's just pretend sleeping. I know. Nobody knows babies like I do." This took place on January 13, 2006, when the baby arrived sleeping and mother wanted to pick him up. Father said the child was sleeping. Mother stated that, "Babies don't

really sleep in car seats. He's pretending." On January 13, 2006, she also indicated the baby was "constipated." He was not. Similar attributions of nonexistent health problems by mother had occurred when she visited Kristina. During that same visit, the baby was observed to repeatedly push the bottle out of his mouth. The parents stated he needed to burp. Mother put the bottle back in his mouth, saying the liquid going down his throat would help him burp.

Mother would frequently state, "I smell urine. I smell a very wet diaper." She would ask father to put his nose to the baby's diaper area to smell. He did this, but did nothing afterwards. Mother consistently took the items for a change of diaper out of the diaper bag, moved them from one hand to the other, and then put them back in the bag, never changing the baby. Father would change the diaper every time, with mother sitting in the chair and giving instructions. Mother was repeatedly observed to reach out and touch the baby's penis while father was changing the diaper. She would then give father further instructions.

Mother was observed putting the bottle in and out of the baby's mouth, often saying he needed to burp as a reason for removing it, but then she would make no effort to burp the baby. She also described normal leg movements by the baby as a sign he was "itchy." Mother was observed as being unable to hold the baby in an appropriate, secure hold. He often slipped down the front of her body whether she was standing or sitting. Mother also would position toys away from the baby's reach and not allow him to touch or explore the toy. She frequently took a "Hokey Pokey Elmo" toy she brought to visits and put it at various spots in the room and told the baby to look at the toy. Joseph would get excited, kick his legs and reach out toward the toy. Neither mother nor father would give him the toy. When Joseph became old enough to explore and reach for

toys, grab them and put them in his mouth, mother prevented this, saying he should never have anything in his mouth.

Mother and father would attempt to sit in the dark with Joseph when he fell asleep during visitation. Mother was heard to say she could see Dayner behind the observation mirror where staff sat, when the lights were off. The couple was observed to display inappropriate behavior with the lights off, with father picking up mother's hair off her neck and putting his nose and lips to her ear. He was observed to put his tongue in her ear, with mother giggling and reacting as if she was tickled. The couple had to be told that visits were not to be conducted in the dark. Afterwards, if Joseph fell asleep, they would hold a book over his face, ostensibly to shield him from the light in the room, which did not appear to distress the sleeping child.

On January 12, 2006, with the lights on, father lifted mother's hair and put his mouth to her ear. The couple then began prolonged kissing. Father also was observed placing two chairs together, facing each other. He sat in one and mother sat in the other holding Joseph. Father put each of his hands on mother's knees and began squeezing her at intervals up her thighs, ending at the top of her thighs where he kept both of his hands. The couple would share prolonged kisses and rub each other's legs or backs during visits. Father also had been observed to squeeze mother's midsection, moving his hand around. He appeared so overcome with emotion on one occasion he knelt down and vigorously reached over and locked his arms around mother's thighs, putting his face up to her thighs, and kept his face there for an extended period of time. During this intimate moment, which department staff were observing, baby Joseph was laying on a table directly adjacent to both of them.

Danyer noted that mother "repeatedly demonstrated parenting deficits during visits that involved a refusal or reluctance to feed her children, an inability to provide basic childcare such as diaper changing or dressing, verbalized misperceptions of the children's health and the need for medications and repeated statements during her interactions with her children that frightened them."

On July 19, 2006, Dayner observed an incident where Joseph was injured when mother attempted to place him in an inflatable chair she brought to the visit. Father was present. Neither parent held onto the child, who rolled off the chair and slammed his head into a door. Placement of Joseph on the chair and the movement it had most resembled sitting him on top of a fully-inflated beach ball. Joseph received a large bruise with swelling on his forehead. Dayner found an ice pack and instructed father to hold it against Joseph's head as much as he could. Mother went to the restroom and wet a paper towel with water and told father to use the wet paper towel instead of the ice pack. Dayner suggested the ice pack was more appropriate. Mother disputed this. When Dayner attempted to address the situation so it would not reoccur, mother became belligerent and attempted to physically remove the worker from the room. Her behavior escalated to the point she had to be asked to leave. She would not comply and a security guard was called. She refused the guard's request to leave the building and the police had to be called. She told the police she wanted them to "document [Dayner's] craziness." Mother continued to lack any insight into the harmful nature of her behaviors, and when attempts were made to address concerns with her, she would claim she never said or did any of the observed behaviors.

Despite numerous prior assessments and evaluations of mother's mental health issues, the department continued to seek further advice on the nature of treatment

that would best address mother's disorder and her reluctance to obtain treatment.

On August 1 and August 12, 2005, mother participated in a psychological evaluation with Dr. Deborah Gruen, Ph.D. Gruen recommended that mother aggressively manage and treat her narcolepsy with medication and sleep regulation and that mother's compliance with treatment should be monitored. Like Sadler, Gruen also diagnosed mother with schizotypal personality features.

On August 3, 2005, mother engaged in another psychiatric evaluation with Dr. David A. Krulee, M.D. Krulee diagnosed mother with Axis I recurrent and severe major depression, with a history of mood-incongruent psychotic features, exacerbated post-partum, currently in partial to full remission. His treatment recommendations are not in evidence.

Dr. Logan L. Green, a neuropsychologist, also conducted a court-ordered evaluation of mother. Green's report, dated January 6, 2006, is in evidence (Exhibit 27), and he testified at trial. Green reviewed the Badillo-Martinez, Sadler, Krulee, and Gruen evaluations, a psychiatric note from August, and the McNally sleep study data. Green noted that Badillo-Martinez had spoken with mother's parents, who told her that mother's behaviors did not change significantly following her brain tumor surgery, but instead, had changed before the surgery occurred. Green reviewed mother's social and medical history with her, notable for her self-serving statement that she "had narcolepsy, but not now," when Dr. McNally had indicated it is a lifelong illness.

Green performed a comprehensive battery of neuropsychological tests on mother that allowed for an in-depth understanding of mother's functioning. Such tests were not performed by any of the other previous or subsequent evaluators. Green concluded that: "The

results on this battery of tests as well as her results on the adjunctive neuropsychological instruments that were administered indicated that the likelihood of a brain dysfunction affecting behavior is very high. There was some evidence of right temporal involvement, but insufficient to result in neuropsychological difficulties. None of the localization scales reached significance. On the other hand, a review of her educational history combined with the results of the CPT are strongly indicative of a neuropsychological diagnosis of attention deficit/hyperactivity disorder (ADHD). It is likely, therefore, that the difficulties that she had in planning, judgment and impulsivity have resulted from an untreated attention disorder rather than frontal lobe dysfunction. This is not to dismiss the role of any other axial disorders in her poor judgment; rather it is only to emphasize the importance of pursuing treatment for this disorder."

At trial, in response to the court's questions, Green noted that he was not asked to conduct a standard psychological evaluation on mother, but he felt the views of other evaluators had merit, and that mother's history is also suggestive of a personality disorder. Green recommended psychoeducational and psychotherapeutic interventions for mother's ADHD, including the administration of medication. He also said it was important to address mother's narcolepsy. In his report, he concludes: "The extent of her personality dysfunction, (whether it be the Axis I form suggested by Dr. Krulee or the Axis II form suggested by the other evaluators or both), will be more amenable to treatment once her attentional difficulties have responded to treatment."

Green testified that the battery of tests he performed on mother revealed that mother's symptoms are not the result of frontal lobe dysfunction as a result of her surgery. He indicated her only neuropsychological

deficit was likely ADHD, but, because she was not completely forthcoming in describing her behavioral history to him, he would need to interview a person who knew her well in order to confirm his hypothetical diagnosis. He noted that a lot of mother's adult problems—lack of stable employment, her overreactions, her mood lability, poor social skills and temper outbursts—could be attributed to ADHD and unregulated sleep. He did not rule out, as part of his evaluation, mother also having a personality disorder and noted that some of her behaviors could be attributable to one, but the ADHD should be explored and addressed first, if necessary. He testified that when a child grows up with untreated ADHD, that child is exposed to many detrimental exigencies during life that could also cause the development of some aspects of a personality disorder. Green indicated, as Sadler had, that treating a personality disorder is an arduous task that takes a very long time, and that he did not believe mother was amenable to therapy, which she needed, because she was quite clear that everyone else had made errors and misunderstood her. Green indicated that the varying evaluations could be reconciled, and that all were in the same "ball park," with slight variations in their terms. He agreed with the other evaluators that mother required therapeutic intervention, and he recommended medication to address ADHD, if it could be confirmed with subsequent collaterals, and her personality disorder. Green noted that a parent with ADHD would exhibit carelessness, a lack of role-taking and an inability to put herself in someone else's shoes. A child raised by a parent with untreated ADHD would have emotional difficulties unless there were also a healthy parent involved who would be willing to learn what the afflicted parent's problems are and how to cope with them.[8]

---

[8] For the first time, during his testimony on December 5, 2012, Green spoke of the possible use of "motivational interviewing" being helpful if mother would attend. No such recommendation is made in his 2006 written evaluation and there is no evidence he spoke of such interviewing techniques

On January 9, 2006, the department was contacted by John Lombardi, a representative of the state Department of Social Services (DSS), who reported that mother was pregnant and due to deliver in August 2006. He was contacting the department in an effort to confirm mother's address to process her application for benefits and medical coverage. Lombardi stated that mother put her parents' address in Watertown on her application as being her residence, but every time he went to the parents' home to confirm the information, mother was never there. He said the one time he found mother there was when he made a specific, announced appointment with her. Mother refused to provide Lombardi with the name of the father of her expected child or his address. Mother told Lombardi she had two children in the department's care due to a "personal vendetta" by Dayner, whom, she said, "wants to ruin my life."

On March 8, 2006, mother's attorney, Kathleen M. O'Brien, citing a breakdown in the attorney-client relationship, was permitted to withdraw as mother's attorney.

The department continued to offer mother individual counseling, as contemplated by her specific steps. Prior to Joseph's birth, in January 2005, mother had been referred to the Family Intervention Center in Waterbury. Joseph Futschik, a social worker assigned to mother's case and the Center's president, told the department that mother made repeated appointments but failed to show up for or call to cancel half of them. She first saw their psychiatrist, Dr. Maria DiTomasso, on May 24, 2005. DiTomasso spoke with mother about

---

any earlier. However, Green could not even tell the court what "motivational interviewing" is. Steinberg, however, testified to trying, during sessions with mother, to get mother to the point where she acknowledged her need for therapy to improve her relationships with others and regain custody of her children.

her lack of attendance and her need to engage in treatment consistently. Mother did not see her failure to keep appointments as irresponsible because she had made them. The Center's assessment of mother indicated significant mental health problems, including paranoia and a delusional disorder. Mother was prescribed medications but failed to take them.

After being unsuccessfully discharged from the Family Intervention Center on November 28, 2005, the department recommended that mother enter psychotherapy with Dr. Anthony Campagna, a psychologist. Although she was offered assistance with transportation to Campagna's office, mother declined.

Mother finally made another effort at counseling services at Thomaston Counseling with Sally Guest, a licensed professional counselor, not a psychologist, beginning in approximately May 2006, only two months before Daniel's birth. Guest was not approved or recommended by the department. Mother misrepresented the facts of the children's cases to Guest, claiming that the unethical, misguided actions of the nurses at St. Mary's Hospital, who wished to cause her harm, were the reason for her involvement with the department. Mother also misrepresented her social history to Guest, and such a misrepresentation can have a significant impact on assessment and prescribed treatment. When told the actual facts of mother's background by the department, Guest stated, "I guess she really told me a big story." Guest told the department that mother behaves "like a person who's had a lobotomy." Despite mother's provision of several releases so that the department could communicate with Guest, the counselor at first refused to give the department any information on her therapeutic plan or goals for mother. She indicated that the only record that existed was her handwritten notes, "that go all over the place because [mother] told me this and then she told me that. It was hard to keep track and

no one would be able to make any sense out of them." Guest indicated that she did not believe she had to show the department her notes. The court had to order Guest subpoenaed to court to obtain information on mother's level of participation and progress.

Guest referred mother to an advanced practice registered nurse (APRN) at Thomaston Counseling for medication review, as recommended in Dr. Green's court-ordered psychological evaluation. Green's evaluation was provided to Guest to assist in her treatment of mother. Mother saw the nurse practitioner on September 2, 2006. When asked by the department worker on September 5, 2006, about the outcome of the appointment, mother stated that the nurse practitioner told her she did not "have the proper credentials to treat me." Guest confirmed this to the department on September 7, 2006, and stated that mother needed to be seen by a psychiatrist. Guest was asked by Dayner why she referred mother to a nurse practitioner, and Guest indicated none of the three psychiatrists she wanted to recommend to mother were available. Guest never did refer mother to a psychiatrist. After a hearing on November 15, 2006, Judge Goldstein ordered that Guest no longer serve as mother's mental health treatment provider.

Associated Women's Health, mother's obstetrical provider for Daniel, reported to the department that the practice had concerns about mother's emotional attitude toward her pregnancy. A representative of the practice stated that the group always had at least two staff members in the examination room with mother due to concerns that she would later misrepresent what took place. Father did not attend a single prenatal appointment. Mother told her physician that she needed to reschedule her caesarean section, which was to take place on July 20, 2006, as she had to go to court that day to have her two older children returned to her care.

There is no record of a scheduled court appearance for July 20, 2006, and there was certainly no plan to return Joseph or Kristina to her care at that time.

On June 19, 2006, one month before Daniel's birth, mother filed a motion for a supplemental evaluation by Dr. Stephen Humphrey, who previously had evaluated only father, in which she alleges that she and father are a couple, plan to marry and are expecting a second child. Mother gave birth to Daniel on July 20, 2006, at Waterbury Hospital. Daniel was placed under a ninety-six hour administrative hold that same day and placed in his current foster home on July 23, 2006. An ex parte motion for an OTC was granted by the court, *Trombley*, *J.*, on July 24, 2006. At the preliminary ten day hearing on Daniel's OTC, on August 2, 2006, mother and father requested an evidentiary hearing. The hearing was referred to the child protection session at Middletown. However, on the date of the scheduled hearing, August 11, 2006, both parents agreed to sustain the temporary custody order which was based on a finding that Daniel would be in immediate physical danger from his surroundings if he were to be discharged to their care. In proposed preliminary specific steps, it was indicated to the court, *Bear*, *J.*, that mother would address issues identified in previous evaluations, including her narcolepsy and ADHD, and would cooperate with medical management of any such conditions. Father would get individual counseling to understand mother's and his own mental health issues. Both parents at this time were living together, but they now agreed to establish separate residences. Mother was not to spend any nights at father's residence. Father also agreed to allow the department and other providers access to his residence and to more effectively communicate with the department concerning his children. Both parents signed these preliminary steps. Both mother and father also agreed to further psychological evaluation by Dr.

Stephen M. Humphrey. The parties also agreed that Joseph's and Daniel's cases, for all future purposes, would be consolidated.

Dr. Humphrey, a licensed clinical psychologist, evaluated mother on September 26, 2006. He also testified at trial. Humphrey interviewed mother extensively, and she relayed a great deal of her history to him. Humphrey asked mother if she understood why Kristina had been removed from her care. She said she was "baffled," and claimed allegations made against her were lies. Mother stated she has never had mental health problems and disputed claims that she had a distorted sense of reality.

Mother described her relationship with father. They met in 2003. Father was a customer at a gas station where mother worked. She said he would talk to her about his life and his BMX bicycle races, and she recalled that he was nice and always happy. Mother denied any history of domestic violence with father, and stated that claims that they were yelling at each other in the hospital were inaccurate, claiming they were just upset about the whole thing. At the time of Humphrey's interview, mother denied living with father, but stated she had a right to stay at her boyfriend's house without it being considered her residence. She indicated that after the court hearing on Daniel's OTC on August 11, 2006, she was told she had to establish a separate residence. However, she admitted that she still was staying at father's home, although she understood she was not to be there between 10 p.m. and 8 a.m., as required by her specific steps. It is clear from discussions mother had with Humphrey that until after the birth of Daniel, mother spent a great deal of time in father's family home. She told Humphrey that father's grandmother lived in one part of the house, father's mother lived in the middle and she and father were in the top section. They had planned to fix up the top section for the two of them, but now that they were

considering renting out the top floor, "now that DCF does not want us together." Mother said she initially thought she and father would eventually own the house.

Mother told Humphrey that she didn't think that the then-pending termination of parental rights petition regarding Kristina was right because she had done everything asked of her. She stated, "This is just a created situation. If I have something wrong with me, I'd like to know myself, but I've never had any problems in my life, until I had my baby—then DCF came into my life." Mother untruthfully told Humphrey she had been willing to comply with medication management, but none of the doctors wanted to give her any medication.

Mother described for Humphrey her experience at age sixteen regarding her frontal lobe issues. After the tumor was removed, she denied noticing any cognitive changes following the operation. Humphrey asked mother about her narcolepsy. Mother said she is not a morning person, so she often did not go to school. She said the only reason she was diagnosed with narcolepsy is that if she puts her head down, she falls asleep in two minutes.

When Humphrey asked about her numerous miscarriages and abortions, mother indicated she was not sure how many miscarriages she had, or even if she had any at all, despite previous statements she had made to department personnel and to earlier evaluators about numerous miscarriages. She did not want to go into the specific reason for her five abortions. She claimed to have taken all necessary precautions to avoid becoming pregnant, and then added: "I blame it on the man. . . . He should be able to feel the condom on him. . . . I cannot feel that. He does."

When Humphrey suggested that after two or three abortions, she might have decided her approach was

not working. Mother, who had described at least five serious romantic involvements to Humphrey, said she was "not a sexually active person," and when she did "rarely have sex," she "took responsibility."

Humphrey noted that mother did not seem depressed, and mother denied any history of depression. She stated she was always positive. She denied ever having any anxiety attacks or lingering emotional trauma related to her five abortions.

When Humphrey explored with mother why she was not taking medication that had been prescribed, why she was unsuccessfully discharged from the Family Intervention Center in November 2005, and why she had not gone to see Dr. Campagna, all indications that she was not addressing her issues, mother replied, "I've been taking care of myself a long time. I'm on top of things with everything."

Humphrey asked mother about father putting his hand over her mouth after she read his written statement and began to speak extemporaneously. She replied, "Joe wanted me to read exactly what he wrote and he didn't want me to elaborate on anything because there are misconstrued ways of writing things. He was trying to help me."

Humphrey concluded, having reviewed several of mother's past evaluations, that they contain statements by mother that suggest confabulation, replacing fact with fantasy. There is no doubt that mother proposes bizarre scenarios that are often egocentric. Although not delusional, mother is prone to a looseness of thought that results in the production and proclamation of absurd, illogical scenarios, and the failure to grasp how her statements sound to others. She then denies she said these things.

Mother's rationalization of five abortions was notable for her failure to adapt her sexual behavior, her apparent lack of traumatization, and her externalization of the blame. These suggest a superficial experience of emotion, which Humphrey believes may be attributable to the surgery mother had age sixteen in her right frontal lobe. He noted that a right hemisphere lesion, as in mother's case, also contributes to an emotional deadness and indifference toward experiences that typically result in strong emotions for most people.

Humphrey agreed with the department that therapy with Sally Guest would not benefit mother. He noted that the various past diagnoses would make it hard for mother to have any confidence in doctors, as she had nearly as many diagnoses as evaluators. He recommended that mother be given a coherent understanding of her deficits, one which would likely have to be repeated and reinforced in the context of a supportive therapeutic relationship. She had to be helped to understand the insidious nature of her cognitive deficits. Humphrey predicted mother would likely resist these explanations, but that her defensiveness might decrease if she were no longer in the position of guarding against claims that make her feel like a bad person due to her psychological difficulties.

Humphrey further opined that mother's cognitive deficits were such that he did not recommend she care for any children independently. He recommended that she not reside with the children in order to reduce the risk that she would be put in a position to care for them independently. He recommended that her access to the father's home be restricted to no more than two hours a day, and that under no circumstances should father ever leave the children alone with the mother. Humphrey did not find credible mother's insistence she was not living with father, as her comments suggested she still was living with him or at his home frequently.

Humphrey also recommended that mother and father consult together with a psychotherapist experienced in treating individuals with a history of neuropsychological deficits. Both adults required instruction as to mother's condition, and then, an opportunity to assess their understanding and integration of this knowledge. If successful to that point, they could begin to develop strategies and coping mechanisms that would minimize interpersonal conflict and provide for effective supervision for the children. Feedback from the treating professional would guide the nature of future contact between mother and her children. Humphrey concluded that the risks posed to the children by mother would be most acute in their early years, when a lapse in care or judgment would be most detrimental. He suggested that as they grew, the boys would still be exposed to peculiar or confusing statements, so he hoped that mother would benefit from structured, sensitive therapeutic intervention designed to help her understand her deficits, the effects of her condition on her emotional expression and ways to manage these issues.

Following the sustaining of the OTC regarding Daniel, the department asked mother about plans to address her psychological and medical issues. On September 7, 2006, mother stated that the day before, she had gone back to see Dr. August, who had seen her sporadically over the past four years. She indicated she wanted him to treat her for all her diagnoses, including her narcolepsy, but there is no indication that August provided any further treatment to mother at any time after 2004.

Supervised visits with Joseph and now, Daniel, continued. Concerns developed regarding the feeding of Daniel, similar to concerns that arose during mother's feeding of both Kristina and Joseph right after their births. Mother would not keep the bottle in the infant's mouth for a reasonable amount of time so the child could drink from it. She never fed Daniel more than

one or two ounces of liquid in any hour-long visit. Once, she was observed putting the bottle in and out of Daniel's mouth sixteen times in a span of three minutes. When confronted and told not to do this, mother adamantly denied what she had just done and accused department personnel of fabricating it.

In August 2006, the department referred mother to the PEAS parenting program. In 2006 and 2007, PEAS was a parent education and case management program under the auspices of the McCall Foundation. Coutant Skinner was a parent educator and supervisor in that program who was assigned to mother's case. She also testified at trial. Coutant Skinner worked with two other supervised visitation programs, the Delta-T and Northwest Center Parent Aide program. Her role was to observe some visits, instruct the parents, ensure they benefited from instruction and achieve the goals set for them. The PEAS program begins with an assessment to identify areas where parenting and other life skills can be improved. Parents are taught childhood developmental stages, appropriate expectations for children, safe care, how to establish rules, routine and structure, how to apply effective discipline, and how to meet the emotional needs of children. The program also seeks to improve the parent's functioning in other areas such as independence, budgeting and keeping appointments.

By November 28, 2006, mother was discharged for failing to return telephone calls or maintain regular contact with Coutant Skinner. Mother also missed more than three case management appointments. At the department's request, Coutant Skinner resumed services with mother on February 7, 2007.

PEAS attempted to work with mother until November 2007. Although PEAS was supposed to focus on efforts to reunify the children with father, mother attended most visits jointly with the father until August 16, 2007,

when the parents broke up and their visits started to be held independently of one another. Mother's parenting goals were largely focused on appropriate supervision of Joseph and Daniel. There were numerous occasions in which Coutant Skinner observed Joseph or Daniel wander far away from their mother at an outdoor playground, in different directions, forcing mother to make a choice about which child to run after. Coutant Skinner had to intervene in several instances to ensure that the boys were safe. Mother left the children unattended on swings and other playground equipment while she collected toys, cleaned up snacks or pursued other endeavors. When confronted about endangering her children in these situations, mother would minimize the perceived danger, but she acknowledged that she could get distracted. Suggestions about where the children could remain while she was involved with other activities were repeatedly offered to her, but mother had difficulty sustaining strategies taught to her. Strategies for communicating and disciplining the children also were discussed, modeled and prompted by Coutant Skinner. Mother did not make eye contact when making a request of her children and did not get down on their level. When Joey pushed or took a toy from another child, often a peer, mother would explain to the other child that Joey doesn't know any better because he is too little. Conversely, on several occasions, when other children hurt Joey by throwing woodchips in his eyes or a ball at his face, mother approached Joey and stated, "What have you done this time?" She made little effort to comfort him.

After the birth of Daniel, mother was frequently observed as preoccupied with Daniel and ignoring Joseph. During one joint visit, as father changed Daniel's diaper, mother was oblivious to Joseph climbing on a chair, standing up on the chair, and crawling onto a table top. Only when Joseph crawled to the point

where he touched mother with his body did she turn and realize he was on top of the table. After the parents broke up in August 2007, during her individual visits with both boys, mother would ignore Joseph, even when Daniel was sleeping and she could pay attention to Joseph. She would continue to hold Daniel and speak to him to wake him up. She told Joseph when he was thirteen months old that he was "now the big boy and you have to do things for yourself." The extent of her interaction with Joseph during her individual visits was to talk at him, directing him to do something.

Suggestions for improving communication and disciplining the children were never capably put into practice by mother. Mother had difficulty keeping her appointments for visits. On another occasion, she missed a visit with her children because she took a nap and lost track of the day and time. She refused to take responsibility for this. Once, she expressed anger with a Delta-T worker for leaving the park and not waiting for her arrival an hour beyond the time the visit was scheduled to begin.

Coutant Skinner also tried to assist mother in achieving a goal of independence by obtaining and maintaining employment, budgeting, researching housing options and attending appointments regularly. Mother did find part-time jobs at a convenience store and a McDonald's. Her whole life had become extremely stressful, as her parents constantly berated her for the loss of her children. Mother considered obtaining her own apartment, but saving enough money for that endeavor proved to be very challenging for her. She told Coutant Skinner she would rather move in with father, as they had planned before the department became involved. Typically, the PEAS program spends eight to twelve months with the family. In the cases of Joseph and Daniel, the program had gone past twelve months in hopes of seeing progress. During her testimony, Coutant Skinner

noted that mother had difficulty applying any of the concepts she was taught. Mother would never be able to spend a sufficient amount of time on basic tasks, such as feeding, because her attention would always be distracted to something else. She had a very difficult time staying organized. She did not comprehend any of the discipline strategies, which, given the ages of the children during this period, only required empathy and simple redirection. Coutant Skinner felt mother had barriers even comprehending the concepts, let alone putting them in place, and she never achieved any degree of sustainability. Coutant Skinner made the decision to discharge mother from the program in November 2007 because mother had made absolutely no progress.

Michael Harte from the Delta-T program often supervised visits between the parents and the children from December 2006 to the latter part of 2007 or early 2008. After the first few months of Harte's involvement, visits that he was to supervise with father began to take place at father's residence. A few months after the program started working with father, mother started showing up at the visits. Harte, like Coutant Skinner, testified that mother appeared to have no ability to carry out what she was directed to do, especially keeping her children safe and in close proximity to her. This remained a concern for Harte from the beginning to the end of his program's involvement. After the parents broke up, Harte worked with mother individually. At one visit, which took place in a shopping mall, one of the children ran off. Mother asked a stranger to watch her other son even though Harte was standing right there. Another time, at a park, she lost sight of one of the boys, and could not find him for five minutes. At the library, mother could not prevent the children from running around uncontrollably, and the library workers

had to ask mother to get her children back under control. Harte attempted to give mother ideas to keep the children on task, like reading books or working on a library computer. Mother was unable to implement anything suggested.

On Halloween, 2007, Harte allowed mother and father to take the children trick or treating together. The parents requested to go to a certain neighborhood. Harte drove them and agreed to extend the visit for an additional hour. Toward the end of the extended time allotted for the visit, Harte advised the parents it was time to end the trick-or-treating, but the parents ignored him and kept going to additional homes. When Harte insisted that it was time to conclude the visit, mother started to scream at him, calling him evil and stating that he had ruined the best night of her life. She told the children, "Mike is ruining mommy's Halloween and your Halloween and he's very angry right now and I don't even want him driving you, but just think about pumpkins." Harte stated that mother was out of control and the children began crying hysterically. Father turned to Harte and said he now knew what the department workers were talking about with regard to mother's behavior. Harte managed to get all of the family back to the car, but the children were crying so hard due to mother's rant that he requested that mother get out of the car. At first, she refused to exit the car. Eventually, mother and father ran off with all the candy. Neither parent made any attempt to console the crying children or apologize to Harte. When asked how her children reacted to her yelling at Harte, mother responded that they were upset because their costumes were too tight and father had taken their candy without giving them any. She did not mention her actions and clearly had no insight into the inappropriateness of her behavior.

Visits between mother and Kristina, supervised at the department office, also continued after Daniel's birth. On October 6, 2006, social worker Dayner, the assigned department worker, was informed by a case aide that mother had called the department to indicate she would be twenty minutes late for her scheduled visit. Dayner then received a phone call from the children's foster mother, Cathy S., stating she had seen mother driving on her street within a quarter of a mile of the foster home within the past ten minutes. The foster mother told Dayner she was notifying the department because she was aware of a court order barring mother from being that close to the foster home. The order had been issued after mother and father drove out to the foster home in 2004 and created a disturbance. When Dayner confronted mother with this information, mother said she had to go down the street where the foster home is located to get to the highway from her house. Dayner told her this was not accurate, as Dayner knew where her parents' home is located, and the foster home is not on the way to the highway. Mother stepped into the visitation room, took Joseph from the case aide and told him, "Kathy Dayner has no business getting me upset like this."

On October 10, 2006, Dayner was observing a supervised visitation between mother, maternal grandmother and four year old Kristina.[9] During the visit, the case aide, Evelyn Bodor, asked mother to stop using a camera with both still photography and videotaping capability, which was in violation of a department policy that previously was explained to mother. Mother had been instructed that all still photography was to take place during the first and last five minutes of a visit. This was due to the excessive number of pictures that mother had been taking during past visits, often numbering

---

[9] Visits with Kristina were separate from visits with Joseph and Daniel, as Joseph W., Sr., is not Kristina's father.

over 100 in a single visit. Mother also had been told that no videotaping was allowed. After mother stopped use of the camera, the maternal grandmother began to photograph and videotape. Maternal grandmother asked why filming was not allowed, and mother responded, in the child's presence, that the department did not want the child to know who her real family was because the foster parents were paying the department to keep the child. The case aide called for Dayner, who stated there was a need to speak to the adults who were sitting at a table with Kristina. Mother said Dayner could not speak to them during the visit, and that she would have to wait until it was over. Dayner insisted there was a need to speak to them immediately and motioned for them to leave the room. Mother and maternal grandmother began shouting, repeatedly calling Dayner a "bitch" and a "creep." They were told to stop shouting and that if they did not, the visit would be terminated. They both continued to yell, and mother began to scream. Dayner determined to end the visit and reached to pick up Kristina from her chair. The maternal grandmother would not stop photographing and videotaping Kristina. Mother then physically pushed Dayner, who was holding Kristina, into a wall. Dayner lost her balance and stumbled onto toys that were placed against the wall. Mother turned to Kristina and screamed repeatedly that Dayner was mean and did not want mother to visit with her. Kristina became scared and started to tremble and cry. It took several minutes for her to calm down. Dayner left the room carrying Kristina but mother followed her into the lobby and continued to scream. Mother then went back into the visitation room and held the door shut while she continued to yell. The department guard returned and told mother and grandmother to leave. The police were called and mother was arrested and charged with breach of the peace. The department filed a motion to

stop visitation with all three children, which was granted by the court. A restraining order also was issued prohibiting mother's contact with Kristina or Dayner. Dayner suffered a shoulder contusion and cervical strain necessitating medical care.

According to Kristina's foster mother and preschool teacher, Kristina was significantly impacted by the incident and indicated she did not want to go to any more visits. Kristina stated, "Mommy Karin pushed Kathy and me into the wall. Why did she do that? I was scared but Kathy Dayner and Evelyn kept me safe." When told the visits were going to stop, Kristina clapped her hands and said, "Oh good."

On October 13, 2006, social worker Pamela Lucier was assigned to all three cases, replacing Dayner. On October 18, 2006, the department filed a motion to get the parents to comply with their specific steps, including allowing the department access to their residence and requiring that mother attend counseling with someone other than Sally Guest. On November 15, 2006, Judge Goldstein ordered an updated psychological evaluation by Humphrey and a referral for mother to a qualified neuropsychologist for counseling. Judge Goldstein also ordered that Sally Guest could no longer be mother's therapist. During that hearing, the department reported that father had finally permitted the department some access to his home.

Lucier continued to attempt to implement Humphrey's detailed September 2006 recommendations for mother, as well as Judge Goldstein's November 15, 2006 orders. Lucier referred mother for counseling services with Comprehensive Neurological Services in Cheshire, Connecticut. On November 17, 2006, Dr. Brett Steinberg, a clinical psychologist and neuropsychologist at the Comprehensive Neuropsychological Services

in Chester, Connecticut, who testified at trial, received a referral from Lucier to provide therapy to mother.

Steinberg's expertise is in the treatment of emotional disorders caused by brain malfunction. He engages in diagnosis and treatment of such individuals, couples and their families. He also has experience in treating personality disorders. Consequently, whichever of the multiple evaluations performed on mother proved to be most accurate, Steinberg was well qualified to treat any personality disorders and/or emotional disorders caused by brain malfunction, including ADHD or frontal lobe damage. Steinberg's plan was to have a few informal sessions with mother to get to know her and develop a working diagnosis. Mother was supposed to see him weekly. Initially, there were delays and scheduling difficulties because the program staff had to consult with mother's attorney to clarify what services would be offered.

During this time period, an unusual "court deposition" took place on January 29, 2007, in which the parties asked Dr. Humphrey to clarify the recommendations he submitted in earlier reports. Humphrey had been asked to reconsider his recommendations after mother's altercation with Dayner, and he did so, filing an addendum with the court on December 15, 2006, in which he declined to alter his prior recommendations. However, he made it clear that if father were to begin to participate in unsupervised visits, under no circumstances should father leave the children alone with mother. During the deposition, Humphrey stated that he supported the specific step ordering mother to be absent from father's home between the hours of 10 p.m. and 8 a.m. each day. He stated that it was of significant importance that father be able to demonstrate his ability to regulate mother's presence in the home before the children were returned to his care. He suggested that mother be in the home for only two

hours during any visitation between father and the children. He affirmed his recommendation that both parents engage in a clinical environment to assist them to better understand mother's mental health and medical issues. He also recommended a change in worker, which already had occurred in October 2006.[10]

Dr. Steinberg first began to see mother for individual counseling in February 2007. In sixteen of twenty-three sessions, father attended these counseling sessions with mother. Steinberg permitted this, despite not receiving a referral for father, as his services were court-ordered and it was requested that father sit in on sessions, although it is not clear who made that request. (The department previously had objected to father participating in counseling with mother and Sally Guest.) Steinberg decided to view father's presence as providing a support that mother seemed to value, but he indicated it impeded mother's progress. Mother had an inclination to lie back, and let father step forward, an aspect of their relationship that did not support her becoming more independent. Steinberg also noted that during a number of sessions, the conversation drifted towards the ongoing legal proceedings, which he saw as an unhelpful preoccupation by both mother and father. This reduced the time needed for therapy and did not provide mother with the full benefit of the appointment. Steinberg indicated it was a continual challenge to return to the matter at hand: mother's clinical issues. Steinberg acknowledged that father would often have a clear opinion and would step in, thus miss an opportunity for mother to practice being more independent. Steinberg admitted that if he had been allowed to work solely with mother, it may have been less difficult to get her to accept her need for treatment and make progress.

---

[10] Humphrey's recommendations, intended to reunify the children with father, are discussed in greater detail in the section of this decision regarding the father.

After assessing mother in several sessions, reviewing prior examination reports and attending an administrative case review (ACR) conference on April 2, 2007, Steinberg concluded that mother "exhibits features of schizotypal personality disorder, including idiosyncratic perceptions, strained reasoning, and suspiciousness, that fall short of meeting full syndromal criteria. Previous examiners' diagnoses of cognitive and/or personality changes following resection of low-grade right prefrontal astrocytoma . . . were judged to be unjustified, based on 1) inadequate consideration of factors pertaining to premorbid functioning, nature and specific locus of lesion, surgical course and post-surgical recovery; and 2) over interpretation of isolated neuropsychological test data without discussion of other interpretive hypotheses. Similarly, diagnosis of attention-deficit hyperactivity disorder was judged to be unjustified, based on 1) over interpretation of nonspecific self-reported impulsivity and attention difficulties during her school years without apparent opportunity to review educational records or interview collateral informants, e.g. parents; and 2) over interpretation of the summary confidence index from the Conners CPT without discussion of performances on that test's indices of inattentiveness, impulsivity and subtle attentional variability. In addition, previous examiners did not address the fact that anomalies and attention and executive functioning may occur in schism type of personality disorder."

In short, Steinberg determined that mother had a personality disorder, not otherwise specified (NOS), with schizotypal personality features, a diagnosis similar to Sadler's, the first expert to evaluate mother. Steinberg does not believe mother's psychological issues were caused by the surgery she had at age sixteen or by ADHD.

Steinberg explained during his testimony that every person has a personality style, which is fairly fixed and establishes a pervasive pattern of interaction with others. People move along a continuum of personality types out to a point where there are maladaptive effects of one's personality style. A person whose style results in maladaptive effects is one who exhibits characteristics of one or more personality disorders. There are usually indications of difficulties functioning in the community. Steinberg reached his working diagnosis of personality disorder NOS after reviewing documents provided to him by the department, including the evaluations of Badillo-Martinez, Gruen, Green and Humphrey.

Steinberg worked to develop specific tools to help mother achieve her main goal: reunification with her children. He hoped to develop intermediate goals with her in a motivational fashion, "like a coach assisting a player." He hoped to support her by identifying and addressing parenting challenges, providing parenting coaching for more effective interaction, increasing her independence, helping her become more proactive in managing her life, assisting her in understanding the connection between her actions and outcomes and helping her to develop effective, empathetic ways to interact with others. Steinberg noted that mother had no personal awareness of her challenges. In terms of really understanding what was going on for her in interpersonal relationships and the way her presentation might be perceived and interpreted by others, mother was really "underinformed."

In a progress report to Lucier dated August 9, 2007, Steinberg recommended that mother's lateness and no-shows would need to be framed as irresponsibility, and she and father needed to develop strategies to achieve good attendance. He indicated that mother and father needed to focus on clinical issues that would support

progress rather than legal issues, which did not. He wanted to explore with mother her ambivalence regarding independence and help her to identify ways in which she allowed others to assume responsibility for her. He hoped to show her that dependence and passivity would not assist her in pursuing reunification or enhance her parenting. He wanted her to recognize the costs and benefits of the current imbalance of power in her relationship with father. He indicated that due to the chronicity, severity and pervasiveness of mother's symptoms, treatment was expected to be a gradual, long-term process that could take as long as several years. Even under ideal circumstances, including active and sustained engagement in therapy, with full utilization of coaching processes, prognosis would be guarded. Steinberg concluded that if mother "failed to develop greater self-awareness and remained other-focused and skeptical about treatment, prognosis would be poor."

Unfortunately, it was difficult for Steinberg, a therapist with impressive qualifications who was quite capable of following through with Humphrey's recommendations and perhaps reconciling the inconsistencies among past evaluations, to achieve any therapeutic goals because mother did not regularly attend their sessions. She often was late and called to cancel, always stating that something was happening to her. Steinberg told her that, in order to make therapy work for her, she had to get a handle on her lateness and cancellations. He noted that what it takes to be organized and on time is clearly relevant to a lot of areas in life, including parenting. Many times, mother told Steinberg she did not need treatment and felt her parenting skills were good enough. Steinberg tried to get her to choose, for herself, to get herself back on track. Steinberg noted that one of mother's significant issues was letting the other people in her life interact with

her assertively, doing things for her. She relied on father and her parents.

Eventually, Steinberg felt he was making no progress with mother. She did not experience a meaningful "buy in." Conversations often got off track, and steps discussed to increase her independence and organization were not sustained over time. She lacked empathy and had difficulty stepping back from her own view of things to understand how she was coming across to others.

On November 14, 2007, Steinberg wrote to Lucier, informing her that he was terminating psychotherapy with mother. Mother had been warned that nonattendance would result in discontinuation of treatment, but her attendance was still an issue. He concluded: "On multiple occasions, I pointed out to [mother] that her frustration regarding her DCF involvement would not eliminate that involvement and that her most productive means of pursuing her goal of being reunified with her children would lie in actively participating in treatment; nevertheless, her investment in therapy remained suboptimal during our final five sessions. During the sessions, she typically attributed her attendance problems to factors 'beyond her control,' e.g. fatigue and traffic, and she suggested that others held unrealistic and/or rigid expectations for her. In addition, during problem-solving conversations she frequently identified coping strategies that entailed having others assume some degree of responsibility for her, e.g. by reminding her of appointments, instead of independently bearing responsibility for her own commitments and circumstances. Given her continued failure to adequately engage in the treatment process, I do not expect ongoing treatment to be productive."

When Coutant Skinner, mother's PEAS parent educator, learned that Dr. Steinberg had discharged mother due to missed appointments, she discussed it with

mother. Mother claimed that it was not her fault, because there was an accident on the highway and Steinberg discharged her after missing only one appointment. In fact, she had missed at least seven sessions and had been as much as fifteen minutes late for several others. When Coutant Skinner lamented the fact that Steinberg would no longer be involved with mother, sharing with mother her observation that Steinberg had a way of explaining things that would enable her to understand and grow, mother said she was the one telling him what to say.

During at least a part of the time mother was treating with Steinberg, she also attended family counseling sessions with Dr. Warren Corson III, a clinical psychologist, who also began individually counseling father in November 2006. The joint sessions were to occur after the father's individual sessions. The purpose of the couples' counseling was to help father gain some understanding of mother's limitations.

On January 8, 2007, the Child Protection Session of the Superior Court for Juvenile Matters conducted a trial regarding the petition to terminate mother's parental rights in Kristina. On January 17, 2007, the court, *Bear, J.*, terminated mother's parental rights. Mother began her sessions with Steinberg and Corson around the same time she lost her parental rights in Kristina, but the loss of Kristina did not seem to motivate her to be more compliant with therapy and to make better progress out of concern for what might happen with Joseph and Daniel.

On March 28, 2007, mother's second attorney, Linda Herzner, was permitted to withdraw as mother's counsel. Herzner cited a break down in the attorney-client relationship.

On April 3, 2007, the department filed a permanency plan for reunification with father. Mother objected and

indicated that the plan should be reunification with both parents.

Corson observed that mother had a lot of blockage and did not want to admit any of her personal limitations. He testified that people with personality disorders are very difficult to involve in therapy. Unless the person admits to having issues, there is little a therapist can do.

Mother stopped attending the family counseling with Corson in August 2007. Prior to the cessation of these sessions, the parents' failure to keep appointments with Corson had been a problem. Father reported to Corson he had severed ties with mother as a result of occurrences at a recent court hearing.

On August 2, 2007, the court, *Wilson, J.*, adjudicated Joseph and Daniel neglected and committed them to the care of the department. Mother agreed to these findings. Judge Wilson also approved a permanency plan of reunification with father, not with mother or with mother and father, to which mother had objected. Final specific steps were issued, which mother, but not father, signed. Father later withdrew a motion seeking overnight visitation with the children. The department social study in support of the children's permanency plans, filed in court on February 22, 2008, noted that father became upset with mother when she decided to plead nolo contendere and to agree to a neglect adjudication and commitment of the children before Judge Wilson.

During a visit on August 3, 2007, father broke up with mother in the presence of Lucier, militaristically referring to mother as a "hostile." He informed Lucier that mother was not to be on his property, and later that same weekend, contacted the police regarding mother's presence there.

In spite of father's claimed rejection of mother, on August 6, 2007, she moved to modify the preliminary specific steps she had signed on August 11, 2006, at the time Daniel's order of temporary custody was sustained, which required that she maintain a separate residence from father. In the motion, mother refers to father as her "significant other" and alleges, "it is in the best interests of the children to have two involved and loving parents" as opposed to a single-parent household. This motion was never heard, but it is an indication of mother's refusal to accept the fact that she and father were required not to live together if they expected reunification efforts to progress. It also raises the question of whether the parents were considering reconciliation.

On December 10, 2007, the department filed its termination petitions on behalf of Joseph and Daniel.

On February 19, 2008, mother filed a motion for expanded visitation with the two boys.

On February 22, 2008, the department filed permanency plans for Joseph and Daniel. By that time, Joseph had been in foster care for thirty-one months and Daniel had been in care for nineteen months. The department's study in support of the termination plan noted mother's lack of compliance with her individual therapy, ADHD or narcolepsy treatment, and parenting education programs. Mother was described as "hostile, argumentative and resistant" to parenting interventions. This study noted that the couples' counseling with Corson had been discontinued due to the parents' breakup in August 2007. The motions for review of the boys' permanency plans were consolidated for trial with the pending termination of parental rights petitions. Judge Olear eventually approved them on March 30, 2009.

Mother had been arrested for the October 11, 2006 incident involving department worker Dayner, which resulted in protective orders and a suspension of her

visitation with all three of her children. Her visits with Joseph and Daniel, but not Kristina, were resumed on January 2, 2007, following a hearing in the Juvenile Court in Torrington, but the length and time of the visits were reduced. In July 2007, mother had been arrested for failure to appear and was incarcerated for several days. Although invited to attend pediatric appointments, mother only had attended two with Joseph and Daniel.

At an ACR on April 25, 2008, mother indicated to the department that she had attempted to return to the Family Intervention Center for clinical services, but the facility refused to provide her services. She also indicated she had attempted to contact another service provider with no success, and asked that the department provide her with information as to Dr. Campagna, to whom the department had referred her in February 2006. The department provided mother with Dr. Campagna's information, but between September 2, 2008, and the commencement of this trial on December 3, 2012, the department had no information on mother's engagement, if any, in any further counseling services.

On May 16, 2008, mother's motion for expanded visits with Joseph and Daniel was denied by the court, *Bear, J.*, On July 9, 2008, another motion for visitation filed by mother was marked off. It was noted on the memoranda of hearing that the department would provide her with an administrative hearing on the subject. On June 25, 2008, the court conducted a hearing on mother's motion regarding an investigation of injuries to the boys while in foster care and determined there was no need for further investigation on that issue by the department.

On October 1, 2008, the court, *Olear, J.*, granted the petitions seeking the termination of both parents' rights in Joseph and Daniel. On October 1, 2008, department

worker Raegan Horvay was assigned to the cases of Joseph and Daniel.

On January 7, 2009, the court, *Olear, J.*, having terminated both parents' rights, denied their motions for a stay and visitation. On March 30, 2009, Judge Olear approved a permanency plan of termination of parental rights and adoption and found that reasonable efforts to effectuate the prior plan, reunification with father, had been made.

The parents appealed Judge Olear's termination decision, and on June 8, 2010, the Appellate Court overturned it. On June 24, 2011, the Supreme Court upheld the Appellate Court's decision, overturning the terminations of parental rights and the August 2, 2007 neglect judgments.

The department made efforts to again engage mother after the issuance of this first of two Supreme Court decisions. Department worker Raegan Horvay, assigned to the cases on October 1, 2008, testified that after the first Supreme Court decision came down in June 2011, she and her supervisor sent the parents letters once a month, letting them know that the department required information regarding their current circumstances and wished to discuss necessary referrals to providers, or to identify providers they might have been working with independent of any department referrals. Mother did attend an ACR that took place on September 8, 2011. She was asked to sign releases for providers, but indicated she was not involved in any formal services and did not need the department to provide any because she was using her friends for counseling.

An addendum to the termination of parental rights social study, dated September 12, 2011, indicates that the department was not currently aware of mother's

current circumstances or participation, if any, in services, as mother declined to speak with the department worker.

On September 21, 2011, mother's motion for visitation dated August 24, 2011, was consolidated on motion by the children's attorney with neglect and termination petitions scheduled for trial at the child protection session at Middletown in September 2011. Following two days of trial on September 26 and 28, 2011, the court, *Bentivegna, J.*, adjudicated the children neglected and committed them to the care and custody of the department. Judge Bentivegna also approved the permanency plans of termination of parental rights and adoption and denied mother's and father's motions for visitation. Mother appealed the neglect judgments but did not appeal Judge Bentivegna's decision denying her motion that visits resume.

A second addendum to the termination of parental rights social study, dated December 14, 2011, indicates that the department continued to make efforts to engage mother with no success. Thus, despite the pendency of the remanded termination petitions, and despite the department's efforts to procure necessary information, the department was not aware of mother's engagement with service providers or her current situation.

A third addendum to the social study in support of termination of parental rights, dated March 5, 2012, reveals that the department continued to make efforts to engage mother and father. Mother responded to a January 5, 2012 letter and contacted the department requesting an update on the boys. A message was left with an update. Mother, in turn, left a message appreciative of the update. She informed the department she was a protected person under the ADA and requested the department have its ADA coordinator contact her. Horvay and her supervisor, Kevin Real, spoke to mother

in regard to her request. Mother maintained that she did not think she had a disability, but that because she was "perceived" to have one, the department needed to contact the ADA coordinator to educate its personnel. Mother clarified that she was not seeking assistance under the ADA for herself, but rather notifying Horvay and her supervisor that department personnel needed to be "educated" on the ADA. Mother then stated she did not feel there was any need for services, and when offered a referral for services, she stated she would go if they wanted her to, but she did not know why she would be attending. She stated that she was a "shining star" of parenting. Mother reported she was still living with her parents and receiving state assistance of food stamps and Medicaid. She was not employed. She indicated she was maintaining compliance with the recommendations regarding her narcolepsy by treating it the natural way, napping as needed.

An ACR was scheduled for February 24, 2012. Mother was invited to participate, but did not attend or call in to participate by phone. Mother did contact the department following the ACR to report she was ill and she requested copies of the treatment plans.

During mother's testimony at the termination of parental rights trial before Judge Bentivegna on March 26, 2012, mother stated that she has never been convinced of a mental health diagnosis for herself. Judge Bentivegna granted the department's petitions for termination of parental rights on April 17, 2012. However, his earlier decision on the neglect petitions was reversed by the Supreme Court on June 30, 2012, necessitating the subsequent vacating of his judgments terminating parental rights on August 1 and 3, 2012.

After this second reversal, the department requested to meet with both parents on August 3, 2012, at the

Middletown Child Protection Session, but their attorneys indicated neither parent would be available. A meeting was scheduled with mother, father, Horvay and the attorneys for August 15, 2012. On August 15, 2012, on advice of counsel, the parents were present at the department office, but did not participate in the meeting. During the meeting, it was represented that neither parent was currently engaged in any services, but each was willing to participate and the department agreed to identify providers in the area of the parents' residences. An ACR scheduled for August 13, 2012, was rescheduled at the request of the parents' attorneys and moved to September 6, 2012. However, on the morning of September 6, the attorneys again requested that the ACR be rescheduled and advised their clients not to participate, although both were present at the department office.

Horvay and her supervisor again tried to engage with mother and continued to send letters and suggestions for referrals in the mail. Mother attended an ACR on October 10, 2012, at which she was provided releases needed in order for the department to make service referrals, but she did not sign them. She also did not respond to the first of two subsequent letters from Horvay, dated October 19 and November 2, 2012, seeking to have mother sign releases to facilitate a referral to Dr. Lauren Ayr at the Connecticut Resource Group in Waterbury and permit the department to contact the physician mother claimed was treating her narcolepsy. Finally, mother contacted the department, indicating she had the releases and would give them to the department at a court hearing scheduled for November 6, 2012. A release was not received in the area office until November 21, 2012, but it was not properly witnessed and was redacted in a manner that prevented the department from sharing the relevant information necessary to make the referral to Dr. Ayr. As of the date trial

commenced on December 3, 2012, there was no information provided to the department by mother as to her engagement in narcolepsy treatment, treatment for ADHD, mental health services or a parenting program, all part of her required specific steps. Mother's last documented engagement in any services was at the end of 2007.

## B

### Father, Joseph W., Sr.

Father is fifty-eight years old. He was born in Torrington, Connecticut. His father is deceased, but he could not recall when his father died. He refused to answer questions about his mother, although it was explained to him that information regarding people in his home who would have access to the children was relevant. He then said his mother is seventy-five years old and still works full-time at a factory in Thomaston. Father resides with his mother and grandmother in a duplex style home in Thomaston which he co-owns with his mother.[11] In 2004, mother reported that father also owned a condominium in Waterbury, which is located at the address he falsely gave as his residence to the Pennsylvania hospital where Joseph Jr. was born. In June 2005, department worker Dayner and an investigative worker went to this location looking for mother after the department had been informed that she had cancelled her scheduled caesarian section and was planning on leaving the state. The condo was located in a housing project and was extremely run down. There was a large amount of debris stacked in front of the door, covered in cobwebs. It did not appear that anyone had been living there in quite some time, and no one answered to knocks on the window. The workers could

---

[11] Some documents indicate father co-owns the home with his grandmother, but the majority of references to his home ownership indicate his co-owner is his mother.

not knock on the door due to the amount of debris piled in front of it.

Father is the second oldest in a sibling group of four. His older brother resides in Goshen and his younger brother, Daniel, is deceased. His sister, Nancy, is married and resides in Thomaston. Father has described his childhood as "typical." He grew up in Thomaston and attended public schools, graduating from high school in 1974 at the age of twenty-three. He also spent some time in the Navy. He attended a community college for about two years, but did not graduate.

Father's employment history consists of factory and construction work. At the time the termination of parental rights social study was filed on December 10, 2007, father had not held a job for approximately two years. He said he could not remember why he left any of the jobs he had. His last known employment was in 2006, when he worked as a night stock clerk in a Torrington grocery store. On December 8, 2006, father relayed to department worker Lucier that he had asked his employer to give him an evening off so he could attend a concert. He said his employer refused and told father he would receive a pink slip if he did not report to work as scheduled. He chose to attend the concert, and lost his employment. Father characterized the employer's position as "abusive," indicating he had been singled out from other employees who had done the same thing and had not been fired.

Father collects disability payments, which he claims are based on cervical injuries he received in a car accident in 1997. He refused to provide the department with a release to confirm this income and the nature of the disability. However, he has worked while collecting these payments, including stocking shelves, and also engaged in vigorous BMX bicycle competitions and Civil

War battle re-enactments, activities that seem contraindicated for someone with a spinal disability.

Father has never been married. One relationship endured for twenty years, but father would not tell the department why it ended or provide the woman's name. Father met mother in 2001, prior to Kristina's birth, at the Patco gas station/convenience store where mother was employed. He would not describe his attraction or relationship with mother to the department.

Father was arrested in August, 2002, for an incident related to what he described as "road rage." This incident took place on Interstate 84 in Newtown. He subsequently was convicted of assault in the third degree and placed on probation for one year. Father's sister, Nancy, during her testimony at the OTC hearing regarding Joseph on August 5, 2005, described a physical altercation between her teenage son and father in which a knife was pulled while the two were fighting in her home. The police were called, but father was not arrested.

Father has no history of substance abuse or experience with domestic violence.

On June 15, 2004, father drove with mother to the foster home of Kristina H. and began banging on the front and back doors, shouting Kristina's name and asking where she was. Mother waited in the car. The only member of the foster family home at the time was a fourteen year old girl who was terrified by father's behavior, believing he was trying to enter the home. Father indicated he does not believe he acted in a threatening manner and does not view his actions that day as inappropriate. The incident at the foster home led to the issuance by the juvenile court of an order barring mother from going within one quarter of a mile of the foster home or being within 100 yards of Kristina except during the visits scheduled by the department.

Father and mother went to the department office the day of this incident and met with the assigned social work supervisor at the time, Melita Joiner. Father asked Joiner if the department would be involved with any children he and mother had in the future. Joiner advised them that if mother's case regarding Kristina was open at the time of the birth of any children, the department would be involved. If the case was not open, an accepted referral would be required for the department to become involved. Between February and June 2005, when mother was pregnant with Joseph, the department repeatedly asked mother to confirm her pregnancy, but she consistently denied it.

As noted earlier in this decision, father's full involvement with the department began in July 2005. On June 28, 2005, mother's obstetrician, Dr. Cynthia Ronan, confirmed mother's pregnancy with a due date of July 8, 2005. Ronan reported to the department that mother had cancelled two caesarian section appointments scheduled for June 24 and June 27, 2005, at a hospital in Derby. Ronan reported that mother told her she was canceling her second appointment for a caesarian as "she couldn't take it anymore, was packing her bags and heading west." She said that she would have baby along the way. Ronan expressed serious concerns for the safety of the unborn child due to mother's apparent mental health issues. She also noted that father had attended some prenatal visits with mother, and she indicated that father presented as "unstable" as mother. Mother and father left Connecticut in a 1984 Volkswagen owned by father. Mother's vehicle was left at her parents' home. Mother, then age thirty-eight, who had experienced edema and high blood pressure when she gave birth to Kristina after only thirty-four weeks gestation, and had required a caesarian section to deliver her premature, three-pound, medically complex daughter, was already approximately thirty-nine weeks pregnant.

Both parents have admitted their fleeing the state was an attempt to avoid authorities removing the child from their custody. They both claimed they left on the advice of counsel. The couple traveled around the country for approximately three weeks. At one point, they attempted to receive some obstetrical care in Indiana, but they cancelled the second appointment. Mother gave birth in Pennsylvania while the two parents were passing through, and the fetal heartbeat had weakened. The hospital personnel made a referral to the Pennsylvania child protection agency because mother was exhibiting bizarre behavior and making illogical statements. The hospital social worker reported to the department that father kept invoking the United States Constitution in all discussions Pennsylvania authorities had with him. Since one or both parents indicated they were residents of Connecticut, Pennsylvania authorities contacted the department. Father untruthfully indicated they had been living in his rundown and uninhabited condominium in Waterbury. The Pennsylvania agency obtained an emergency custody order and indicated it would surrender jurisdiction to Connecticut once the department obtained its own temporary custody order, which it did on July 21, 2005.

Father returned to Connecticut with mother and the two appeared in the department office together on July 22, 2005. Mother had contacted the department and stated she and father wanted to come to the office to speak to the assigned worker, Dayner, and her supervisor, Kevin Real. During this meeting, father did not speak one word, although he was asked basic questions such as his address and phone number. He wordlessly stopped mother from speaking at times by putting his fingers to her mouth.

At the contested temporary custody hearing on August 5, 2005, Dayner testified that father was refusing to speak with the department. Father testified on that

date and stated he was advised by his attorney to refrain from speaking with the department. He also testified that he accompanied mother on her cross-country travels at a time when she was thirty-nine weeks pregnant until she delivered at forty-two weeks because he felt this was being "a good father." He stated he did not want mother to travel alone, and she had told him she would leave Connecticut with or without him. He said he could not stop her. He was asked by the child's attorney if he ever thought to enlist the help of the maternal grandparents or mother's physician in preventing mother from engaging in this dangerous behavior. He stated he never thought to ask anyone to help him in preventing mother from leaving the state.

After Judge Taylor sustained the OTC on Joseph, the Torrington juvenile court issued preliminary specific steps in Joseph's case for father. Dayner sent father a letter on September 15, 2005, and another letter a month later outlining the preliminary specific steps issued on August 17, 2005, which father had signed. She gave him information about court mandated services, including Family Ties or Family Strides for parenting education, and the Family Intervention Center or Family Services in Waterbury for individual mental health counseling.[12] She advised him to call if he needed assistance. He did not respond to Dayner's letters. She attempted to engage father in a discussion about mother's mental problems, referring to several evaluations previously performed. Father did not engage or respond.

After Joseph's removal, father refused to provide the department with any reliable contact information other than use of an answering machine at mother's parents' home. On October 28, 2005, he finally provided the

---

[12] While subsequent evaluations by Dr. Humphrey may not, at first, have recommended individual counseling for father, he was required by the court, from the very beginning of Joseph's case, to attend individual counseling.

department receptionist with his phone number after a change in the time of a visit could not be timely relayed to him, as the department had no number for him and mother had failed to check the answering machine at the maternal grandparents' home for her messages. A message left for them on the maternal grandparents' answering machine the previous day had informed them that the visit time had to be earlier the next day. They did not check for the message and arrived late for the visit. They were furious. Father told the receptionist on October 28, 2005, that his number could be called only after 3:30 p.m. There was no answering device at the number he provided. This inability to make effective contact was discussed again with father on December 12, 2005. Father stated he refused to get an answering machine. Mother stated on that date the father is at his grandmother's home during the day, and that her home was on the other side of the duplex house owned and lived in by father. The department case supervisor asked father if he could provide his grandmother's phone number. He refused.

On September 21, 2005, father accompanied mother to the department office in Torrington for an ACR. When Dayner attempted to hand father a copy of the treatment plan regarding Joseph, he stood motionless and would not accept the plan from Dayner. He did not answer when asked by her supervisor, Real, to come into the meeting room. He walked wordlessly into the room, remained speechless throughout the meeting and put his fingers to mother's mouth when he wanted her to not speak or stop speaking.

Father changed attorneys after the August 5, 2005 temporary custody hearing. His newly assigned attorney informed the department that father's refusal to speak was based on his first attorney's advice, but he wanted the department worker to meet with both him and father to begin a cooperative working relationship.

A meeting took place on September 26, 2005, at which father did speak minimally. It was explained to father that the department was mandated to provide the court with a social study and he was given, in writing, questions that are typically asked so the study could be prepared. He was asked to look at the questions, review them with his attorney and then let the department know if there were any difficulties or objections regarding the requested information. He agreed that the department worker could come to his home to interview him, and a home visit was scheduled for October 6, 2005. On that date, Dayner, accompanied by department investigative social worker, Tammy Cushman, went to father's residence in Thomaston. Upon arrival at father's residence, while the two department workers were still in the car, father came out of one side of the house and ignored the greeting spoken to him by the workers. He walked wordlessly into the other side of the building while the workers followed. He said nothing and stood looking at Dayner and Cushman. He was asked if they could start by touring his home to show planned accommodations, if any, for baby Joseph. He walked from room to room, sticking his arm out to indicate another room, but spoke no words to explain anything. In what appeared to be a bedroom, a bed frame had been dismantled and was on the floor. He was asked where Joseph would sleep, as there was no crib set up anywhere in the home. He responded that his plan was for the baby to sleep in this room, which was his, and he was taking the bed apart to get a smaller bed so the crib could fit in the room. He was asked where mother would be sleeping if he no longer had a double bed in the room. He said, "Isn't it DCF's order that she's not here?" He was told that the department had not ordered this, but he was asked if his plan was to separate from mother. He would not answer this question.

All three then returned to the living room, with father saying nothing. He was asked if the workers could sit down and asked where he would like them to sit. He stated, "On your backsides." He was obviously angry and was asked if he was still willing to answer questions for the social study. He stated, "Do I have to? Do all fathers go through this?" He was told he did not have to speak to the department workers, but that his refusal to be interviewed would be reported in the study and that all fathers involved in juvenile court proceedings are usually interviewed. He did not respond and was asked again if he planned to answer any questions provided to him days before. He stated, "We'll see how it goes." He then was willing only to answer direct concrete questions such as his name, but he refused to answer any open-ended questions that would elicit his thoughts or feelings. For example, he was asked to describe what he saw as his strength and weaknesses. He stated he could not answer the question. He was asked to describe his personality traits. He stated the question was "too vague." Cushman, in an attempt to assist him, told him that some people describe themselves as quiet or outgoing. He said his personality traits depend on who he is with and then he said, "Skip that question." When asked to give his view on why the department was involved with his child, he responded, "Next question." When asked what his goals were, he responded, "Too vague." Dayner attempted to clarify the question by stating that goals sometimes can be related to education, employment, relationships or family. He then responded, "Get little Joe back." He was asked if he had any goals related to family issues and he responded, "Next question."

Father then was asked if he planned to follow the preliminary specific steps issued by the court on August 17, 2005. He responded, "Yes," and indicated he had an appointment at the Family Intervention Center on

October 3. As that date already had passed, he was asked whom he had seen and what service he was going to utilize. He responded forcefully, "I had an appointment." He finally admitted he had not kept the appointment because it conflicted with a scheduled visit with Joseph, and he had made another appointment for October 13, 2005.

The department later learned from Joseph Futschik, a licensed clinical social worker at the Family Intervention Center, that father did appear for the second appointment, but refused to fill out necessary paperwork. Futschik asked father why he was there, to which he responded that he was being forced to be there, he did not want to be there, and had no need to be there. Futschik told father that if he decided he wanted to be seen and would complete the agency paperwork, he could come back for service provision. Father told the department supervisor that he was offended by the paperwork requested by the Family Intervention Center, as it asked questions about sexual behavior. Futschik informed the department on January 17, 2006, that the initial fact sheet clients are asked to fill out does not ask any such questions. The more in depth packet that clients are asked to complete asks one question regarding sexual orientation.

On February 3, 2006, Dr. Stephen Humphrey conducted a court ordered psychological evaluation of father. Father refused to be interviewed without his attorney being present, but he neglected to make this demand until the moment the evaluation was to begin. This delayed the commencement of the interview, as his attorney had to be contacted and drive from Avon to the Torrington court, where the evaluation was scheduled to take place.

Humphrey reviewed the neglect petition and summary of facts, OTC documentation regarding Joseph,

the neglect social study prepared by Dayner and an affidavit signed by her. He noted: "DCF documentation concerning [father] primarily discusses his refusal to speak to DCF employees on various occasions. . . . Concerns were expressed in DCF documents that [father] continually whispered to [mother] throughout visits rather than speaking openly, and that he touched and kissed her in inappropriate ways during visits with Joseph."

Father stated during this interview that he had listened to bad legal advice to "leave the state with [mother] to have little Joe." Father discussed his schooling and childhood with Humphrey, and then discussed his automobile accident in some detail. This was a "pretty serious accident," in which his stopped vehicle was struck and pushed 108 feet down the road. Father indicated that he went from being a "health, robust guy" to a man in a neck brace, and he was no longer physically able to do the things he used to do. Father related that he continues to experience pain "constantly."

Father also described his "road rage" incident in detail. He was returning home on Interstate 84 in bumper-to-bumper traffic at approximately 10 p.m. He explained that there was room in the passing lane, but as he went to move over, a man driving a van sped up, preventing him from changing lanes. He said that the other driver then purposely tapped his back bumper twice. Father said that he stopped his car and opened his door, standing between the open door and the frame of his car. He claimed the other driver boxed him in so that he was trapped in that position. Then, the other driver struck the door jamb area of father's car. Father then went over to the other car to talk to the driver. Father claimed that the other driver reached for something, at which point, father "punched him right in the mouth." He reported that the police "refused to look

at the evidence," because he had hit the man. He later learned that the man was reaching for a cell phone.

Father denied any other aggressive behavior or history of domestic violence. He denied any history of anxiety, depression, hallucinations post-traumatic anxiety or delusions. He stated, "I'm happy. . . . I love life. This is a wonderful experience.

Father indicated that he loved mother and wanted to marry her and raise children with her. He said they met at a convenience store where she was working nights and weekends. He claimed the relationship had been going well, overall, and denied believing that any aspect of her behavior was unusual or bizarre. Although he stated that mother was living in Watertown with her parents, he noted, "She does spend a lot of time with me, of course. That's her physical [address]." At this time, father was visiting with Joseph two times a week for two hours each. He considered his son a very happy, bright and alert child who didn't cry a lot.

Father indicated to Humphrey that, although he attended an intake appointment at the Family Intervention Center, he felt its questionnaire was "way too personal" and he wanted to see some other provider. He advised Humphrey that he had enrolled at Catholic Family Services (CFS) in Waterbury, and would begin going to parenting classes there on February 22, 2006. He denied involvement in any other services and stated that to his knowledge none were recommended. There is no evidence that father attended or completed the CFS parenting program.

Father also told Humphrey that he is capable of raising children and that he had helped his sister raise "each and every one" of her children. Humphrey observed that child protective services had been involved with his sister's family, and that one of the children he mentioned was apparently troubled. Father stated that his

niece had been diagnosed with bipolar disorder and that such symptoms are prevalent on her father's side of the family.

When asked about observations in the department documents that doctors along the way had suggested mother's behavior was unusual, father replied, "Only in Scranton, Pennsylvania was the first time." Scranton is where Joseph was born. Father said that his understanding was that doctors thought her asking numerous, medically-based questions was bizarre. He admitted that he and mother were looking at real estate in Alabama because "everything seems cheaper." He added that the climate is also better. He indicated that the only reason there were concerns about his ability to parent was that he left the state with mother so Joseph could be born elsewhere.

Father hesitated when asked if mother was pregnant again at the time of the evaluation. He looked toward his attorney, who told him to answer. Father indicated that she was pregnant with his child. Father indicated he felt Joseph should be sent back to him right away, and that his long-term goal was to raise Joseph with mother, but that he would do whatever was necessary to get Joseph back and accept any stipulations or conditions. He stated, "With or without Karin, Joe comes first."

Humphrey administered a Personality Assessment Inventory (PAI) but father's testing profile was entirely invalid, due to an extremely elevated score on the PAI scale. Humphrey reported that this suggests that father attempted to represent himself as extraordinarily free of common faults to which most people will admit. Humphrey indicated that the range of scores obtained undermined the validity of the PAI clinical scale profile, and that no assessment of father's personality functioning or psychological status was possible on the basis of

the skewed results. However, based on his observations and review of the records provided to him, Humphrey felt capable of diagnosing father with a personality disorder, not otherwise specified (NOS), which he testified was not difficult to formulate in father's case. Humphrey said father is hypervigilant and engages in paranoid thinking. He also is mildly narcissistic and has obsessive qualities. Humphrey indicated that a personality disorder is a pervasive pattern of interaction with the world that is "rigid and self-defeating" and "encompasses all relationships." It was abundantly clear to Humphrey that father was failing to accomplish some goals because of his rigid, self-defeating, hypervigilant, obsessive pattern of behavior and quality of his interactions with others. In laymen's terms, Humphrey testified, father "couldn't get out of his own way."

Humphrey did not recommend individual psychotherapy for father at the conclusion of his first evaluation because Humphrey did not think treatment would alter an ingrained personality disorder. What was required, Humphrey concluded, was a safe, *monitored* environment, progressing gradually toward reunification if no new child protection issues arose. He noted that father had to abide by the restrictions the court would set, especially regarding mother's involvement in the care of the children. During his testimony, Humphrey denied that he ever, at any point during his involvement with these cases, recommended an immediate return of Joseph to the custody of the father.

Humphrey observed the interaction between father and Joseph on two occasions. Father was warm, nurturing and appropriate. Father indicated to Humphrey that he planned to reinforce Joseph with positives and rarely say "No."

Humphrey was significantly concerned, based on documentation provided to him, that father did not

appear to endorse the opinion put forth by various other persons that mother has mental health problems that would interfere with her ability to parent. Humphrey noted that department records contained several detailed descriptions of blatantly odd behavior reportedly exhibited in father's presence. Notably, father stated that he has never seen mother engage in behavior that he would consider bizarre or unstable. Although he conceded her behaviors in Scranton had been unusual, he claimed that was the first time he'd seen peculiar behaviors by mother. Humphrey noted that father's claim that mother does not present with any behavioral oddities contradicts observations made by medical professionals in several states, a psychiatrist and a department investigator. Humphrey concluded: "His adamant defense of [mother] is augmented by a substantial amount of paranoia regarding how others will interpret his statement and actions. His guardedness in both the interview and testing was significant. . . . [Father] presents as an eccentric, idiosyncratic man, but in this examiner's opinion [he] does not qualify for an Axis I diagnoses. A diagnosis of personality disorder, NOS, is offered, as his peculiarities suggest the existence for pervasive attitudes and conduct that are 'rigid and self-defeating.' "

Father denied to Humphrey the need for any support or interventions for himself, and stated that he would get help from his own family.

Humphrey recommended that father complete parenting classes, demonstrate that he had prepared a safe and adequate space for Joseph, and present a plan for the child's daily care, including times and alternative caretakers if father were not around. Humphrey stated the department would need to assess the designated caretaker's ability to perform childcare tasks and father would need to abide by court orders pertaining to mother's contact with him and Joseph.

Father misinterpreted Humphrey's recommendations as a vindication. On May 24, 2006, although he had not yet complied with a single recommendation of Humphrey's, father filed a motion to vacate the OTC regarding Joseph. A few weeks later, on June 19, 2006, mother moved for a supplemental evaluation by Humphrey, in which she averred that she and father were a couple, planning to marry and expecting a second child. Her motion stated that she disagreed with a plan for reunification with only father. Later, father's attorney also suggested during the August 2, 2007 hearing before Judge Wilson that Humphrey recommended Joseph's immediate return to father's home because he did not perceive father as having the potential to physically harm Joseph. This interpretation of what Humphrey recommended is not at all accurate. Humphrey concluded that *if* father complied with and completed parenting classes, demonstrated the preparation of a safe and adequate space for Joseph, presented a plan for his daily care and agreed to abide by a court order pertaining to mother's contact with him and Joseph, then Joseph could stay with him on three consecutive days per week for six weeks to allow the child time to acclimate. During this time, father would have to permit the department to make unannounced visits to his home at least once during the three days, and father would have to agree to spend most of his time with Joseph in his home. Following that six-week period, if father abided by the court recommendations and if no new child protection issues were observed, efforts toward full reunification could begin as long as the same protective conditions were in place. Humphrey felt the situation would minimally require a period of protective supervision, due to the risk of unsupervised contact with mother and both parents' past attempt to flee the state and avoid the department's scrutiny of their care of Joseph. However, an order of protective supervision

would necessitate a neglect adjudication, something to which father has never agreed. A neglect adjudication would not occur until almost a year and a half later, on the first day of a scheduled trial on August 2, 2007, and father successfully appealed his efforts to open and vacate that judgment, which took almost another four years. Humphrey strongly recommended that any contact between Joseph and his mother not within guidelines established by the court should be considered as potential parental neglect and investigated as such.

After Humphrey evaluated father in February 2006, Dayner reviewed each of Humphrey's evaluation recommendations with father in a letter in April 2006. She also sent him a referral to the PEAS parenting program. This letter was sent certified and father signed for it. He did not respond to Dayner's letter, but made a reluctant effort to engage in the PEAS program in May 2006. Dayner testified that the PEAS referral was only intended for father, based on Humphrey's recommendation that father be the primary focus of reunification efforts, but PEAS later told Dayner they had been "unofficially" working with mother throughout their involvement and PEAS asked that Dayner also make a referral for her. Father never allowed Dayner to view his living quarters on the top floor of the home he jointly owned with his mother. Dayner testified at trial that the entire time she worked on Joseph's and Daniel's cases, from July 2005 to October 2006, she never developed a "reciprocal working relationship" with father. He barely spoke to her.

Visits between Joseph and the parents did not always go well. Many specifics are fully described above in the preceding section of this decision concerning mother, particularly father's inappropriate, amorous behaviors with mother during visits and his failure to intervene when mother exhibited particularly neglectful or aggressive behaviors. Father explicitly demanded of

Dayner's supervisor that Dayner never be permitted to speak with him during the visits.

As of the date of Daniel's birth, July 20, 2006, mother and father continued to reside together in Thomaston at father's home. They were intending on getting married and raising Joseph and Daniel together. A few months prior to Daniel's birth, the Department of Social Services worker indicated he could never reach mother at her stated residence, the home of her parents. She was never there. Prior to Daniel's birth, father admitted to Coutant Skinner, the PEAS worker, that the only reason he had not married mother, whom he described as his "lifelong companion," is that the couple were advised by counsel not to do so. Father confirmed to Coutant Skinner that he and mother were living together. Mail sent to mother at father's address was returned to the department marked "Return to Sender," written in *mother's* handwriting. During Humphrey's evaluation of mother in September 2006, after the OTC hearing regarding Daniel, mother admitted she was primarily living with the father both before and after Daniel's birth.

By the time of Daniel's birth, father had acquired little insight into mother's limitations and denied that she presented with mental health issues that impeded her ability to safely parent the children. Prior to and for months after Daniel's birth, father failed to respond to the department's request that he provide a written parenting plan independent of mother, as recommended by Humphrey in March 2006. As of July 20, 2006, according to program supervisor, Kevin Real, in his affidavit seeking an ex parte temporary custody order for Daniel, father continued in his refusals to communicate with the department, seriously limiting the department's ability to assess his capability to safely parent. When approached by a department worker to engage him in a conversation, father refused to make

eye contact and would stand silent, making no sounds or movements when questioned. None of the letters sent to father inquiring as to his compliance with the preliminary specific steps set for reunification with Joseph on August 17, 2005, were ever answered. The only speech Dayner heard from father between August 2005 and July 2006 was when father began reciting the constitution at the start of an ACR on March 10, 2006. On one occasion, father had mother read a written statement he had prepared in an effort to express a concern regarding Joseph. Additionally, father made repeated efforts to prevent mother from responding to department inquiries by tapping her on the arm or shoulder, shaking his finger at her, putting his finger to her mouth, and, on one occasion, attempting to cover her mouth with his hand to stop her from speaking. This misguided and insensitive method of managing mother's peculiar behaviors and declarations is the only effort father made to handle her mental health problems.

In the course of his evaluation, Humphrey noted that father was disposed to paint himself in an unrealistic, overly positive manner. Despite father's indication to Humphrey in February 2006 that he would do whatever it took to get Joseph back, his subsequent actions and inactions belie those words.

Father did not contest the order of temporary custody for Daniel, which was based on a finding of immediate danger of physical harm. Preliminary specific steps, similar to Joseph's, were issued in Daniel's case and signed by father on August 11, 2006. This is the first time father or mother specifically agreed to live separately and abide by most of Humphrey's recommendations.

After Daniel's birth, Dayner attempted to refer father to behavioral health programs at Charlotte Hungerford

and Waterbury hospitals. In September 2006, she sent him a certified letter, for which he signed, but he did not follow through with those referrals. After the issuance of the preliminary specific steps regarding Daniel on August 11, 2006, mother was not supposed to be at father's residence from 10 p.m. to 8 a.m., (a step that was actually more expansive and lenient than the mere two hours Humphrey had recommended).

On September 22, 2006, the parents had a verbal and physical altercation during a visit with Daniel. Mother attempted to keep the bottle away from father, who then used his arm and elbows to shove mother away. Mother stated she is "a pediatrician person" who knows "all there is to know about children," and that she made sure she had this knowledge "before I had any children." Mother stated she did not want Daniel "to associate crying with being given a bottle," as she sees people giving Daniel, then two months old, a bottle when he cries. Father could be heard breathing extremely hard. He appeared to be seething about this incident, but did not contradict mother. He said nothing.

On September 26, 2006, Humphrey conducted a court-ordered psychological evaluation of mother, which is discussed earlier in this decision in more detail. This was in response to mother's request that she be evaluated by Humphrey.

On September 26, 2006, Humphrey also updated his evaluation of father. At this time, father was working nights three days a week as a grocery store stocker, but he often got extra days. Recalling his earlier recommendation that father allow the department unannounced access to his living quarters, Humphrey asked him why he still only permitted the department access to his mother's apartment, but not his own. Father said he told the department and his attorney that his sons would be living in his mother's apartment if they were

returned. He claimed that was now his residence, noting that he and his mother owned the home together.

Humphrey noted that father had remained relatively noncommunicative with the department prior to his re-evaluation. Father failed to engage in any identified services, with the exception of the PEAS program, which, although recommended by Humphrey in March 2006, father did not seriously begin until August 2006, after Daniel's birth, because he was less than coopera-tive during the initial assessment phase. Father consis-tently represented in multiple forums that the department's involvement in his life with mother and his children had been unfair, abusive and illegal. He contended that he had no issues that would prevent him from parenting his children and deemed the court-ordered services as unnecessary, unfair and a violation of his constitutional rights. Father maintained that the department was "going overboard." He claimed show-ing the department his mother's home, where the chil-dren would live, and suggesting that his mother would be "an extra pair of eyes and ears" was adequate, and there was no need to allow anyone to see his own living quarters. Humphrey asked father whether he was prepared to inform the department of his childcare plan, something Humphrey recommended in March 2006. He said he was, but the department requested it in writing. He said he would care for the children with his mother, who was still working full-time at age seventy-five, as "first backup" and his sister, who has a child protection history, as the "second backup."

Humphrey asked father about Joseph's falling from an inflatable chair and being injured during a supervised visit on July 19, 2006. Father responded that Dayner was just trying to "push Karin's buttons." However, father agreed that putting Joseph in the chair alone was inappropriate. He stated that mother, nine months pregnant with Daniel at the time, couldn't get to Joseph

quickly enough, and he wasn't watching because he was discussing a makeup visit with Dayner. He expressed continued reluctance to speak to the department personnel based on his experience that his words "always come out as something different" in reports. He stated, "They have triggered my defense mechanism. I've got a wall built so high."

Father denied ever physically touching mother's mouth when meeting with the department. He admitted he put his hand in front of her face, but said he did not make contact. He insisted he was trying to help her by monitoring her speech because mother "is not realizing the spin that can be put on the things that she's doing." He also admitted that mother made comments about medical matters that were beyond her experience and training, and he agreed that this was so, stating, "I wish she'd lay off on that, myself. It's definitely not received well at all." He said he has told mother, "You have no credentials in the medical field and when you start speaking this, you're definitely going to be hammered." He admitted he had "nudged" mother during the visit with Daniel on September 22, 2006, an action the department characterized as a shove.

Although during the second evaluation of father in September 2006, father was beginning to acknowledge mother's deficits, Humphrey testified that father still was indicating that there should be no limits on contact between mother, him and the children and was still resistant to fully acknowledging mother's impairments. Mother, also evaluated by Humphrey in September 2006, admitted she was at father's home more than she was supposed to be based on Humphrey's recommendations, and she saw no reason why she shouldn't be there often. Humphrey testified that as of September 2006, he was not recommending return of the children, even to father alone, without progress in the other interventions he had suggested.

As part of his re-evaluation, Humphrey noted "little change in father's underlying presentation." However, he was much more amenable to participation during the current evaluation and engaged in more objective, appropriate analysis of some of mother's unusual behaviors. Unfortunately, Humphrey noted: "[I]t appears that he has not effectively demonstrated that he can maintain a home life separate from [mother]. [Father] is steadfast in his commitment to the ideals of personal rights. Although noble, this stance complicated the current case because his advocacy for his rights has not taken into consideration mother's odd behaviors. . . . [Father] is only now beginning to express an understanding of [mother's] behavioral issues, but probably has been semi-consciously or unconsciously addressing them all along by his hyper-vigilant management of her."

Humphrey concluded that father and mother demonstrate a "unique interdependency." They still presented as committed to one other and "have indicated repeatedly that they intend to remain together and hope to raise their children as a family."

After the September 2006 evaluation, Humphrey modified his earlier recommendation that reunification with father could be placed on a relatively fast track. He only supported one overnight visit per week, not three, and again, only under the following conditions: Mother should not be at father's residence more than two hours per day, and the two hours should be designated and be the same each day. Father should consent to the department's visiting his home at any time of day and should permit access to the entire building to ensure there were no health hazards or other problems. Humphrey emphasized, "Under no circumstances should father leave the children alone with [mother]." To prevent father's potential inability or refusal to limit mother's presence on his own, Humphrey felt it important

that mother continue to be under a court order to spend only two hours at father's home whenever the children were visiting there. Father should give the department a list of names of alternate caretakers or facilities that would provide supervision for the children while he worked or was otherwise unable to care for them. His list needed to include phone numbers and his relationship to such persons. Humphrey recommended that the children's attorney work with the department to determine the appropriateness of father's suggested caretakers. Finally, he recommended that mother and father consult together with a psychotherapist experienced in treating neuropsychological deficits to instruct both of them as to mother's condition. He noted that should father comply with all of his recommendations for a period of three months, with no occurrence of any clearly abusive or neglectful circumstances, he would recommend increasing the time the boys spent with father to three nights per week for another three months, and then begin a plan to complete reunification in the late spring of 2007.

After the incident that occurred between Dayner, mother and maternal grandmother on October 10, 2006, Coutant Skinner, the parent educator with the PEAS program, discussed the incident with father, who stated that it "was a long time in coming." Coutant Skinner stated she asked father if he thought mother's behavior was appropriate. Father would not answer the question.

Humphrey subsequently was asked to reconsider his September recommendations, especially after father noted to Coutant Skinner that mother's attack of Dayner was "a long time in coming," and continued to deny Coutant Skinner's repeated requests to access his part of the residence to ensure it was safe. Humphrey, in a report filed with the court on December 14, 2006, unfortunately, minimized the behavior of the mother and the grandmother during that incident, and made

no comment on reports of how affected Kristina was. Instead, he suggested that a new worker be assigned, because the parents' perception of Dayner had adversely affected the benefit the family might derive from its relationship with the department due to a "perception of malice," whether or not accurate. This response on the part of Humphrey, who declined to change a single one of his recommendations, in the court's opinion, was too lenient and denigrated the efforts of a very experienced department worker. He did note that it was "disconcerting that father has not permitted [Coutant] Skinner access to his home." Humphrey continued to recommend therapy for mother, and father still had outlined for him a very clear path to achieving reunification, one that had been awaiting his compliance since March 2006, almost a year earlier.

Also, on January 29, 2007, when he engaged in the "court deposition," Humphrey indicated father also would benefit from individual therapy. Humphrey indicated he supported the specific step, issued in August 2006 at Daniel's temporary custody hearing, that mother not reside in father's home between the hours of 10 p.m. and 8 a.m. He also recommended that mother spend no more than two hours in the home when the children were there with the father.

During his trial testimony on December 5, 2012, Humphrey stated it was significantly important that father be able to demonstrate his ability to regulate mother's presence in the home prior to the children being returned to his care. Humphrey also opined that if, between 2007 and the time of trial in 2012, father and mother had refused to participate in individual or couples' therapy or successfully completed a parenting education program, he would conclude that there had been no substantial progress toward reunification since 2007.

He noted the parents' failure to engage with the department or services did not surprise him due to the "deep-seated" nature of both parents' personality issues. He testified that a layperson would look at the situation and say, "Why not cooperate? Why not engage in services?" Humphrey's response: The nature of the parents' disorders defines their response to treatment.

On cross-examination, Humphrey indicated that the way father interacts is contrary to what father would hope and expect. While father wants to talk about his constitutional rights, or authors Huxley and Orwell, focusing on such topics does not benefit his cause, and this approach sets him back and severely hinders his ability to make progress in this case. His fixations also affect his ability to care for children. Father's self-defeating patterns are so pervasive, they would affect his interaction with pediatricians, educators and others who need to have contact with the children and would lead to conflicts with other people attempting to intervene in the children's best interests. Humphrey testified that he could foresee how the obsessive quality of father's way of looking at the world and interacting with others could be disrupting to the children.

Humphrey also negated the parents' claim that the dates of the numerous evaluations in these cases rendered them "stale." He noted that the parents' behaviors have been tracked over an extended period of time, and each evaluator integrated the results of the others. Both parents, he noted, have personality disorder diagnoses that remain very stable over time; these are not the kind of diagnoses that might be intermittent. Input from ongoing treatment providers would have been helpful, but regrettably, neither parent had remained in treatment.

When asked if renewing contact between the parents and the children was recommended after four years

without visits, Humphrey stated that the children would first need psychotherapeutic interventions to assess their current understanding of their situation and determine how they would tolerate renewed contact. Any approach would have to be child-centered. He said any adverse reactions, such as those previously noted by the foster mother after prior visits, would "cause him great reservation about moving forward with renewed access."

Between the date of Joseph's birth and the replacement of Dayner with Lucier in October 2006, Dayner testified that she never developed a "reciprocal working relationship" with father. It was not until November 2006 that father provided the department with his plan of care for the children, a plan Humphrey had recommended he devise almost nine months earlier.

The department determined the plan submitted in November 2006, was not acceptable, as father identified his seventy-five year old mother and his sister as alternative caregivers. The paternal grandmother had indicated that she did not believe her son had any mental health issues. At times, she had expressed annoyance that visits were taking place in her portion of the family residence. Consequently, father's representation that the children would reside in her area was not credible and undermined his claim she was willing to act as a daycare provider. Father's sister had a child protection history of her own and she had once testified to an altercation between father and her son that involved a knife. In addition, Humphrey's report after his September 2006 evaluation, which reflected admissions by both parents that they were still living together, combined with father's refusal to allow anyone to see his living quarters to determine if, in fact, mother had vacated the premises, raised concerns that father was not complying with the specific step that mother not spend nights with him in Thomaston.

Father became engaged in the PEAS parenting program through the McCall Foundation beginning in June 2006. The targeted client was father, not mother, but mother was always present for the PEAS appointments. If father actually acknowledged the need for him to parent separately from mother and convince the department that he was willing and capable of caring for the children on his own, this display of continued togetherness and interdependence was not indicative of any such intention. At the initial PEAS assessment meeting in June 2006, both parents attended. At that meeting, according to Coutant Skinner, father knew he needed to recognize mother's parenting deficits and separate from her in their living arrangements. However, Coutant Skinner noted, he *surprised* mother in indicating that he was willing to consider doing that. Father had refused to engage in previously referred services at the Family Intervention Center Individual Counseling Services, the Charlotte Hungerford Behavioral Health Center counseling services, the Family Strides parenting program, the Family Services of Greater Waterbury individual counseling services and the Northwest Center for Families and Mental Health-Parent Aide services. During the assessment, Coutant Skinner noted that father was only willing to accept services on his own terms and he didn't want to participate in the assessment. He felt his parenting skills and his home were already suitable.

Coutant Skinner recognized that given father's history of refusals to engage in services, father would be slow to trust, so she told the parents she would go to the next department-supervised visit just to observe. During most of the visits observed by Coutant Skinner, Michael Harte or Kelly Velez from the Delta-T program or James Farrell and Janiel Bonello from Northwest Family Parent Aide program also were present, working with one or both parents.

During her observations of visits, Coutant Skinner noted that both parents were engaged with the children, but that they needed to learn consistent parenting. For example, Joseph needed to be in a high chair while he ate so he would focus on eating and not be otherwise distracted, but father refused to use the high chair and would insist on feeding Joseph on his lap, with Joseph facing away from him. Joseph needed to be encouraged to feed himself, but father would insist on feeding him to avoid a mess. Repeatedly, the parents were told that upon arrival at 1 p.m. on Fridays, Joseph needed to be fed lunch immediately, but they refused to start feeding him until 2:30 p.m. or later, and often did not ensure he ate sufficient amounts. The foster mother indicated the baby always would eat two complete jars of baby food for lunch, but the parents would give him only one-fourth of the two jars. The parents also needed to understand that Joseph should not be allowed to crawl out of the visiting room into a heavily trafficked hallway.

Eventually, goals were established for father that included separating from mother, developing a safe and stable home where the children could live, and child-proofing his mother's part of the home for visits before his own apartment was ready. Father was to open his own checking account, develop basic parenting skills and insure the children were safe and that their emotional needs were met. Father also was to attend individual therapy and benefit from it.

After the visits were moved to the grandmother's home in December 2006, father would not let Coutant Skinner see his own apartment. During the entire seventeen months Coutant Skinner worked with him, father only showed her his apartment once, and it was not ready for children. The visits never took place there. Coutant Skinner tried to advise father of the need to prepare his own upstairs apartment for the children, since his mother had expressed frustration with the

children's presence in her part of the home and had asked on several occasions why the visits could not be conducted upstairs in father's apartment. Father was adamant that he would not alter his living quarters for his own children, and insisted that they would reside in his mother's portion of the home. Father had difficulty setting limits. He did not agree with suggestions about positive discipline, developing empathy in a child and making him feel safe. He just never wanted to say no. Often, father would get distracted by having in-depth conversations with other people. He would have to be prompted to pay attention to the children, wake them from their naps and to pay attention to how they were eating and playing. He sometimes preferred to talk about his problems with the department and the government. He refused to establish a checking account. He said his mother paid his bills. Coutant Skinner suggested he sit with his mother and at least participate in household planning and management. He declined to consider that, indicating he preferred to remain "off the grid." Several times when Coutant Skinner and Delta-T parent aides arrived for a visit, father could not get into his mother's space because, oddly, he did not have a key.

When father had difficulty insuring his car, PEAS gave him money for insurance and fixed his car so he could keep his appointments. PEAS also paid to fix up his minivan when it needed repair.

Like mother, father, despite considerable effort on the part of Coutant Skinner, was eventually terminated from the PEAS program for lack of progress in November 2007, after the program had worked with him well over its usual time limit of eight to twelve months.

The department also initiated referrals for additional parent aide services for father in November 2006. On November 21, 2006, father participated in an initial

home visit with the Northwest Center Parent Aide program (Northwest). Subsequent to this assessment visit, there was an attempted home visit made on December 8, 2006. During this second home visit, father presented as agitated, uncooperative, aloof and resistant to engaging with James Farrell, the assigned Northwest parent aide. The visit ended after forty-five minutes at the request of department worker, Lucier, who also was present. Farrell noted: "During both home visits, [father] appeared to be uninterested in parent aide services. His speech was tangential and his conversational style can be described as circular and defensive. All of this parent aide's questions were quickly deflected and redirected back to [father's] position that DCF should not be involved in his life and therefore parent aide services should not be involved in his life. [Father] is capable of demonstrating insight into his parenting abilities, but this insight is quickly eclipsed by his defensive and oppositional disposition. . . . At no point during this writer's brief interaction with [father] was there any sense of commitment to or engagement with the helping process."

On December 8, 2006, father articulated annoyance at having to answer hypothetical parenting questions, and stated that he would rather not have his visits with his children interrupted. He asked that Northwest schedule visits outside his visits with the children, but was advised that the program was designed to assist parents during parent-child interactions. On December 20, 2006, Lucier asked that the parent aide program hold off on scheduling the next home visit at a case conference at the department office. On January 8, 2007, father was notified of a scheduled home visit that included the children, but he cancelled the appointment, indicating he had to support mother at a legal proceeding. On January 17, 2007, Northwest held a brief case conference with Lucier and her supervisor. Father

was still resisting their involvement. It was agreed that Northwest would contact father in writing and request that he call the program to set up a home visit within the next week. His children were to be present for the visit. Father was sent a letter that day, and advised that if Northwest did not hear from him within one week, his case would be closed.

On January 29, 2007, parent aide coordinator Jamel Bonello, along with Farrell, made a scheduled home visit with father. Upon their arrival, mother also was present and informed them that she would now be participating in the weekly visits with the children and would like to be a part of the parent aide intervention. She was informed her unanticipated participation would have to be confirmed with Lucier. During this visit, father was more welcoming, but had a very difficult time setting goals and developing a treatment plan for himself. This was due to his belief that he did not need help parenting and was accepting services only on the advice of his attorney. Bonello and Farrell were able to eventually develop only one service goal on which father reluctantly agreed to work. At this point, Northwest advised the department that its personnel questioned the appropriateness and effectiveness of the program to meet father's needs, as his diagnosis of personality disorder NOS accounted for his general lack of insight.

On February 2, 2007, Bonello and Farrell arrived at father's home for a scheduled visit with father and mother. Upon arrival, they knocked on the front door several times, but there was no response. Father came from around the outside of the house, asked them to wait a few minutes, and then had to go back around outside the house. At that point, father's sister arrived with the key to the downstairs apartment and opened the door. Father, mother and Michael Harte, from the

Delta-T program, then entered grandmother's apartment downstairs. It was noted during this visit that mother concentrated solely on Daniel in one-half of the living room while father concentrated solely on interacting with Joseph in the other half. They noted that "it is difficult for [father] to interact with many parts of his environment at the same time. Even as he remained focused on interacting solely with Joe, Jr., he was easily distracted by a telephone call, speaking with the Delta-T worker and his need to organize the toys as the children played with them, typically normal social stimuli."

During the next visit on February 5, 2007, father and mother focused on recounting the history of their involvement with the department. Their report was not congruent with the information provided to Northwest by the department. The parent aides tried to help the parents understand that regardless of their feeling that they had been treated unfairly, they needed to comply with the department's recommendations. Northwest Center subsequently ended its involvement with the family on February 12, 2007, due to significant resistance from the parents, which was impeding the goal of returning the children home, where the Northwest program might be more effective. Since the program's final letters were addressed only to father, it appears that they never accepted mother as one of their clients, although she was present for visits on January 29, January 31, February 5, February 7 and February 12, 2007.

Michael Harte of the Delta-T program also worked with the department to supervise visits from December 2006 to either the latter part of 2007 or the early part of 2008. His supervision of visits started at the paternal grandmother's residence. He, too, was supposed to be supervising only father's visits, but mother joined in after a few months. At one point, the visits were

increased to six hours, and Harte split the supervision with another worker. He testified that suggestions made to father were usually ignored. Harte was conferring with Coutant Skinner and also attempting to help father achieve the goals she had set with him, such as establishing some independence from the paternal grandmother by opening a checking account. Harte even offered to bring father to the bank, but father wanted no part of the idea.

Father, like mother, often seemed oblivious to circumstances that could threaten the safety of the children. Once, Harte noted, father let the children run away from him to a point near the road where he would not have been able to get to them fast enough if one of them had decided to dart into the road. There was a pattern of not keeping his children in a safe, close proximity to him when out in the community. He would not control or redirect them sufficiently. He would just put a hand in the child's face rather than getting a good hold on the child by physically taking the child. Once, one of the children pinched the other. Although father shouted "no," he scooped the offending child up and gave him a hug. Harte indicated this could be confusing to the child, who might think he was being praised for pinching. Father often would have the responsibility of feeding the children. He would always have bananas or cereal and crackers, but nothing else. He was very controlling and, similar to Coutant Skinner's observation, would not let the children feed themselves, although they were old enough to do so. He would say he didn't want them to make a mess. Father often would criticize mother for her parenting abilities in front of the children.

Father, at times, also could not control his own anger and frustration in the presence of the two children. In January 2008, he requested that a visit end early. Harte had just pulled up in his car and the children were in

the back. Father noticed the children had gotten haircuts. He became very upset, visibly shaking and pacing back and forth. He unbuckled a car seat roughly, hitting one of the children in the face. He took the children inside and called his lawyer. The paternal grandmother tried to tell him the haircuts looked cute, but father said he wanted the visit ended; he was trying to call his lawyer because he should have been notified of the haircuts. Harte tried to explain to him the haircuts were not a big deal and he should spend time with his children. He continued to request that the visit end immediately. Harte also testified to father's involvement in the incident on Halloween, 2007, as another example of his inappropriate behavior in the presence of the children, when father ignored Harte's request to end the extended visit, and tolerated mother's angry outburst, rather than intervening to stop it. Father ran off with mother and all the candy, leaving Harte to deal with two upset children.

Department worker Lucier was working with father while he was engaged with the PEAS, Northwest and Delta-T programs. She often observed father's visits with the children. At times, she noted, father was very kind and attentive. At times, Joseph could be aggressive and would hit Daniel. Father would be advised to discipline Joseph, but he would not listen to the advice. He continued to place Daniel in a baby swing after being told many times the child had grown too big for it. When he had six-hour visits, he was asked to develop a routine with the children that included a nap in order to maintain structure and routine. He never did this.

Father also allowed the children to sit in their own urine because he felt a diaper was not wet enough. He would thank the providers for advice, and do what he wanted.

The day after the neglect adjudication was entered by Judge Wilson on August 2, 2007, there was a scheduled visit. When the department arrived with the children, father was not at his home, but mother was there.

Lucier and mother walked around town and met up with father on the Thomaston green. Father, according to Lucier, "went off" on mother and told her they were no longer together because they had separate interests. When they returned to his home to begin the visit, he proceeded to try to kick Lucier and mother off the property, but reconsidered since the children were present.

Lucier noted that father often was rude to mother. On one occasion, mother bought a kiddy pool and wanted to blow it up for the children because it was a very hot day. She had not discussed it beforehand with father, so he was adamant that he was not going to set up the pool. Mother blew up the pool, but father wouldn't allow her access to the water at his residence. Mother had to go to a neighbor's house to get water. During another visit, it was clear to Lucier that something had gone on between mother and father before she got there. As they walked through the neighborhood with the children, father walked thirty paces ahead of mother with Daniel, leaving her with a cumbersome stroller and a wiggling Joseph as she struggled to climb a very steep hill.

Lucier indicated that mother and father obviously were a couple when she was assigned the case in October 2006. Mother represented that her legal address was with her parents, but she said father was her boyfriend and admitted to Lucier they spent a lot of time together. Both told Lucier they had always planned to raise the children together as a couple. This stated intention did not change until August 2007, when father terminated his relationship with mother, at least for a while. Lucier diligently renewed efforts to engage the parents and implement Dr. Humphrey's recommendations. In December 2006, because father appeared willing to work with the PEAS program, Lucier moved the visits from the department office to father's home and

increased them to three hours, twice a week. Lucier supervised the visits and also contracted with the Northwest and Delta-T programs to help supervise. The visits were increased to six hours, twice a week in April 2007 to twice a week, six hours each time. The first three hours were for father's visit, and the latter three hours were for mother's. Lucier also referred father and mother for individual and couples counseling with Dr. Steinberg and Dr. Warren Corson III.

In November 2006, father was referred to Dr. Warren Corson III, a clinical psychologist and director of Community Counseling of Central Connecticut, Inc. in Bristol, Connecticut, for individual counseling and possible family therapy. Commencing on November 20, 2006, father participated in an assessment that consisted of four hourly sessions. Corson concluded that Humphrey's diagnosis of father's personality disorder NOS was correct based upon the data collected, his own observations and father's responses to questions during the assessment period. Corson indicated in an intake report that while a diagnosis of a personality disorder should not be ignored, father did not pose a threat to himself or to his children and that the department's current plan for reunification, which Humphrey had recommended, should be considered. Corson recommended a full range of therapy, including family therapy with mother, and eventually, the children, if it was age-appropriate.

Father began therapy with Corson on February 2, 2007, on a weekly basis. Developing treatment goals with the father was difficult for Corson. At most sessions, mother would be in the waiting room, but sometimes she would start the session with Corson and father. After the third or fourth session, attendance became a problem. Father did not attend and would not answer his phone. Corson once got an e-mail from father referring Corson to his lawyer. Corson testified

that he is experienced in treating people with personality disorders, and that the best way to work with such persons is with behavioral-based therapy that is pragmatic and problem-directed. The therapist must attempt to help the patient identify irrational behaviors and beliefs and explore better options. Father requested that mother attend to help him gain more understanding of her limitations and because he did not want Corson to judge mother "on paper." Corson determined mother had a lot of blockage and did not want to admit any of her limitations. Father was beginning to learn to help guide her, but in August 2007, father broke off the relationship with mother, blaming the state. He was angry that the state did not want him to be with her in order for him to get his children back.

In a report dated August 13, 2007, Corson wrote that therapy was strained at times, due to father's stating consistently that he felt forced to attend therapy and expressing doubts as to the validity of the profession as a science. Despite such resistance, the sessions often ran long. Therapy focused on the behavioral issues facing father and helping him to explore possible ways to improve the situation. Progress was slower than Corson would have preferred, but he was encouraged that father was developing some insight. Father and Corson were working toward father gaining insight into how his personality disorder affects personal and professional relationships and interactions and how he could improve his current skill sets. They also were working on increasing his understanding of mother's limitations and how they would impact her parenting, as well as increasing father's knowledge of parenting skills.

Unfortunately, on June 22, 2007, Corson felt compelled to write father, indicating that if father cancelled another session, he would be discharged from Corson's treatment for noncompliance. Subsequently, father was discharged, however, the department requested that

Corson resume treatment with father. Corson agreed, but in September 2007, Corson discharged father a second time for nonattendance.

On October 9, 2007, Corson, in a report, indicated: "Over the last few months of treatment this client's behavior, attendance and attitude began to change for the worse. His participation was lacking and there was no insight on the client's part. The client complains of transportation issues which affected his ability to attend sessions as scheduled but he refused to clearly define the issue. . . . It is believed by this writer that this was in fact an act of passive aggressiveness and that any transportation issue was either greatly exaggerated or fabricated. This client has continued to paint himself as victimized by 'the system' while his behaviors can only be defined as self-sabotaging. He appears to be deliberately placing obstacles to reunification and this writer has doubts as to whether this client truly desires reunification based upon the incongruence between his actions and words. He is not behaving in a manner consistent with wanting to become reunited with his children."

Corson, at this point, recommended that if reunification remained a plan, there should be a parent aide in place, announced and unannounced visits from the department and other reasonable services to ensure that father and the children were in the best possible environment for reunification. Full compliance with the parent aide should be made a condition prior to and after any reunification, Corson noted. He also commented, "[B]ased upon his action and inaction the past few months, there is some concern that the children could face neglectful situations upon return to this client." Corson testified that father's actions, not his diagnosis, prevented progress. Father's refusal to work with other treatment providers and to engage consistently in the process prevented him from becoming an adequate

parent. There were times, Corson noted, when father seemed more excited to be engaged in the court battle. Reuniting with his children seemed secondary. Corson felt father could be so blinded by what he thought was right, he did not consider the collateral damage. Like Humphrey, Corson made it clear that he did not ever recommend the children could be returned immediately to father's care. The children would need therapy and the parents would need to continue to work on their issues and work with a parent aide. Any plan for reunification carried with it an assumption that father would do what he needed to do.

On October 30, 2007, Corson wrote Lucier and indicated that his organization rarely agreed to reopen a client's case within sixty days of discharge. However, father was requesting reinstatement for therapeutic services. Corson agreed to renew sessions with father, provided father made every appointment on time, started and stopped sessions on time, stopped discussing his "injustice at the hands of DCF," or any other entity, and instead focused on improving his situation. Corson also insisted there would no longer be any phone-based sessions and that father communicate clearly any issues that might impact his attendance or participation. Father had to be willing to agree to work between sessions and show improvement toward his goals. After being reinstated, father attended a session with Corson on Tuesday, November 13, 2007. At this session, despite the additional courtesy Corson had extended to father, father told Corson he did not feel he needed therapy and did not believe therapy or psychology are legitimate. He felt there was nothing wrong with him or that anything was in need of change. He stated he wished to be discharged, and hoped Corson would support his desire for discharge. Corson e-mailed Lucier on November 30, 2007, and stated, "It is my

professional opinion that any further therapeutic interventions with this client would be fruitless. Further services are contraindicated due to the aforementioned reasons. Though he maintains a desire for reunification, his actions and inactions would indicate otherwise."

After father was discharged for the third time by Corson, father asked department worker Lucier to refer him back to the Family Intervention Center in Waterbury, but Lucier wanted father to find out if that program had a doctoral-level clinician like Corson. Father never got back to her. After that, father expressed an interest in seeing Dr. Howard Kreger in Waterbury. The department supported this, but declined to pay for it. The department felt it already had given father a competent provider with the credentials recommended by Dr. Humphrey, but father had rejected Corson without good reason. On January 30, 2008, the court, *Goldstein, J.*, denied father's motion for financial assistance from the department for his self-referred treatment. Eventually, father reported he was referring himself to a Dr. Rachel Sampson in 2008, but there never was any confirmation from father that he engaged in therapy with Sampson or any other therapist after 2008.

Lucier was permitted to view father's residence, including his portion of the home, on November 13, 2006. She didn't find any real safety issues in father's apartment, but pointed out that the place needed painting and there were loose tiles in the bathroom. By November 2006, father was offering his own apartment as the primary environment if the children were returned to him. Lucier only returned to his apartment one time, on January 22, 2007, and it had yet to be painted and the tiles were still not fixed. After the neglect hearing of August 2, 2007, father was extremely angry and became more threatening and aggressive

toward staff assigned to his case.[13] Father forbade mother to be on his property, so her visits were moved into the community, two times a week for three hours, supervised by Delta-T. This schedule continued, with the PEAS and Delta-T visitation supervisors continually noting safety and parenting issues on the part of each of the parents, as described more fully above, until November 2007, when the department determined to file termination petitions. Those were filed on December 10, 2007. By February 2008, the parents were not engaged in any services, and the visits were scaled back. Due to his increasingly aggressive and threatening attitude toward those supervising his visits, father's visits were moved away from his home and back to the department offices in February 2008, but he still received two, two-hour visits a week.

Lucier ended her involvement with these cases in September 2008, shortly before Judge Olear terminated the parents' rights. The next worker, assigned on October 1, was Raegan Horvay. Horvay testified that she has been the worker up to the time of trial, a period of over four years. Judge Olear's decision terminating parental rights was made shortly after Horvay was first assigned. At that point, the department was under no obligation to make ongoing service referrals while appeals on the terminations were pending. Judge Olear had denied the parents' post-trial motions for visitation and stays.

After June 29, 2011, when the Supreme Court decision reversing Judge Olear came down, Horvay and her supervisor tried to talk to the parents and re-engage them. Horvay sent letters that advised both parents

[13] On August 6, 2007, father's attorney, Philip Walker, moved for permission to withdraw as counsel due to a breakdown in the attorney-client relationship. Father was displeased about the neglect adjudication and had informed Walker not to contact him again. The motion to withdraw was granted on August 22, 2007, and father subsequently was provided with new counsel.

that the department needed information regarding their circumstances and wished to discuss service referrals, offering to identify providers. The letters did not come back, but father never responded.

An addendum to the termination of parental rights social study, filed on September 15, 2011, indicated that the department was not then aware of father's circumstances or participation, if any, in services, as father had declined to speak with the department on July 28, 2011, and also had advised mother not to speak.

On September 21, 2011, father's motion to resume visitation dated August 24, 2011, was consolidated with the pending neglect and termination petitions scheduled for trial at the Child Protection Session in Middletown. At the beginning of the neglect trial, on September 26, 2011, father's attorney, Mark Weber, attempted to withdraw, but his motion was denied. Ultimately, on February 15, 2012, Weber was permitted to withdraw. Following two days of trial on September 26 and 28, 2011, the court, *Bentivegna, J.*, adjudicated the children neglected and committed them to the custody of the department. Judge Bentivegna also approved the permanency plans of termination of parental rights and adoption and denied the parents' motions for visitation. Father did not appeal Judge Bentivegna's denial of his request to resume visits.

A second addendum to the termination of parental rights social study, dated December 14, 2011, indicates that the department had continued to make efforts to engage father without success. Horvay testified that she and her supervisor sent the parents letters once a month, letting them know that the department required information regarding their current circumstances and wished to discuss necessary referrals to providers, or to identify providers they might have been utilizing independent of department referrals. Father did not respond

to the letters. Thus, despite the looming pendency of the remanded termination petitions, the department remained unaware of father's circumstances.

Father did attend an ACR that took place on September 20, 2011. He did not actively participate except to suggest violations of the ADA by the department. He directed questions and comments to the foster parents in regard to their understanding and awareness of mother's disability and his claim that the state failed to accommodate it. He told the foster parents that the children had two parents that were willing and able to take care of them. Father continued with his attempts to enlighten the foster parents in the parking lot following the ACR. He was unwilling to provide the department with any information regarding possible involvement in services.

Although invited, father did not attend or call into to participate in an ACR on February 24, 2012.

During his testimony at the termination of parental rights trial before Judge Bentivegna on March 26, 2012, father stated he believed he did not need any services to address mental health or parenting deficiencies.

After the second reversal by the Supreme Court was issued on June 28, 2012, Horvay and her supervisor tried to engage with the parents at court and through letters, sending and suggesting referrals in the mail. It is noted in a fourth addendum to the social study in support of termination of parental rights, dated November 28, 2012, that Horvay and her supervisor requested to meet with both parents on August 3, 2012, while at court in Middletown, but the parents declined, as their attorneys indicated they were unavailable. A meeting was then scheduled for August 15, 2012, when the attorneys could be present. On August 15, the parents, on the advice of counsel, refused to participate in the

scheduled meeting. During the meeting, it was repre-
sented that father would be moving in the near future
and the department requested confirmation of any new
address to allow for appropriate service referrals. The
address was never provided. It also was represented
that neither parent was currently engaged in any ser-
vices, but each was willing to participate, and the
department indicated it would attempt to identify pro-
viders in the area of the parents' residences. A letter
was sent to father on September 27, 2012, requesting
information regarding his current situation. The letter
also included a referral for services. Father did not
respond.

An ACR was rescheduled twice between August 2012
and October 2012. It was finally held on October 10,
2012. Father participated by phone after his attorney
called him, but he refused to communicate with or
respond to any questions posed by the department and
would only speak to his lawyer. He did not clarify his
housing or employment situation. He did send three
e-mails referencing the ADA and contacted supervisor
Kevin Real on October 12, 2012, regarding the ADA, but
refused to acknowledge he had received mail from the
department. Father was sent additional letters on Octo-
ber 24 and November 2, 2012, requesting the same infor-
mation requested in the September 27, 2012 letter,
which yielded no response. The November 2, 2012 letter
also asked if father would be available for a home visit.

Essentially, the parents barely communicated with
Horvay. During the pendency of the two appeals, and
between those appeals, they requested visits through
court motions, which were denied. Their most recent
motions for visitation were consolidated for hearing
with the other claims addressed by this trial. The depart-
ment consistently has objected to resuming visits with
father due to his failure to successfully engage in and
progress with counseling and parenting programs, as

well as the tremendous progress and stability of the children after visits had ceased. There have been no visits between father and his children since the fall of 2008.

## C

## Joseph and Daniel W.

Joseph has been in foster care in Connecticut since August 2005—seven and one-half years. Daniel has been in foster care since July 2006—six and one-half years.

After Joseph was born, he suffered from irritability, stiffening his body and tightening his legs, particularly after feeding. A change in his formula to one that was soy-based alleviated the symptoms.

The boys' last visit with their parents was prior to the termination decision issued by Judge Olear on October 1, 2008. Joseph was three and Daniel was two. There is no evidence that either parent has sent the children any cards, gifts or letters since that date. The children do not inquire about their mother or father and appear to have no memory of past visits.

In November 2007, Lucier referred Joseph and Daniel to the Center for Children with Special Needs in Glastonbury, Connecticut. Elizabeth Nulty was assigned to work with the children and their foster parents on the boys' behavioral issues, especially Joseph's. Joseph was then two and one-half years old. He had begun to scream, swear, smear feces, urinate throughout the house and act aggressively toward people and animals. During the time Nulty observed Joseph, she saw some of these behaviors. She noted that the frequency and intensity of the behaviors were atypical for a two year old. Bimonthly sessions were recommended and the foster family drew up a plan to address the behaviors. Consistency and the ability to follow suggestions on the part of the foster parent were important in order

to obtain results. Changes took a while; Nulty worked with the family until February 2010, and Joseph and Daniel consistently improved over time.

Joseph's foster mother, Cathy S., testified that when the visits with the parents were increased from two days to three days a week in the latter part of 2007, after father broke up with mother and the parents' visits were held separately, Joseph's behaviors became increasingly aggressive toward his brother and sister, especially the latter. Joseph would spit at Kristina and pull her hair. The feces smearing and urination also started. Daniel was more quiet and submissive, but at times, imitated Joseph's concerning behaviors. Cathy S. testified that after a visit, Joseph's behaviors were extreme, but then would subside after a day or two. She related that when visits were finally ended in the fall of 2008, the behaviors significantly subsided within a couple of weeks. Cathy S. indicated she later consulted with Nulty after a holiday vacation because of bedtime issues, but when the holiday was over and normal schedules resumed, things went back to normal.

When the foster mother's daughter was pregnant, the boys indicated an assumption that their foster mother had given birth to them. The foster parents sat down with them to tell them that the foster parents were not their biological parents. The boys also were told Kristina was their biological sister. The boys' reaction was, "Oh." They then went and played. This revelation did not seem to affect them much; and they have not asked their foster parents any questions about their origins since.

The boys reside with their two foster parents and the biological son of that couple, as well as two other adopted children, a boy and a girl. The boys call their foster parents "Mom" and "Dad." They get along very well with Kristina. All three children play together. They

like to play school, swim, walk the dog and do homework together. The boys have good relationships with the older children in the home, as well as with members of the foster family's extended family.

Both children do wonderfully in school, achieving 90 and better on graded papers and are on target for all subjects. Joseph is in the second grade and Daniel is in first grade. Joseph did require additional support to build his reading skills and made such progress that the school felt he no longer required the extra help. Daniel required speech services for stuttering when he was in preschool, and the foster home implemented the school's recommendation at home. He no longer requires speech therapy. Both boys are healthy and have no medical conditions that would require additional care. They attend routine doctor and dental appointments and are up to date with their immunizations.

Cathy S. described Joey as a "spitfire," very quick-witted and funny. He is very good with his hands, and loves Legos and transforming recycled items into something else. His "imagination is really something," Cathy S. testified. Daniel is artistic and quiet. As of the date of trial, he was making an alphabet book and drawing an animal book. He draws all the time. Both of the boys' teachers think they are wonderful, friendly, helpful and good friends to their classmates. There are no serious disciplinary issues.

### III

### NEGLECT ADJUDICATIONS

In a coterminous proceeding, the trial court must first, pursuant to Practice Book § 35a-3,[14] determine, by

---

[14] Practice Book § 35a-3, captioned "Coterminous Petitions," provides as follows: "When coterminous petitions are filed, the judicial authority first determines by a fair preponderance of the evidence whether the child or youth is neglected, uncared for or dependent; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by

a fair preponderance of the evidence, whether the child is neglected, uncared for or abused. The ground of neglect alleged in Joseph's petition is that the child is being denied proper care and attention physically, educationally, emotionally or morally. The summary of facts contained in that petition alleges that "Mother has a significant and long standing mental health condition that impairs her ability to safely parent her child. Despite the provision of psychiatric services, mother has failed to benefit from said services. Father has no insight or acceptance of [mother's] psychiatric impairment and the implications they have for this child. By virtue of the child's age, he requires a competent and responsible caregiver." The grounds of neglect alleged in Daniel's petition is that the child is being denied proper care and attention physically, educationally, emotionally or morally and being permitted to live under conditions, circumstances or associations injurious to his well-being. The summary of facts in that petition alleges that, "Mother has unresolved mental health issues that prohibit her from adequately caring for the child. Despite the provision of psychiatric services, mother has failed to avail herself of or benefit from said services. Father fails to recognize the mother's mental health issues and how they negatively impact her ability to care for the child. Father has not demonstrated an ability to care for the child independent of the mother. By virtue of the child's age, he requires a competent and responsible caregiver."

These are cases of predictive neglect. "Our statutes clearly permit an adjudication of neglect based on

clear and convincing evidence; if so, then the judicial authority determines whether termination of parental rights is in the best interests of the child or youth by clear and convincing evidence. If the judicial authority determines that termination grounds do not exist or termination of parental rights is not in the best interests of the child or youth, then the judicial authority may consider by a fair preponderance of the evidence any of the dispositional alternatives available under the neglect, uncared for or dependent petition."

potential for harm or abuse to occur in the future. General Statutes § 17a-101 (a) provides: 'The public policy of this state is: To protect children whose health and welfare *may* be adversely affected through injury or neglect . . . .' By its terms, § 17a-101 (a) connotes a responsibility on the state's behalf to act before the actual occurrence of injury or neglect has taken place." (Emphasis in original.) *In re Michael D.*, 58 Conn. App. 119, 123–24, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000).

As the Appellate Court has noted, "The department, pursuant to the statute, need not wait until a child is actually harmed before intervening to protect a child." Id., 124. No court is required to leave a child in the custody of a parent who is clearly incapable of providing even basic care for the sole purpose of demonstrating that the child will suffer actual harm. See *In re Kelly S.*, 29 Conn. App. 600, 615, 616 A.2d 1161 (1992); *In re Angelina P.*, Superior Court, judicial district of Hartford, Juvenile Matters, Docket No. H12-CP10-013506-A (September 16, 2011) (*Dyer, J.*). Where a child's family presents with a history of neglect of older children and parental inability to respond meaningfully to address the parental deficiencies that had been identified in the earlier cases, neglect can be predicted. Obvious inability to meet minimal expectations of parenting skills will sustain a finding that prospective harm to the child of such a parent is predictable. For example, in *In re Curnijah H.*, 121 Conn. App. 292, 994 A.2d 710 (2010), a finding of predictive neglect was upheld based on a mother's lack of success in addressing her drug abuse and mental health issues, thus rendering her unable to care properly for any of her children. "The doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred." *In re T.K.*, 105

Conn. App. 502, 513, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

Connecticut case law is clear that neglect and even termination findings may issue against a parent who knowingly exposes his or her children to contact with a person capable of causing physical or emotional injury to them. Enablers of persons perpetrating neglect or abuse also bear responsibility. See *In re Jorden R.*, 293 Conn. 539, 562, 979 A.2d 469 (2009); *In re Antonio M.*, 56 Conn. App. 534, 543, 744 A.2d 915 (2000); *In re Lauren R.*, 49 Conn. App. 763, 771–72, 715 A.2d 822 (1998); *In re Felicia D.*, 35 Conn. App. 490, 501–502, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994).

Recently, our Supreme Court, in the case of *In re Joseph W.*, supra, 305 Conn. 646, upheld the application of the predictive neglect doctrine in child protection cases, but clarified the standard for determining whether it exists. In neglect proceedings involving the doctrine of predictive neglect, the "trial court must determine, on the basis of evidence of events preceding the filing of the neglect [petition] . . . whether, for [the child], it was more likely than not that, if the child had remained in the care of either the mother or the father, or of both parents, the child would have been [neglected]." (Citation omitted; footnote omitted.) Id., 648–49. The petitioner is required to meet this standard separately with respect to each parent who has contested the neglect petition and has expressed a desire, or at least a willingness, to care for the child independently of the other parent, and prove that if the child were to remain in that parent's independent care, the child would be "denied proper care and attention, physically, educationally, emotionally or morally . . . or would [be] permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth . . . ." (Citation omitted; internal quotation marks omitted.) Id., 649. Either parent can

defend a neglect petition based on predictive neglect if he or she can show that, even if the other parent might neglect the child in the future if given custody, he or she would not neglect the child in the future if given sole custody. However, "[i]f the parents have indicated that they intend to care for the child jointly . . . or if the trial court discredits a parent's claim that he or she intends to care for the child independently, the trial court may treat the parents as a single unit in determining whether the petitioner has met its burden of proving predictive neglect." Id., 647–48.

The court incorporates by reference here all of the relevant factual findings it has previously made in this memorandum of decision.

The court finds by a fair preponderance of the evidence that the department has correctly invoked the doctrine of predictive neglect with respect to both Joseph and Daniel.

In making its finding, "[i]t is the right and the duty of the [trier of fact] to draw reasonable and logical inferences from the evidence. . . . In considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *In re Carissa K.*, 55 Conn. App. 768, 783, 740 A.2d 896 (1999). Although direct evidence of a person's state of mind or intention may not always be available, intent can be inferred from conduct and events leading to and immediately following a particular event. See *State v. Bennett*, 307 Conn. 758, 780, 59 A.3d 221 (2013) (*Norcott, J.*, dissenting); *State v. Otto*, 305 Conn. 51, 66, 43 A.3d 629 (2012).

Conduct yields facts and inferences that demonstrate a pattern of behavior and attitude that is probative of a person's mental state.

Although in the adjudicatory phase, pursuant to Practice Book § 35a-7 (a), the judicial authority is limited to evidence of events preceding the filing of the petition, "[t]hat rule of practice refers to the events preceding the filing of the petition, not the evidence preceding the filing of the petition. Section 35a-7 (a) does not require the evidence of the events to have been gathered before the filing of the petition." (Internal quotation marks omitted.) *In re Nelmarie O.*, 97 Conn. App. 624, 628, 905 A.2d 706 (2006).

Addressing Joseph's neglect petition first, the court finds by a fair preponderance of the evidence that the petitioner has proved, by direct and circumstantial evidence, that the parents were a unit as of the adjudicatory date established in Joseph's petition, July 21, 2005.

At no time prior to or on the adjudicatory date of Joseph's neglect petition, July 21, 2005, did either parent indicate an intention, express a willingness, or even engage in any activity that suggested an inclination to live separate from the other and care for Joseph as a sole custodian, independent of the other. Neither of them ever made a credible claim that he or she intended to take sole custody of Joseph and parent him separately to prevent the other parent from neglecting him.[15] At no time prior to Joseph's adjudicatory date did mother or father express to the Pennsylvania authorities or the department a desire to independently parent Joseph, even though father later admitted to Dr. Humphrey that mother's statements in the hospital in Scranton would have been viewed by hospital personnel as

---

[15] In fact, the Supreme Court noted in 2011 that father *never* made any claim that although mother might neglect the children, he would not; rather, he denied *any* possibility of neglect. *In re Joseph W.*, supra, 301 Conn. 263 and n.17.

bizarre. Despite the risk to mother and the baby, father and mother were physically and emotionally allied in their determination to thwart any efforts on the department's part to protect Joseph as it already had protected Kristina. Mother concealed her pregnancy and the name of the potential father from both the department and DSS. When the parents met with the department supervisor, Melita Joiner, before Joseph was born, they were informed that if Kristina's case was still open, there likely would be a case opened on their expected child. They made no effort to develop a responsible plan with the department that might have prevented Joseph's removal, although they claimed they sought the advice of an attorney before they left. Instead, they embarked on a plan to actively hide the birth of Joseph from Connecticut child protection authorities. After Joseph was born, the parents gave inaccurate information to the Pennsylvania authorities, whose immediate concerns, similar to Kristina's case, were based on the parents' bizarre presentations, particularly mother's. For the most part, father refused to responsibly speak with them, and instead engaged in continuous invocation of the constitution. If Pennsylvania officials had not intervened, the parents' plan, later admitted to by both of them, was to get married or live together and raise Joseph outside of Connecticut, possibly in Alabama because, as father later noted, one can live cheaply there and the climate was better. However, if the hospital had discharged Joseph to them, they actually had no ascertainable residential destination other than their vehicle. They had made no actual plan for housing or any source of income.

Accordingly, the court does not have to consider mother or father independent of each other in adjudicating predictive neglect, but can treat the parents as a unit, which is exactly what all the evidence reveals they were as of July 21, 2005—a fiercely allied, desperate

duo intent on parenting Joseph jointly, whether or not they resided together, which they in fact did for a great deal of the time, prior to and well after Joseph's birth. When Joseph was born, father was firmly committed to remaining on the lam with mother. He already had engaged in bizarre behavior with her, obviously evincing an alarming lack of judgment and insight into her blatantly peculiar mental deficiencies. The fact that he could not perceive or acknowledge her issues and engaged in bizarre and elusive behaviors with her clearly called his own mental stability into question at the time of Joseph's birth. At the very least, he was a devoted enabler of mother's peculiar and dangerous notions of parenting.

Karin H., as of July 21, 2005, continued to have unmet medical and psychological needs that rendered her largely unable to properly care for a completely dependent infant. Hospital personnel were alarmed at the thought of mother assuming a role as the sole caretaker for Kristina in 2002 and determined she was entirely incapable of doing so. Mother's subsequent behaviors and resistance to direction during visits with Kristina and her refusal to address her mental health, narcolepsy and possible ADHD indicated she was making no progress as to her issues in order to reunify with Kristina at the time of Joseph's birth. Every evaluator who looked at mother from 2003 to 2005 warned against returning Kristina, or any child, to mother's care. She rejected medical advice, attributed illnesses to Kristina that no one else observed, fed the child improperly and showed a concerning lack of empathy. She attributed her loss of her daughter to a conspiracy of hospital and government officials and accepted no responsibility for her actions. With the assistance of father, she conducted a frightening surveillance of the children's foster home.

When Joseph was born, mother had made no progress or improvement since the birth of Kristina. She had

not addressed her mental health or her narcolepsy, a medical condition that could cause her to fall asleep or otherwise lose control at unpredictable times, which could place a child, especially an infant, in peril. She continued to lack the insight, judgment and basic competency required to adequately protect and raise any child, especially an infant. In spite of experiencing the loss of her daughter, mother, prior to the neglect adjudicatory date for Joseph, had consistently refused the offers of services and treatment made by the department or suggested by her own physicians, services that might assist and possibly enable her to acquire the help and skills necessary to appropriately care for a child. As of July 21, 2005, her lifestyle continued to be unstable, transient and fraught with risk to her and to the physical and emotional safety and well-being of the child born to her. Her deficient parenting abilities, continuing bizarre behavior, unstable lifestyle, deficient mental health and elusive and untruthful propensities were no different in 2005 than they were in 2002. Unfortunately, mother also had allied with a boyfriend who, despite dating her for months, had developed no appreciable insight into the extent of her mental and medical disorders, and encouraged her to defy, rather than work with, the department. This was a toxic combination.

Prior to Joseph's adjudicatory date, father had behaved aggressively and punched a man during a road rage incident. In addition, father and his sister's son were engaged in an altercation involving a knife. In 2004, father had accompanied mother on her trip to the foster home in an effort to intimidate or frighten the persons inside. Exercising extremely poor judgment, father drove the car around the home several times, then exited the vehicle and went up to the door and began banging on it, shouting Kristina's name. The babysitter inside was terrified. This activity, in which father had no real interest at stake other than his distorted

perception of supporting mother, resulted in mother being barred from going near the foster home and certainly, such actions were not helpful in her quest to reunify with Kristina. The parents were fortunate not to have been arrested. Father saw nothing inappropriate about their actions. Before Joseph was born, father accompanied mother to a meeting with a department supervisor to ask what might happen, given the pendency of Kristina's case, if the couple had a child. He was alerted that if mother had an open case, the department would probably open a case on Joseph. The department had no other contact with father prior to Joseph's birth. When mother became pregnant, rather than contacting the department to discuss a plan that might protect and avoid the removal of the expected child, father and mother concealed the pregnancy and the identity of the father from the department and the fact that mother was residing with him. Father was aware of mother's pregnancy and obviously believed the expected child was his, because he attended some of her prenatal medical appointments. Since he felt it incumbent on him to frighten the people in Kristina's foster home with mother, he undoubtedly was aware of mother's involvement and the fact that Kristina had been out of her care for several years, but he never even considered a less risky course of action other than fleeing without any plan. After mother indicated to her obstetrician, Ronan, that she really had not wanted to have this baby and was planning to pack her bags and leave the state, Ronan alerted the department. Ronan also indicated to the department that she had been observing father during prenatal visits, and in her opinion, father was "as disturbed" an individual as mother. Mother already had cancelled two scheduled caesarian section appointments and her pregnancy had progressed to thirty-nine weeks. Her delivery of Kristina had developed complications, including edema and high

blood pressure. An even worse exercise of poor judgment on father's part was his decision to aid and abet mother in fleeing the state to deliver Joseph so the department would not obtain custody of him. When mother and father took off in his twenty year old Volkswagen with no careful plan for housing or employment in place, mother was well past the delivery dates her physician felt were appropriate. The two then drove half way across the country to Indiana, but left there without explanation after making an attempt to obtain obstetrical services. Ronan received a request for mother's records from a hospital in Indiana and again alerted the department. Eventually, mother had to deliver the baby in Scranton, Pennsylvania, virtually an "any port in a storm." The fetal heartbeat, by this point, was weakening.

After Joseph was delivered, mother and father were evasive in providing information to the Pennsylvania hospital personnel. They lied about where they had been residing, but it is notable that both gave an inaccurate address in Waterbury. Mother expanded on an obviously unrealistic plan to buy a mansion in Alabama. She lied about having contacted an Alabama pediatrician. Mother later admitted to the department that the parents' plan on July 18, 2005, was to move to Alabama and she, a woman who should not drive for more than twenty minutes at a time due to her narcolepsy, would commute back to Connecticut once a week to continue her efforts at reunification with Kristina. She said father would remain in Alabama with Joseph during these trips. Father engaged in constitutional incantations with the hospital personnel. He later admitted that some of the statements mother made in Pennsylvania were inappropriate, but also stated that this was the first time he'd witnessed her peculiar behavior. After only a few days observation, the hospital personnel contacted the Pennsylvania authorities to prevent the discharge of Joseph to these two people who were

behaving in a bizarre fashion and misrepresenting their circumstances. The Pennsylvania child welfare agency contacted Connecticut and determined that Connecticut was the appropriate forum for a child protection proceeding given the information and ties both parents had with Connecticut. When the court, *Taylor, J.*, heard evidence on the circumstances of Joseph's removal, it sustained the OTC on the basis of danger of immediate physical harm on August 5, 2005.

With respect to Joseph, based on the circumstances of the mother and father as of the adjudicatory date, July 21, 2005, the court finds by a fair preponderance of the evidence that it was more likely than not that if Joseph had been permitted to remain in the care and custody of his mother and father, it would have caused Joseph to be denied proper care and attention, physically, educationally, emotionally or morally. To discharge Joseph from the hospital into his parents' care would have placed him in an unhealthy, risky environment lacking the twenty-four hour, responsible and informed supervision and assistance mother would have required to safely provide the infant with even the most basic of needs, which, more likely than not, would have led to Joseph's being denied proper care and attention. Mother undoubtedly would have persisted in her eccentric and dangerous notions of infant care, such as seeing medical problems where there were none, insufficiently feeding the child, and questioning medical providers' opinions and recommendations. Father, despite admitting mother was bizarre at times, was sticking by her and failed to perceive the dangers, although he had been in a relationship with her for at least nine months. It was very clear to every professional mother had encountered that mother could not be entrusted with an infant's care. As of the adjudicatory date, there is no evidence that father was willing to live separately from mother or to protect the child from

unsupervised, or inadequately supervised, contact with mother. Father later admitted to Humphrey in February 2006, that, had the department not become involved with Joseph, he was going to marry mother, and they and the child would have remained together, jointly parenting the child.

Even if one of the parents had indicated a willingness to parent Joseph independently of the other, the facts asserted above also establish by a fair preponderance of the evidence that if Joseph had been permitted to remain in the care and custody of either one of them, independent of the other, it was more likely than not Joseph would have been denied proper care and attention physically, educationally, emotionally or morally or permitted to live under conditions, association and circumstances injurious to his well-being. Mother was mentally incapable of safely caring for an infant, and father displayed no credible willingness to fully protect Joseph from her.

Since 2002, mother had consistently failed to adequately engage in and benefit from services designed to ameliorate the significant risk she poses to her children, apparent since the date of Kristina's removal. Prior to July 21, 2005, father exhibited poor judgment, aggressive behaviors, hostility toward others and a lack of insight into mother's limitations, denying or failing to notice that she had any mental health issues that impeded her ability to parent despite the fact that they were so consistently obvious to everyone else.

Unfortunately, mother, aided by father, continued to engage in a cyclical pattern of conceiving children, whose custody, of necessity, had to be assumed by the state at birth in order to protect them from the real risk of imminent and serious harm that every professional who has ever evaluated and observed mother try to care for her children has noted as a serious concern.

A fair preponderance of the evidence shows that at the time of Daniel's birth on July 23, 2006, the parents were still residing together and intending to marry and/or remain together. Both parents admitted, before and after Daniel's birth, that they were still living together in Thomaston when Daniel was born. Father admitted it to Coutant Skinner, Humphrey and Lucier, and mother admitted it to Humphrey. Neither parent expressed a credible willingness or desire to separate from the other and raise Daniel independently. The court therefore, for purposes of determining Daniel's neglect adjudication, will continue to consider the parents as a unit, rather than independently, in adjudicating whether or not Daniel would be predictively neglected as of his adjudicatory date, July 24, 2006. When Daniel was born, neither parent was even close to reunifying with Joseph, and mother had made no progress in achieving reunification with Kristina. Although Humphrey, in March 2006, had set forth a series of steps for father to take to achieve reunification independent of mother, father had not begun to adequately address a single one of Humphrey's recommendations by July 24, 2006, the adjudicatory date relevant to Daniel's neglect petition. Father did not permit inspection by the department or the PEAS program of a suitably prepared living space for the children in his living quarters. He did not provide a written plan for substitute caretakers should he be unavailable that did not include mother as an alternative until the fall of 2006, and then, his plan proved unacceptable. Most significantly, as of July 24, 2006, he had not commenced the individual counseling he needed to be educated to accept and identify mother's mental health issues and formulate a parenting plan to keep the children safe from her.

As of July 24, 2006, the psychological and parenting issues mother had exhibited since the birth of Kristina had not abated. She continued to refuse to fully engage

in services or accept the recommendations and suggestions of service providers. Not one professional who had evaluated her since Joseph's birth believed she could safely parent a child without constant supervision. In addition, as of July 24, 2006, the psychological and parental deficiencies in the father had become quite obvious, although there was fair indication of them at the time of Joseph's removal in July 2005. Father's now diagnosed and unaddressed personality disorder was impeding his efforts to regain custody of Joseph. He continued to refuse to speak to department representatives, even to provide simple information, which prompted the department to move to have him evaluated by a psychologist. He often attempted to prevent mother from speaking during meetings and visits by gesturing to her and even covering her mouth with his hand.[16] Despite the department's extensive efforts to engage him after Joseph's birth, his own actions and inactions—his defiance of the department worker, refusal to cooperate with service providers and unwillingness or inability to follow through with Humphrey's recommendations—had severely disadvantaged him. He had to be repeatedly prodded and urged to participate in services, and he rejected some referrals entirely. He indicated to Humphrey that he did not believe that any aspects of mother's behavior were unusual or bizarre.

Prior to Daniel's birth, the parents were consistently a couple—during visits with Joseph and attendance at

---

[16] The court recognizes that father has a statutory right to remain silent in this case. See General Statutes § 46b-137 (d) and Practice Book § 32a-1. However, he was required to comply with court-ordered specific steps, which would necessitate some minimal level of cooperation and communication with department representatives. In addition, throughout the proceedings, and even before Joseph's birth, he was represented by counsel who also were capable of communicating with the department on his behalf if he chose not to do so. His right to remain silent did not authorize him to physically restrain mother from speaking to the department personnel or otherwise interfere with her attempts to do so.

department meetings. They both had exhibited hostility to the department workers and other service providers, inattentiveness to the children, and resistance to basic and necessary direction on appropriate child care. Father often stood by while mother fed Joseph inappropriately or inexplicably denied him access to a toy. Just days before Daniel was born, mother carelessly allowed Joseph to fall off an inflatable chair. Father was not watching. When mother became belligerent toward the department worker supervising the visit, father did nothing to stop her. The parents' amorous moments during visits with Joseph, while department personnel were observing, were immature, contemptuous and distasteful. So intertwined was their focus that each insisted on attending the other's counseling sessions. As of July 24, 2006, father still did not accept that mother had psychological difficulties that prevented her from being an adequate parent. Despite admitting to Dayner when she first visited his home in 2005 that he knew the department might want to see him reduce the time he spent with her, he had not convincingly done so, or even indicated a willingness to do so, prior to the date Daniel was born. In January 2006, the DSS could not confirm mother's address as her parents' Watertown residence, and mother refused to answer Dayner's inquiries about her residence. When Dayner asked father if he intended to separate from mother, he refused to answer. Prior to July 24, 2006, he never allowed Dayner or Coutant Skinner of the PEAS program sufficient access to his own apartment so they could be assured it was appropriate for children and that mother was not staying there. In fact, after the OTC hearing on August 11, 2006, the court had to issue an *order* in the preliminary specific steps carefully restricting mother's presence in the father's home, which mother immediately questioned. There is, in fact, an acknowledgment on the parents' part that they were

not prepared to safely and properly care for Daniel at the time of his birth, as they both *agreed* to the sustaining of his OTC on the basis of risk of imminent physical harm and they signed the preliminary specific steps.[17]

The court finds by a fair preponderance of the evidence that, as of July 24, 2006, the adjudicatory date for Daniel, it was more likely than not that Daniel, if he had been permitted to remain in the care of his parents, would have been denied proper attention, physically, educationally, emotionally or morally and would have been permitted to live under conditions, associations and circumstances injurious to his well-being.

Even if one of the parents had indicated a willingness to parent Daniel independently of the other, the facts asserted above also establish by a fair preponderance of the evidence that if Daniel had been permitted to remain in the care and custody of either one of them, independent of the other, it was more likely than not Daniel would have been denied proper care and attention physically, educationally, emotionally or morally or permitted to live under conditions, association and circumstances injurious to his well-being. As of July 24, 2006, mother had consistently failed to adequately

[17] Query whether the court's sustaining of Joseph's OTC, after a hearing, on August 5, 2005, and the parents' stipulation to sustaining Daniel's OTC on August 11, 2006, both on the basis of risk of imminent physical harm, should not be considered admissions or prima facie evidence of predictive neglect, since the grounds for securing an OTC are more exacting. Clearly, a finding of risk of imminent physical harm equates with a finding that a child will more likely than not be denied proper care and attention physically or emotionally or more likely than not be subject to conditions, associations and circumstances injurious to his well-being. Courts regularly consolidate OTC and neglect petition hearings and routinely rely on the facts established to sustain an OTC as sufficient to adjudicate neglect. See *In re Julian R.*, Superior Court, judicial district of Windham, Child Protection Session at Willimantic, Docket No. K09-CP11-012604 A (March 7, 2011) (*Foley, J.*); *In re Geneo P.*, Superior Court, judicial district of Hartford, Docket No. H12-CP11-013897-A (September 9, 2011) (*Dyer, J.*).

engage in and benefit from services designed to ameliorate the significant risk she poses to her children, apparent since the date of Kristina's removal. Prior to July 24, 2006, father continued to exhibit poor judgment, hostility toward others and a lack of insight into mother's limitations, denying that she had any mental health issues that impeded her ability to parent, despite the fact that they were consistently obvious to everyone else. His reluctance to engage in recommended services that would help him gain insight and address his own mental health issues persisted. While he may have gone through the motions, he did so unconvincingly, and there is no credible evidence he intended to adhere to recommendations that would permit him to safely parent Daniel without mother being his constant companion. Accordingly, pursuant to the doctrine of predictive neglect, Joseph and Daniel W. are hereby found neglected as alleged by a fair preponderance of the evidence.

IV

TERMINATION OF PARENTAL RIGHTS
ADJUDICATIONS

Trial of a petition to terminate parental rights has two phases, adjudication and disposition. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Citation omitted; internal quotation marks omitted.) *In re Roshawn R.*, 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In the adjudicatory phase of the proceeding, the court must make separate determinations as to reasonable efforts and the statutory grounds for termination. The first ground for termination alleged here as to both

parents in each petition is the failure to rehabilitate pursuant to § 17a-112 (j) (3) (B) (ii). "That statute provides for the termination of a child where the child is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 149, 962 A.2d 81 (2009).

The federal Adoption and Safe Families Act of 1997 requires states to enact certain provisions in order to continue receiving federal foster care funds. These include provisions to require initiation of termination proceedings when a child has been in foster care for 15 consecutive months if the state has provided the family with services necessary for the child's safe return home. Section 17a-112 (j) (3) (B) (ii), unlike § 17a-112 (j) (3) (B) (i), does not require that the neglect finding have been made in a prior proceeding. The department can pursue a neglect and a termination petition together either by filing them coterminously or moving to consolidate such pending petitions. See *In re Randi R.*, Superior Court, judicial district of Hartford, Juvenile Matters, Docket No. H12-CP08-0111870-872A (July 10, 2012) (*Frazzini, J.*); General Statutes § 17a-112 (*l*).

The second ground for termination alleged in each petition only as to mother is failure to rehabilitate by a parent of a neglected child under the age of seven whose parental rights to another child have previously been terminated. See General Statutes § 17a-112 (j) (3) (E). Under this ground, "the trial court may terminate

the parent's parental rights if the requirements of § 17a-112 (j) (1) and (2) have been met and the parent of a child under the age of seven years who is neglected or uncared for, has failed, or is unable or unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's rights to another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ." (Emphasis omitted; internal quotation marks omitted.) *In re Joseph W.*, supra, 301 Conn. 266. In making its determination under subsection (j) (3) (E), the court may base the requisite finding that the child is neglected on evidence presented at the termination proceedings. The statutory basis for termination does not mandate a preexisting finding of neglect in a prior proceeding. Id., 266–67.

## A

### Reasonable Efforts Findings

A termination of parental rights under § 17a-112 (j) on nonconsensual grounds, as has been pleaded for the respondent parents here, requires the court, in the adjudicatory phase, to find, as of the adjudicatory date, whether: There is clear and convincing evidence that the department has made reasonable efforts to locate each parent; and there is clear and convincing evidence that the department has made reasonable efforts to reunify the child with each parent, *unless* the court finds that the parent is unable or unwilling to benefit from reunification efforts.[18] General Statutes § 17a-112

---

[18] General Statutes § 17a-112 (j) provides, in pertinent part, as follows: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent

(j) (1); *In re Jorden R.*, 293 Conn. 539, 552, 979 A.2d 469 (2009); *In re Brendan C.*; 89 Conn. App. 511, 524, 874 A.2d 826, cert. denied, 274 Conn. 917, 879 A.2d 893, cert. denied, 275 Conn. 910, 882 A.2d 669 (2005); *In re Vincent B.*, 73 Conn. App. 637, 640, 809 A.2d 119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003). "[R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Ebony H.*, 68 Conn. App. 342, 349, 789 A.2d 1158 (2002); see also *In re Daniel C.*, 63 Conn. App. 339, 361, 776 A.2d 487 (2001); *In re Jessica B.*, 50 Conn. App. 554, 566, 718 A.2d 997 (1998). The court incorporates by reference here all of the relevant factual findings it has previously made in this memorandum of decision.

From the date of the filing of the neglect petition on behalf of Joseph in July 21, 2005, until the adjudicatory date, December 10, 2007, the department made reasonable efforts to locate mother and father. Both parents were duly served with notice of the temporary custody orders, the neglect and termination petitions in accordance with the law. Commencing in August 2005, the parents' specific steps required that they keep the department, their attorneys and the attorney for the children notified of their whereabouts. Each parent reviewed and signed specific steps, so both were on notice that they had an affirmative obligation to keep the department aware of their whereabouts. Despite some misrepresentation at certain times by the parents as to where mother was actually staying and the father's refusal to actually disclose an address until late 2005, the department managed to maintain a reasonable ability to contact both mother and father throughout all proceedings.

is unable or unwilling to benefit from reunification efforts . . . ." See *In re Shaiesha O.*, 93 Conn. App. 42, 47–48, 887 A.2d 415 (2006).

In these cases, the department alleges that reasonable efforts had been made to reunify Joseph and Daniel with their parents. Alternatively, the department alleges that each parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Thus, although § 17a-112 (j) begins with a presumptive obligation that the department make reasonable reunification efforts, it later excuses this obligation in cases in which a trial court finds, by clear and convincing evidence, that a parent is unable or unwilling to benefit from such reunification efforts. See *In re Jorden R.*, supra, 293 Conn. 554.

The petitioner has proven by clear and convincing evidence that as of December 10, 2007, the adjudicatory date of the termination petitions, the department made reasonable efforts to reunify mother and father with Joseph and Daniel. In certain respects, the court finds the efforts were extraordinary.

When Joseph was born, mother, as part of her specific steps to achieve reunification with Kristina, was uninspiredly engaged in counseling with Dr. Heather Toll of the Connecticut Resource Group. Toll discharged her by the end of 2005. Efforts as to mother since July 21, 2005, consisted of referrals for psychological and neuropsychological evaluations by Doctors Gruen, Krulee, Logan and Humphrey. The department made additional referrals to implement the recommendations of those experts. The department attempted to work with mother's self-referred counselor, Sally Guest, but was met with a lack of cooperation from Guest, and became concerned when it learned Guest had been provided an inaccurate history by mother and that father was attending sessions intended solely for mother. The department sought and obtained an order from the court prohibiting further services from Guest.

It then made referrals to Dr. Steinberg and Dr. Campagna for individual counseling services and/or medication management. Mother failed to consistently attend and fully cooperate with counseling. Although not referred for individual counseling services with Dr. Corson, mother was not prevented from attending family counseling with father, conducted by Corson, and the department supported the services financially. This service was ended when father broke up with mother after she consented to a neglect adjudication and commitment of the children in August 2007. The department also encouraged mother to address her narcolepsy, but mother was resistant to following through with Dr. Polnitsky or even her own chosen psychiatrist, Dr. August, to address that condition.

The department offered mother supervised visitation at its office or with other providers until October 2008. Mother was referred to the McCall Foundation Parent Education and Assessment Services (PEAS) program, and the Delta-T program for supervised visitation and hands-on parenting education. She also was permitted to participate in father's parent aide service through the Northwest Center for Families and Mental Health. All these agencies ended their services due to mother's failure to make progress with identified goals.

Father was provided with a psychological evaluation by Dr. Humphrey, as well as two updates to insure that services were sufficient and appropriate. Father was referred to the Family Intervention Center twice, the Charlotte Hungerford Behavioral Health Center, the Family Services of Greater Waterbury and Dr. Corson for individual and family counseling services. For all counseling referrals, father either failed to complete the application process or failed to consistently attend scheduled appointments. He also was referred to the Family Strive program, the Northwest Center for Families and Mental Health for parent aide services, the

McCall Foundation PEAS program and the Delta-T program for parenting education and supervised visits. The McCall Foundation even assisted father with funds so he could obtain auto insurance and auto repairs to help him keep his service appointments. Father's engagement with all of these parenting programs ended due to his failure to make gains toward identified goals. Father also was permitted to attend mother's counseling sessions with Steinberg to aid him in gaining insight into her mental health issues. His participation in that counseling ended when Steinberg discharged mother for lack of attendance and compliance.

The petitioner also has proven by clear and convincing evidence that, as of the adjudicatory date, December 10, 2007, both parents were unable or unwilling to benefit from reunification efforts. In making this determination, the court has taken into account mother's lack of cooperation with the department's reunification efforts in cases involving her older child, Kristina, which resulted in the termination of her parental rights, as well as the unaddressed parental deficiencies exhibited by mother prior to and at the time of both boys' births. As with her older child, mother was observed to be incapable of caring for Joseph and Daniel without full-time supervision, yet she stubbornly insisted she could care for them, on her own, or with the assistance of a father who, at various times, denied the existence of, or minimized the severity of, mother's mental health issues. Mother ignored or rejected all suggestions from the parent aides or educators when her behavior during visits became concerning. At times, she could not control her temper, resulting in threatening or assaultive behaviors and outbursts that upset the children. Mother acquired no insight from her past experiences and remained incapable of recognizing that she needed a number of services if she were to ever assume the care and custody of her children.

Father, until late 2006, barely spoke to the department worker. It was months before he would even provide the department with contact information in the event a visit needed to be rescheduled. He attended a single assessment at the Family Intervention Center in Waterbury, but refused to complete the intake form because he felt it was too personal. Eventually, he agreed to enter the PEAS program, which was unsuccessful. He never managed to set up a proper living environment for the children and he failed to establish greater independence from his mother or Karin H. He refused to even consider opening a checking account. Months after Dr. Humphrey issued recommendations to promote reunifying with the children, father reluctantly began to comply, but he was unable to present an acceptable, alternative care giving plan. He should have focused on preparing a proper environment and participating in services independently of mother, but he just could not tear himself away from her negative influence, nor could he cease negatively influencing her. Her presence was pervasive. Father's and mother's claim that she didn't reside with him were not credible. The department had trouble getting information to mother at the phone number she gave them at her parents' residence. Mother admitted to Humphrey in September 2006 that she had been living with father most of the time. Mother's parents indicated mother and father were planning to marry and live in the home he co-owned with his mother. In the months just preceding the birth of Daniel, the Department of Social Services was never able to contact mother to confirm she resided with her parents. Months after court orders were issued that mother not spend nights at the father's residence, a department supervisor observed mother's car parked overnight at father's home three times in a five-week period. Visits and parenting education with the PEAS program, initially planned to promote reunification between father

and the children ended up having to include an omnipresent mother. Without any notice to the department, she was in attendance for all of the visits conducted at father's residence. Counseling with both Sally Guest and Steinberg that was intended for mother ended up including father, and mother attended, father's counseling with Corson.

Although father finally began counseling with Corson to address his own personality disorder and learn how to manage mother's problematic behaviors, he approached counseling with the rigid opinion that he did not need it and did not believe in it.

Father, too, engaged in behaviors during some visits that placed the children at risk or upset them. For example, his reaction to the boys' haircuts was over the top. His inability to gain insight into mother's parenting deficiencies and mental instability also encouraged mother's continuing state of denial.

As Corson noted, father "can't get out of his own way." Mother has the same issue, having been diagnosed with a personality disorder similar to father's. Father and mother, encouraged by father, are far more intent on winning every little battle, despite potentially losing the war.

Prior to the adjudicatory date, both parents refused to accept the need for and value of mental health treatment, and in mother's case, medical treatment. The parents never accepted that the recommended programs or treatment were worthwhile. They consistently refused to accept advice and suggestions regarding their parenting skills and made no progress in addressing the child protection concerns. By their actions and inactions, both parents have shown they were unwilling and unable to benefit from reunification efforts as of the adjudicatory date. Essentially, they were never sincerely amenable to achieving rehabilitation.

B

Statutory Grounds for Termination

The termination petitions were filed on December 10, 2007. Under Practice Book § 35a-7 (a), in the adjudicatory phase of the proceeding, "the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." See *In re Anthony H.*, 104 Conn. App. 744, 757, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008). In the case of a termination under either § 17a-112 (j) (3) (B) (ii) or § 17a-112 (j) (3) (E), "[t]he court should consider all potentially relevant evidence, no matter the time to which it relates." *In re Mia M.*, 127 Conn. App. 363, 14 A.3d 1024 (2011). The court incorporates by reference here all of the factual findings it has previously made in this memorandum of decision.

An inquiry regarding personal rehabilitation requires a historical perspective of the respondent's child caring and parenting abilities. *In re Jennifer W.*, 75 Conn. App. 485, 499, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003); *In re Galen F.*, 54 Conn. App. 590, 594, 737 A.2d 499 (1999); see also *In re Christopher B.*, 117 Conn. App. 773, 786–87, 980 A.2d 961 (2009) (trial court properly relied on respondent's history with department prior to filing of most recent neglect petition).

1

Failure to Rehabilitate—General
Statutes § 17a-112 (j) (3) (B) (ii)

This ground for termination, alleged against both parents, states, "[I]f the child is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of

such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and the needs of the children, such parent could assume a responsible position in the life of the child.

With respect to the ground of failure to rehabilitate, set forth in both § 17a-112 (j) (3) (B) (i) and (ii), the factual determination for the court is whether the parent has achieved rehabilitation as contemplated under the statute, that is, rehabilitation sufficient to render the parent able to responsibly care for the child.

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation achieved, if any, falls short of that which would reasonably encourage a belief that at some future date, [the parent] can assume a responsible position in [the] child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999).

Where the ground alleged involves failure to rehabilitate under § 17a-112 (j) (3) (B), "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition [or last amendment thereto] to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis

omitted; internal quotation marks omitted.) *In re Jennifer W.*, supra, 75 Conn. App. 495; see also *In re Joseph L.*, 105 Conn. App. 515, 527, 939 A.2d 16, cert. denied, 287 Conn. 902, 947 A.2d 341 (2008); *In re Stanley D.*, 61 Conn. App. 224, 230, 763 A.2d 83 (2000); Practice Book § 35a-7 (a). "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." *In re Stanley D.*, supra, 231; *In re Michael L.*, 56 Conn. App. 688, 694, 745 A.2d 847 (2000).

"Although the standard is not full rehabilitation, the parent must show more than 'any' rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation." (Citations omitted.) *In re Jennifer W.*, supra, 75 Conn. App. 500. "[E]ven if a parent has made successful strides in [his] ability to manage [his] life and may have achieved a level of stability within [his] limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, [he] could assume a responsible position in the life of [his] children." *In re Alejandro L.*, 91 Conn. App. 248, 260, 881 A.2d 450 (2005). The issue is not whether the parent has improved his ability to manage his own life, but whether he has gained an ability to care for the specific needs of the child at issue. See *In re Jocquyce C.*, 124 Conn. App. 619, 627, 5 A.3d 575 (2010); *In re Summer S.*, 124 Conn. App. 540, 545, 5 A.3d 972 (2010); *In re Mariah S.*, 61 Conn. App. 248, 261, 763 A.2d 71 (2000), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001).

"[T]he court is well aware that significant physical and emotional disabilities . . . by themselves, do not render individuals unfit to parent their children. By accepting treatment and with the assistance from appropriate family members, public and private organizations and other support networks, many individuals

have been able to overcome such challenges and successfully function as loving and nurturing parents to their children." *In re Angelina P.*, Superior Court, judicial district of Hartford, Juvenile Matters, Docket No. H12-CP10-013506-A (September 16, 2011) (*Dyer, J.*). Regrettably, that is not the case here.

The court finds by clear and convincing evidence that, as of the adjudicatory date, December 10, 2007, both Joseph and Daniel had been in the custody of the commissioner for at least fifteen consecutive months. Joseph had spent over twenty-eight consecutive months in foster care; Daniel, over seventeen consecutive months.

The court further finds, by clear and convincing evidence, that Joseph and Daniel are neglected, based on the adjudications of neglect rendered earlier, in Part III of this decision.

"It is well established that when the department takes custody of a minor child, the trial court has the authority to issue specific steps to . . . facilitate reunification with the parents. . . . The trial court also may augment the specific steps with supplemental orders." (Citations omitted.) *In re Leah S.*, 284 Conn. 685, 696, 935 A.2d 1021 (2007). The court finds by clear and convincing evidence that, pursuant to § 46b-129 (b), the parents were provided with specific steps to take to facilitate the return of Joseph and Daniel. Preliminary specific steps were issued ex parte in Joseph's case on July 21, 2005, by Judge Trombley. Those preliminary specific steps were revised as court orders by Judge Taylor on August 5, 2005. Both parents signed the preliminary steps issued for Joseph on August 17, 2005. Preliminary specific steps were issued ex parte in Daniel's case on July 24, 2006, by Judge Trombley. Those were revised and issued by Judge Bear as court orders and signed by both parents on August 11, 2006. The preliminary

specific steps issued for both Joseph's and Daniel's cases were substantially similar.[19]

"[S]pecific steps are . . . considered [to be] 'fair warning' [to a parent] of the potential termination of parental rights in subsequent proceedings . . . ." *In re Jeffrey C.*, 64 Conn. App. 55, 62, 779 A.2d 765 (2001), rev'd on other grounds, 261 Conn. 189, 802 A.2d 772 (2002). "Indeed, the failure to comply with specific steps . . . weighs heavily in a termination proceeding." *In re Devon B.*, 264 Conn. 572, 584, 825 A.2d 127 (2003).

The court finds the following with respect to the parents' compliance with their revised preliminary steps.

a

"Keep all appointments set by or with DCF. Cooperate with DCF home visits, announced or unannounced, and visits by the child's court-appointed attorney and/or guardian ad litem." "Keep child(ren)'s whereabouts and your own whereabouts known to DCF, your attorney and the attorney for the child(ren)."

Mother did not, for the period of July 21, 2005 to October 2006, provide the department with a consistent address, telephone number or times when she could be available for home visits, announced and unannounced. Since October 2006, mother has been compliant with this step, although she continued to spend a great deal of time at father's address in Thomaston. In cooperating with home visits, mother was usually present for such

---

[19] Final steps issued after both neglect adjudications in August 2007 and October 2011 are not in evidence and their validity might be questioned since those neglect judgments were overturned. The court, therefore, is considering the revised preliminary steps, which are in evidence, as the operative steps for purposes of the determinations it needs to make in this decision. Procedurally, ex parte preliminary specific steps are routinely revised after the conclusion of OTC preliminary or contested hearings.

visits at the father's residence, not that of the maternal grandparents.

At the time of Joseph's birth, father provided the hospital in Scranton with an address in Waterbury. The department was able to verify that no one actually resided at that address. Not until October 2006 did father provide the department with the address of his actual residence in Thomaston. Even then, he gave the worker inadequate directions. Between July 2005 and October 2006, father did not speak to the department worker, although he signed for certified letters sent to his Thomaston address, which he had given to the court on August 5, 2005.

Father, during the period of July 21, 2005 to October 16, 2006, refused the department and service providers access to the actual apartment in which he resided and allowed access only to the paternal grandmother's apartment. He refused to permit this in response to a direct request from social worker supervisor, Kevin Real, during an ACR on September 7, 2006. Father consistently refused to allow Coutant Skinner, the PEAS worker, access to his living quarters. She reported this to the department on March 12, 2007. Father never demonstrated to the service providers or the department during any home visits that his living quarters would provide a safe and nurturing environment for the children or that mother's presence as his cohabitant had been eliminated. In August 2012, the department was informed that father was planning to move from his Thomaston home, but father has refused to respond to the department's request to confirm that he actually has a new address.

The parents were fairly consistent in attending ACR meetings and appointments with the department workers until 2011, when they, at times, refused to meet with the department representatives. Father failed to inform

Delta-T worker Harte that he would not be home for a visit with the children in January 2007 when he accompanied mother to court during the trial of Kristina's termination petition. The children were needlessly brought to his home. Often, however, while father was in attendance at meetings or visits, he would refuse to engage in any discussion or answer even routine questions posed by the department, and at times, he sought to prevent mother from conversing as well, even placing his hand over her mouth.

b

"Participate in counseling and make progress toward the identified treatment goals: parenting and individual or group counseling. Cooperate with service providers recommended for parenting/ individual/ family counseling, in-home support services and/or substance abuse assessment/treatment." Mother also was provided with the additional step that she "comply with medication management as prescribed to address ADHD, narcolepsy and personality disorder and follow the recommendations of the UConn. sleep study."

Mother was to learn safe, responsible and appropriate child care and parenting skills, address psychiatric problems, mental health and emotional concerns and comply with all psychotropic medication regimens. She also was to follow recommendations and goals determined or specified by appropriate service providers.

Mother has not been compliant with the specific steps requiring her to participate in counseling and comply with recommended medication regimens. Since July 2005, she was referred to Dr. Heather Toll of the Family Intervention Center in Waterbury, Dr. Anthony Campagna and Dr. Brett Steinberg for individual counseling. She was to engage with Dr. Warren Corson for couples counseling with father. When she self-referred to Sally

Guest, the department attempted to work with her program, but it was problematic and the court eventually ordered that mother not participate in counseling with Guest. Mother refused to follow the recommendations of Dr. McNally and Dr. Gruen regarding her narcolepsy. Although mother said she was going to work with her own psychiatrist, Dr. August, she did not. Mother also refused to follow the recommendation of Dr. Green regarding ADHD and the need for medication. Mother has been evaluated a number of times, at the department's expense. All the evaluators have indicated that mother requires prolonged treatment before she can safely have a child entrusted to her care without supervision. Mother has ignored recommendations for medication to treat her mental illness, her narcolepsy and possible ADHD. She consistently has failed to follow through with recommendations from providers and court evaluators to address her psychiatric problems and emotional issues, despite being granted a great deal of leniency and repeated referrals. It appears the department was willing to try anything to get her to comply. Even when she did agree to see a provider, she did not attend counseling consistently and was discharged for lack of cooperation. Her couples counseling with father was ended when they broke up in August 2007. There is no documentation mother has addressed any of her psychological or medical issues since the end of 2007.

Mother has not demonstrated that she has improved her ability to safely parent and nurture her children, despite having been referred to and participated in the PEAS, Delta-T and Northwest Center programs, which were provided to her at father's residence, and later, in the community. Her lack of progress was continually demonstrated by her failure to adequately supervise her children. At times, she demonstrated a disinclination or inability to engage in even simple childcare tasks

such as bottle feeding and diaper changing. Most concerning is her lack of empathy, such as asking her son what he did when another child hurt him and frightening her children with bizarre and unjustifiable outbursts, such as the Halloween, 2007, incident. All of the parenting providers indicated that after months of effort, mother had difficulty sustaining what she learned and had made no progress. Her lack of consistent attendance also was a problem.

Mother never achieved a level of convincing skill or stability as a parent or sufficient degree of participation in mental health treatment that would have warranted a referral to an intensive, in-home reunification program. Since 2008, her participation and compliance with recommended services is unknown due to her failure to fully communicate or cooperate with the department's efforts to discuss renewing referrals.

Father was to address and improve his mental health, learn to understand the dynamics of mother's mental health needs and develop strategies to maintain the children's safety. He also was to develop appropriate parenting skills, understand and meet the children's developmental needs, and meet any other goals determined by the department and service providers.

Between July 2005 and November 2006, father was referred to several agencies for individual counseling; letters we sent to him clearly stating his need to engage in individual counseling, including offers of assistance in fulfilling the specific steps. He did not respond, although he signed for the certified letters. In February 2006, during a court-ordered evaluation, father told Dr. Humphrey that the only service he had been ordered to engage in was parenting classes.

On September 21, 2006, father asked the department's receptionist to send an e-mail to Dayner regarding sending material to Sally Guest, whom he indicated he

wanted to see for individual counseling. He had been informed at court on August 11, 2006, and at an ACR on September 7, 2006, of the inadvisability of treating with the same counselor as mother.

On November 11, 2006, counseling services for father with Dr. Corson were initiated. Corson met with father four times simply to assess him, and Corson recommended father could benefit from individual and family therapy to help address issues relating to department involvement and related adjustment issues. Both Humphrey and Corson diagnosed father with a personality disorder NOS. Father continued to express that he did not feel the need for counseling. Ultimately, in November 2007, he was discharged for lack of attendance and adamant refusal to participate. Given his entrenched opposition to psychology and lack of cooperation, the court refused to order the department to pay for any further counseling for father based on his subsequent, proposed self-referral. There is no indication that father has engaged in any additional counseling since 2008.

Although referred in March 2006, father did not commence fully participating in parenting services with the PEAS program until August 2006. Initially, he refused to cooperate. His parenting deficits were never adequately addressed due to his resistance to instruction and failure to cooperate fully with the program's outlined goals. He denied the PEAS parent educator, Coutant Skinner, access to his own apartment so she could measure his progress, if any, in creating a safe, suitable home for his children in which mother would not be residing a great deal of the time. His assertion that the children could live in his mother's apartment was never credible; the paternal grandmother complained that the children were using her space for *visits*. He never gave a legitimate explanation as to why the children could not reside in his own apartment.

On November 21, 2006, father reluctantly participated in an initial home visit with the Northwest Center parent aide program. To address his concerns, the program modified its involvement to include one scheduled visit with the children and one without them. In December 2006, the department engaged the Delta-T Group to also provide supervision and parenting instruction during the parent-child visits. Initially cooperative, father, over time, demonstrated oppositional and passive-aggressive behaviors when offered suggestions on how to better meet his children's needs during visits. He did not believe he needed any help parenting his children. By February 2007, Northwest had closed father's case as the aides felt the program might be more effective if and when the children actually resided in the home.

Like mother, father showed an inability to safely supervise his children, on one occasion allowing them too near a busy street. He displayed a tendency to be too controlling of them, not encouraging them to develop the ability to do things, such as eating, on their own, and resisted efforts to maintain a structured environment for them that included eating in a high chair and napping. When father got angry and did not have his own way, he denied the children pleasurable activities such as splashing in a pool. He once insisted on terminating a visit before it had begun because the boys had been given haircuts.

Despite these concerning deficiencies, father believed he did not need any help parenting. All the parenting programs ended their involvement because they felt their programs were ineffective for father and he had made no progress. Like mother, father never reached a level of cooperation with services or rehabilitation that would have led to the provision of an intensive, in-home reunification program, although parenting services were afforded to him at his home.

There is no evidence that either parent has engaged in any mental health counseling or parenting programs, jointly or severally, since 2008. The department's efforts to re-engage the parents, when appropriate, were unsuccessful. The parents refused to fully respond to the department's requests that they call or meet to discuss new referrals or reunification goals.

So fixed are their anti-authoritarian beliefs that they have, for over four years, refused to consider re-engaging in beneficial reunification efforts, even when it is clear that their failure to address their own mental health and parenting issues was a barrier to resuming visitation at the end of June 2011. Twice they have been granted a reprieve from the Supreme Court and maintained their parental rights, but they have never reconsidered their rigid, uncooperative attitude toward the department and court-mandated services, and they never accessed appropriate services on their own.

c

"Cooperate with court-ordered evaluations or testing." Father also was to "provide DCF written plan for parenting/means of support, names and information of child care providers."

It is unacceptable to attend costly evaluations and then wholly reject the experts' recommendations. Cooperation requires something more than merely attending the evaluation.

After Joseph's birth, mother attended evaluations by Humphrey, Green, Gruen and Krulee. The department made appropriate referrals based on the doctors' recommendations, but mother failed to follow through with any of them.

Father underwent a court-ordered psychological evaluation with Humphrey in February 2006. The evaluation was delayed for an hour because father insisted

that his attorney be present, but he did not make that request until the beginning of the time scheduled for the evaluation. His attorney was called by the court and had to travel to Torrington from Avon to sit with father. Humphrey reported that father expressed wanting to marry mother and raise a family with her. Father denied that mother's mental health issues affected her ability to parent. In order for reunification to move forward, Humphrey recommended that father complete parenting education, demonstrate an ability to provide a safe, secure home for Joseph (Daniel was not yet born), provide a parenting plan that included alternative caregivers other than mother and abide by court orders regarding restrictions on mother's access to his home. After March 2006 and before July 2006, when Daniel was born, father failed to fully comply with Humphrey's recommendations or the specific steps issued regarding Joseph in August 2005. He did not provide an acceptable parenting plan and failed to respond to Dayner's letters requesting one in April and June 2006. When he finally presented a plan, in November 2006, it was not acceptable. He did not resolve issues relating to adequate housing for the children in his own living quarters. As of July 2006, father was not compliant with the court-ordered specific steps and recommended services. His refusal to cooperate and his resistance to services prevented the implementation of necessary and reasonable reunification efforts. After Daniel was born in July 2006, the department continued to work with father. Department worker Lucier made additional efforts to implement Humphrey's recommendations, which were incorporated into the preliminary specific steps issued on August 11, 2006. After Humphrey's updated evaluation in September 2006, and his unusual court "deposition" on January 29, 2007, he made additional recommendations, including the need for father to engage in individual counseling. By 2007, the focus had

shifted to reunification of the children with father, not mother, although mother was apparently not discouraged from attempting to continue to live with father. She sought a court order to reverse the course of reunification efforts by filing a motion on August 6, 2007, in which she referred to father as her "significant other," requesting she be allowed to spend more time at father's home than the specific steps issued on August 11, 2006, allowed. She alleged in that motion that it was in the best interests of the children to have two involved and loving parents rather than being raised in a single parent household.

It was not until August 2007, that father demanded separate visits for mother, and that was not because he gained additional insights into her unaddressed mental health limitations, but because he was angry that she had agreed to a neglect judgment. This was his way of punishing her. Prior to this breakup, he remained completely supportive of and pathologically allied with mother. Even after August 2007, he continued to support mother as a perfectly suitable parent as the two of them continued to conduct a purposeful, hostile and aggressive rejection of the framework created by the specific steps, ultimately being unsuccessfully discharged from every service to which they were referred. By December 2007, father had failed to fully comply with the services recommended by Humphrey, including counseling with Corson and parenting education with the PEAS program, Delta-T Group and Northwest Center.

d

"Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in further proceedings before this court."

Mother failed to fully comply with this step. In 2006, she refused to provide the department with a release to speak to her neurologist, Dr. Roger Bobowick. Between 2006 and 2007, she did provide releases so the department could speak to providers, including the uncooperative Sally Guest. Recently, she failed to execute a proper release for a possible therapist, Dr. Lauren Ayr of the Connecticut Resource Group in Waterbury.

Father failed to fully comply with this step. He refused to sign a release for the Family Ties parenting education program. He would not sign a release so the department could confirm his receipt of disability payments and the reason for them. Between 2006 and 2007, he did sign releases so the department could speak to providers.

e

"Get and/or maintain adequate housing and legal income." On August 11, 2006, mother also was required to "establish residence separate from father" and "not be in father's residence from 10:00 p.m. to 8:00 a.m." On August 11, 2006, father was required to "allow DCF and [treatment] providers access to residences" and "establish residence separate from mother with suitable accommodations for children's care. Mother will not be in father's home from 10 PM to 8 AM."

From the spring of 2005, before Joseph was born, at least until August 2007, mother was residing a great deal of the time at father's residence. Although she claimed to be residing at her parents, she was often unreachable at the phone at that location. On June 19, 2006, just before Daniel's birth, mother filed a motion for a supplemental psychological evaluation by Humphrey, in which she stated that she and father "are a couple, plan to marry and are expecting a second child." Mother admitted to Humphrey in September 2006 that she was frequently staying at father's. She and father admitted they were planning to get married and live

and raise the children together and this plan also was asserted to the department by the maternal grandparents. Letters sent to mother, care of father, were being returned to the department, but the notations to return the letter were in mother's own handwriting. After the court issued specific steps on August 11, 2006, requiring that she not spend nights at father's home, a department supervisor saw her car parked at father's on three separate occasions during the prohibited hours in late winter of 2007. Mother never accepted the step that she not reside with father. She was a constant presence in the father's home in 2006 and the first part of 2007 whenever the department or providers arrived there with the children for visits with father. She objected to a permanency plan of reunification with only the father. Mother's parents' home was never an option. The maternal grandmother would not even allow supervised visits at her home, and mother complained that her mother berated her for not being successful in regaining the custody of her three children. In addition, the grandparents also had no insight into their daughter's mental and parenting deficiencies. The maternal grandmother, as shown during the episode in October 2006 with Dayner, was as capable of inappropriate tirades as the mother. The maternal grandparents' home would not have been a safe or suitable choice for the children whether or not mother was living there. When father ended their relationship and asked for separate visits in 2007, mother continued to press for reunification efforts that included her, but the only possible home to return the children to would have been father's. Mother never obtained her own independent residence or obtained income sufficient to support her own housing unit, although the PEAS program attempted to work with her in doing so. Her last known employment was part-time at a convenience store and a McDonald's restaurant in 2007.

Father, despite having his own apartment in a home he co-owns with his mother, never permitted full access to his living quarters so the department could be assured mother was not living in them, nor did he ever show he had created an environment that the department or other providers could observe and approve as safe and suitable for the children, in his unit or in his mother's. His attorney indicated in 2012 that father no longer owns part of the home where he was residing with his mother, and that he had relocated, but the department has not been apprised of his new address.

The last known employment of father was working nights stocking shelves at a Torrington grocery store in 2007. He also claimed to be collecting disability, but never confirmed this, or the reason for it, despite the department's requests for a release. He claims he collects disability payments due to a disc injury he received in a 1988 auto accident, but he has worked various jobs since then and participates in Civil War battle reenactments and strenuous BMX bicycle races for the fifty-plus age group.

f

"Immediately let DCF know about any changes in the make-up of the household to make sure that the change does not hurt the health and safety of the children."

Neither parent fully complied with this step. They were never fully forthcoming to the department about mother's residing at father's home in Thomaston.

g

"No substance abuse. Do not use illegal drugs or medication not prescribed for your use by a qualified healthcare provider."

There is no evidence of illegal substance use or abuse on the part of either parent. There is compliance with this step. When Daniel's preliminary steps were issued, it was not even deemed necessary to mandate steps regarding substance abuse.

h

"Do not violate the laws of this state, any other state or the United States, or have any involvement/further involvement with the criminal justice system."

Father complied with this step. Mother was arrested for the incident with department worker Dayner in October 2006, and charged with assault in the third degree and risk of injury.

The charges were still pending in 2007, when mother also was charged with failure to appear. The disposition of the case is unknown.

i

"Consistently and timely meet and address the child's physical, educational, medical or emotional needs, including, but not limited to, keeping the child's appointment with such providers. Make all necessary child-care arrangement insuring that the child is adequately supervised and cared for by appropriate caretakers. Accept and cooperate with in home support services referred by DCF. Maintain the child within the State of Connecticut during the duration of this case except for temporary travel out of state with the authorization of DCF or the Court in advance."

These steps, included in Joseph's, but not Daniel's preliminary steps, were never practically applicable, as they are meant to be complied with after progress with other steps has led to a determination that the children could safely be returned home, on a trial basis, full-time, or at least for extended, unsupervised visits. They

are often included as requirements during a period of protective supervision that is either ordered in lieu of a commitment or after a commitment has been opened and modified. The parents' failure to comply with their other, crucial steps prevented them from getting to a point where the time spent with the children could be safely expanded.

It did not take too many observed visits to discern both parents' need to learn to appropriately understand and meet their children's needs. Early visits with Joseph revealed mother engaging in the same concerning behaviors, such as inappropriate bottle feeding, that she had engaged in with Kristina, and father either did not recognize the problem, or if he did, he did nothing to correct her. Even after parenting programs and supervised visitation at father's home were implemented, both parents failed to maintain a reasonable degree of safety for the children during supervised visitation. Father permitted his young children to wander too close to a busy street before intervening. He allowed the children to sit in their own urine because he felt the diaper was not wet enough; and he exhibited defiant and passive-aggressive behaviors when service providers pointed out identified unsafe or inappropriate parental behaviors. Father also failed to provide the department with an acceptable alternative care-giving plan for the children should they ever be returned to his care.

Mother routinely permitted the children to play loosely supervised and also demonstrated little ability to provide a safe environment for the children during visits, including losing sight of her child for more than five minutes during a visit and chasing her two year old son through the mall while leaving her one year old son with a stranger. Both parents have exhibited defensive, hostile, argumentative and ultimately insulting interactions with service providers who have

attempted to promote better supervision of the children during visits.

Neither parent made any measurable progress despite receiving significant parenting and treatment supports and extra visitation time.

Mother and father attended two pediatric appointments with Joseph and Daniel. On April 24, 2007, father failed to attend one for which he was given notice.

Neither parent has removed the children from this state.

j

"Visit the children as often as DCF permits."

Both parents visited the children when permitted, although neither one of them completely accepted or benefited from the concurrent parenting education that was required during their visits. The department complied with court orders that the parents be given more liberal visitation than is usually offered upon removal, particularly to parents who fail to comply with services necessary to address their parental and mental health deficiencies. The parents were not always appropriate during visits. Mother's visits were suspended for several months after she pushed department worker Dayner during a supervised visit with Kristina in October 2006. On May 16, 2008, prior to the first trial on the termination of parental rights petitions, Judge Bear denied the parents' requests for expanded visitation. Subsequent to the entry of the first trial court judgment terminating their parental rights in 2008, the trial courts have declined to permit the resumption of the parents' visits.

k

"Tell DCF in writing the name, address, family relationship and birth date of any person(s) who you would

like the department to investigate and consider as a placement resource for the children."

The department did consider and reject the maternal grandparents as a placement resource, but there is no evidence that this possible placement was at mother's or the grandparents' request. Father never requested that the department consider any of his relatives as a placement resource, although he suggested his mother and his sister as alternate caregivers for his children should he regain custody of them. The department concluded that neither of these two relatives would be suitable, even as babysitters.

*l*

"Tell DCF the names and addresses of the grandparents of the children."

The department was provided with this information.

\* \* \*

The court finds by clear and convincing evidence that, as of the adjudicatory date, December 10, 2007, mother had failed to achieve such a degree of rehabilitation so as to encourage the belief that within a reasonable period of time, she could resume her role as a parent for Joseph and Daniel. On the dates that the children's neglect petitions were filed, mother's presenting problems arose from her failure to address her mental health issues and lack of parenting and basic life skills. Her issues were substantially similar to those identified and unsuccessfully addressed by mother in the child protection matter involving her then three year old daughter, Kristina, which this decision has thoroughly reviewed. Shortly after Joseph's birth, and before Daniel's, mother's parental rights to that daughter, Kristina, were terminated on the ground that she had failed to rehabilitate.

Since the dates of the removal of each of the boys from the parents' care—Joseph on July 21, 2005, and Daniel on July 24, 2006—mother has not been compliant with the specific steps requiring her to participate in counseling and to follow the recommendations of the court-ordered evaluations. In spite of experiencing the loss of Kristina, mother, prior to the adjudicatory date of December 10, 2007, had consistently refused the appropriate offers of services and treatment made by the department or suggested by psychologists, physicians and other experts that might assist and possibly enable her to acquire the help and skills necessary to appropriately care for a child.

In areas where expert opinion is offered, and there was a considerable amount in these cases, "[A] trial court is free to rely on whatever parts of an expert's opinion the court finds probative and helpful. . . . In family cases in particular, it would be anomalous to require a trial court to assign particular weight to a report which is based on statements that the court may evaluate differently and on circumstances that may have changed." (Citations omitted.) *Yontef* v. *Yontef*, 185 Conn. 275, 281–82, 440 A.2d 899 (1981). "[T]he credibility of expert witnesses and the weight to be accorded their testimony are within the province of the trier of facts, who is privileged to adopt whatever testimony [she] reasonably believes to be credible. . . . Furthermore, it is well settled that the trial court possesses discretion in ruling, not only on the qualifications of expert witnesses, but on the admissibility and weight of their opinions and testimony. . . . [If] the witness qualified as an expert, *any objection to his testimony would go to its weight rather than to its admissibility.*" (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re David W.*, 254 Conn. 676, 687, 759 A.2d 89 (2000).

Although mother was generally compliant with several steps, including visiting her sons when permitted to do so, the steps with which she has complied are rendered inconsequential due to her failure to engage in and benefit from the therapeutic services made available to her. There has been a pervasive, consistent pattern of mother failing to follow recommendations from court evaluators to address her psychological problems, specifically her personality disorder, narcolepsy, and possible attention deficit disorder. While each expert's evaluation drew slightly different conclusions, prolonged therapy was prescribed by every professional who evaluated mother. If mother had maintained herself in therapy, the variations could have been further explored and/or eliminated as a source of the problem, or addressed if determined to be a contributing factor. All the experts warned against mother assuming care of the children without constant supervision if her mental health and medical issues remained unchanged. Humphrey testified that he did not want to see the children reunified with mother individually. The risk for impulsive behaviors by her, lacking in insight and ungrounded in reality, were too concerning.

The court finds most persuasive the assessments by Sadler, and subsequently, Steinberg, who, unlike the other evaluators, treated mother over a period of several months. Steinberg noted that several evaluations, including Green's, contained conclusions that were based on an insufficient history. Steinberg does not believe mother's mental health issue is related to the brain surgery she had at age sixteen, or ADHD, but rather, her personality disorder. This is supported by mother's own statement that she did not detect any changes in her level of cognition after the surgery and that, except for a brief follow-up to drain some fluid, she had no further treatment to assist her recovery.

Mother also refused to provide the department with a release so her neurologist could be contacted.

Mother has not demonstrated that she has improved her ability to safely parent and care for her children despite having received parenting instruction, including the PEAS program. Her PEAS counselor, Coutant Skinner, concluded that after over a year of participation, mother had made no progress. Mother did not even enhance her ability to care for herself, failing to establish a greater degree of independence so she was less reliant on, and less affected by, the unhelpful influences of father and her parents. She continued to present a danger to any child who might be left in her care without full supervision, as first noted by Sadler in 2003 and, several years later, by Humphrey in 2006. Even when her visits were being scrutinized by the department or providers, mother could not avoid engaging in bizarre and dangerous behaviors. She imagines symptoms and illnesses that no other observer notes in her children. She refutes routine pediatric recommendations, claiming she knows better than the medical doctors because she was once trained as a medical assistant. She handed her child over to the care of a stranger in the mall, lost site of one child for over five minutes in a public park, assaulted the department social worker, screamed profanities and threats in the presence of her four year old daughter, and petulantly created a scene on Halloween, 2007, that left her two sons terrified and crying while she and father ran off with their candy.

Steinberg opined in August 2007 that "[d]ue to chronicity, severity and pervasiveness of symptoms, treatment expected to be a gradual and long term process that could take as long as several years. Under ideal circumstances, i.e., active and sustained engagement in therapy with full utilization of coaching resources, prognosis would be guarded. If patient failed to develop greater awareness and remained other focuses and

skeptical about treatment, prognosis would be poor." A few months thereafter, in November 2007, Steinberg discharged mother due to her failure to attend and actively participate in treatment."

Steinberg's failed effort, five years ago, just before the adjudicatory date, is the last known attempt by mother to address her mental health issues. Her last attempt to involve herself in parenting education also ended in November 2007, with no noted improvements.

The court also finds by clear and convincing evidence that there is nothing relative to mother that has occurred since the adjudicatory date of December 10, 2007, that would encourage the court to believe that, within a reasonable time, mother could assume a responsible parental position in the lives of Joseph and Daniel. She has refused more recent offers of referrals to services and has provided no verification to the department that she has successfully self-referred to therapy, parenting education or medical providers to treat her narcolepsy and possible ADHD. There is no indication mother has conscientiously explored medical, psychological or parenting options on her own since the adjudicatory date. Mother declares that even the services she did engage in were unnecessary. So pervasive and unrealistic is her denial of the existence of her emotional and parenting problems that she has actually described herself as "the shining star of parenting." Her open defiance of the department's and her attorneys' recommendations, and even the court's authority, has never abated. In fact, it has worsened. After the first day of trial, when she stated she has no disability, without excuse or explanation, she was absent from the remainder of the proceeding.

The court finds by clear and convincing evidence that, as of the adjudicatory date of December 10, 2007,

father also had failed to achieve such a degree of rehabilitation so as to encourage the belief that within a reasonable period of time, he could assume a role as a parent for Joseph and Daniel. When the termination petitions were filed on December 10, 2007, father was not in a position to care for the children or tend to their physical, emotional and medical needs. Since the time of Joseph's removal, father had embarked on so resistant and uncommunicative a course of action that he did not fully commence any of the services first recommended in specific steps issued in 2005 until August 2006, after Daniel was born. Father refused to tell the department where he lived or provide a telephone number even though it made it difficult when visits needed to be rescheduled. Humphrey's 2006 recommendations provided father with a clear path to successful reunification, but father never followed through with them. He refused to prepare an adequate home for his children and continued to deny the department and Coutant Skinner access to his living quarters. At least until the summer of 2007, he continued to allow mother to reside in his home. He never developed a viable parenting plan that guaranteed he would not rely on leaving the children unsupervised with mother. He never benefited from counseling to address his own personality disorder or educate himself on mother's mental health difficulties so he could develop a safe way to incorporate her into the children's lives. After he finally began counseling and parenting education, he often was rude and hostile. He rejected any direction or suggestions from his therapist, Corson, the department workers or his parenting providers. He was blatantly disrespectful toward Corson, who had twice reconsidered discharging him and agreed to try again. Aspects of father's parenting style were unsafe or inappropriate and revealed a lack of knowledge of child development, nurturance and empathy toward the children, as evidenced by his reactions to the kiddy pool being erected

and the children's haircuts, as well as the debacle on Halloween in 2007. In addition, he often failed to intervene to correct mother's obviously deficient parenting behaviors. He made excuses for her unjustifiable outbursts because he felt the department personnel deserved her wrath.

Father failed to achieve sufficient rehabilitation or show any real and sustained growth in managing his own affairs more independently or in parenting the children on his own. The level of rehabilitation he achieved, if any, fell short of that which would reasonably encourage a belief that at some future date he could assume a normal parenting role. Most concerning was his continued lack of appreciation for mother's disturbing behaviors and parenting deficiencies. There is no evidence that he would be capable of restricting her access to the children or that he agreed that he should do so. He consistently stated he saw no issues with mother's mental health or parenting. The pathological alliance of the parents was clearly evident until August 2007, and unfortunately, vestiges of it remain, regardless of whether or not they are still a couple.

The evidence also is clear and convincing that since the adjudicatory date of the termination petitions, father had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, he could assume a responsible position in their lives. Subsequent to December 10, 2007, father continued to deny any child protection concerns and made even less effort toward improving his ability to assume a responsible position in the lives of the children. He is no closer to being ready to assume a full-time parenting role than he was prior to the adjudicatory date; in fact, he is less so due to his total disengagement with the reunification process. He has failed to participate in any services to promote reunification and demonstrate any improved ability to care for his children.

He never followed through with recommendations that he engage in additional counseling to insure he understood how mother's mental problems could potentially hurt his children. After the release of the Supreme Court decision in July 2011, despite being given a second chance, he refused to engage with the department in any services that could facilitate reunification. After the release of the Supreme Court decision in June 2012, despite being given a third chance, he continued his stalwart rejection of assistance and made no credible effort of his own to equip himself to raise the children in a safe and nurturing environment. If reunification again were to be considered, father would require a substantial period of time and cooperation to address his and the children's needs before he could be considered sufficiently responsible to parent Joseph and Daniel with credible assurance he would not leave them unsupervised with their mother. He is still in total denial of his psychological diagnosis and its effects, as well as his need for counseling or parenting education. At the beginning of trial, he also indicated he has no disability. His hostility toward the department continues. His attorney reported he has a new address which he refuses to disclose.

Dr. Humphrey noted that father's fixations affect his ability to care for children, because his self-defeating patterns are so pervasive, they would affect his interaction with pediatricians, educators and others who need to have contact with the children and would lead to conflicts with persons attempting to intervene in the children's best interests. Humphrey opined that father's obsessive way of viewing the world and interacting with others would be disrupting to children.

While there may be no absolute nexus between a personality disorder and parenting abilities, there is

clearly a causal connection between both parents' untreated personality disorders and their failure to comply with specific steps and other recommendations, cooperate with the department and service providers and make sufficient progress, with or without the department's assistance, in addressing their woefully inadequate lack of independent, responsible adult lifestyles as well as their parenting deficits.

Humphrey testified that the parents' failure to meet established treatment goals through counseling and parenting programs before or after 2007 would lead him to the conclusion that no progress in changing their skills or beliefs has occurred. This, he opined, paints a bleak picture. Unfortunately, stated Humphrey, the parents' lack of progress was predictable given their Axis II personality disorders, which impede their ability to adequately respond to treatment and position themselves to adequately care for their children.

Unfortunately, since the adjudicatory date, both parents have ended just about any pretense of cooperation with the department to promote reunification efforts. Since the adjudicatory date, to coin father's phrase, they have built even higher walls. They have become less, not more, resolved to purposely engage in treatment, and they appear to have little insight or concern into the effect their intractability has had on their relationship with their children.

The petitioner has proven the ground of failure to rehabilitate pursuant to § 17a-112 (k) (3) (B) (ii) as to both parents by clear and convincing evidence.

2

Failure to Rehabilitate—General
Statutes § 17a-112 (j) (3) (E)

The second ground alleged for the termination of mother's rights in the petitions is the failure to rehabilitate ground contained in § 17a-112 (j) (3) (E).

The department has alleged that mother has failed to rehabilitate herself to capably parent Joseph and Daniel, who are both under the age of seven, and who both are adjudicated as neglected, and that the mother's parental rights in another child were previously terminated pursuant to petitions filed by the department. This ground for termination, set forth in General Statutes § 17a-112 (j) (3) (E), states in pertinent part: "[t]he Superior Court . . . may grant a petition [to terminate parental rights] if it finds by clear and convincing evidence that . . . the parent of a child under the age of seven years who is neglected or uncared for . . . is unable or unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families."

The court finds by clear and convincing evidence that: (1) Joseph was born on July 18, 2005, and was less than seven years of age as of the adjudicatory date of December 10, 2007; (2) Joseph is adjudicated neglected, as found earlier in this decision under the doctrine of predictive neglect; (3) Daniel was born on July 20, 2007, and was less than seven years of age as of the adjudicatory date; (4) Daniel is adjudicated neglected, as found earlier in this decision under the doctrine of predictive neglect; and (5) the commissioner filed and successfully prosecuted a prior petition in the Superior Court for juvenile matters to terminate mother's parental rights in her daughter, Kristina H. Judgment terminating her parental rights to Kristina, (born October 9, 2002), was entered on January 17, 2007. Without objection, the court took judicial notice of that prior judgment; and (6) the mother has failed,

and is unable or unwilling, to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the children, mother could assume a responsible position in the life of the children.

In determining whether mother has achieved a degree of personal rehabilitation sufficient to encourage a belief that she could assume a responsible position in the life of her children, the court adopts the definitions, meanings and findings set forth above in its factual findings in which mother's inability or unwillingness to achieve a sufficient degree of rehabilitation is extensively discussed, as well as the analysis earlier in this decision that formed the basis for this court's conclusion, by clear and convincing evidence, that the petitioner has proven the mother's failure to rehabilitate under the substantially similar ground set forth in § 17a-112 (j) (3) (B) (ii). The evidence is clear and convincing that as of the adjudicatory date, December 10, 2007, mother had not achieved rehabilitation as would encourage the belief that she could, within any reasonable time, assume a responsible position in the lives of Joseph or Daniel. The evidence also is clear and convincing that, since the adjudicatory date, mother has made so little progress, due to her lack of sustained effort, that there is nothing to justify a belief that within a reasonable time, she could assume a responsible position in her boys' lives.

Mother's circumstances have changed little from the time when she first gave birth to Kristina. It is particularly disturbing in the cases of Joseph and Daniel that there is no doubt mother knew of and agreed to the steps she would have to take to convince those around her that she could take care of her children without neglecting them, but she continued to make little effort to improve her mental health or develop a viable plan with effective and adequate supports. She knew that the removal from her care of any child born subsequent

to Kristina was inevitable if she did not address her mental health and other problems. That is why she fled the state before Joseph was born, further signifying her unwillingness to admit and address her mental health and medical issues. In Joseph's case, it did not take the Pennsylvania hospital personnel long to detect the concerning nature of her disorder and her parenting deficiencies. Despite the years mother has been working with the department in the cases of all three of her children, the extensive and comprehensive services she has been offered after numerous evaluations and the elapse of over six years since the youngest child's removal from her care, mother's willingness to work toward reunification has never been consistent. In two instances, despite the obstacles she already faced in assuming a responsible parental role for one, then two small children, she irresponsibly became pregnant with another. Even when she has tried to cooperate, her progress has been limited due to the woeful inadequacy of her attendance at and participation in therapy, her inability to accept recommendations and direction and remember what she learns, and her poor judgment. Since 2007, she has avoided participating in services, especially the counseling she desperately needs. There is no point in making these two children wait any longer for the reformation of a mother who is so unmotivated and lacking in insight. Despite having endured the loss of Kristina and the gradual disintegration of all her mother-child bonds, she has not been interested in the serious work required to achieve rehabilitation. As the years have progressed, while her two sons languish in foster care, despite her legal successes in overturning two prior judgments terminating her rights,[20] which one

---

[20] In both instances, mother simply received the benefit of father's procedural challenges to both the plea process in neglect proceedings and the standard of proof for predictive neglect. Neither of the Supreme Court decisions ever considered, let alone sanctioned, the appropriateness of mother's and father's refusal to follow the court's orders as contained in the specific steps.

would think would compel her, given two additional chances, to finally become serious about rehabilitation, she has become more withdrawn from the process and less willing to cooperate.

The petitioner has met her burden of proving ground § 17a-112 (j) (3) (E) as to mother by clear and convincing evidence.

V

TERMINATION OF PARENTAL RIGHTS DISPOSITION

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Citation omitted; internal quotation marks omitted.) *In re Roshawn R.*, 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). On disposition, the court may consider information through the close of the evidentiary hearing. In the dispositional phase of this case, the court has considered the evidence and testimony relating to facts and circumstances through December 11, 2012, the date upon which the evidence was concluded in these matters. In making the dispositional findings, the court incorporates by reference here all of the factual findings it has previously made in this memorandum of decision.

A

Required Statutory Findings

In making the dispositional decision in a nonconsensual case, the court is mandated to consider and make written findings regarding seven factors specified in General Statutes § 17a-112 (k). See *In re Tabitha P.*, 39 Conn. App. 353, 361–62, 664 A.2d 1168 (1995). Those

"seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Citation omitted.) *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003). As required by the statute, the court has considered the statutory factors and makes the following written findings with regard to the department's petitions to terminate the parental rights of the mother and father, and the court has considered these findings in determining whether it is Joseph's and Daniel's best interests to terminate the parental rights of his parents.

1

The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent.

In accordance with directives in the specific steps, the department has offered numerous referrals to a comprehensive array of services, evaluations and supervised visitations to the parents to facilitate reunification with the children. These services were made available to the parents on a consistent, timely and sufficient basis. These services are more fully described in Parts II, III and IV of this memorandum of decision.

2

Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.

The department's extensive efforts at reunification, and the parents' unsatisfactory levels of participation, have been discussed thoroughly in Part IV of this memorandum of decision. In Part IV, the court found by clear

and convincing evidence that the department made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. This court also found by clear and convincing evidence that the respondents were unable or unwilling to benefit from reunification services. In accordance with the orders outlined in the preliminary specific steps, the department offered appropriate assistance and services to both respondents and their two children to address the issues that led to removal.

3

The terms of any court orders entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations.

The department and the respondents were issued preliminary specific steps on August 5, 2005, and August 11, 2006. The step requirements, and the parties' compliance with them, are thoroughly reviewed in Part IV of this decision. The parents read and signed the steps. When appropriate, the department consistently offered the parents social work services, transportation assistance, supervised visits, including in home visits, parenting education, life skills assistance, and medical and psychological evaluations, consultations and services. The department workers appropriately attempted to follow the recommendations of experts consulted and sought providers with an unusually high level of involvement and/or expertise. For example, most of the mental health service providers offered were at a doctorate level. The department referred father, then mother, at her insistence, to the McCall Foundation PEAS program, which not only attempted to provide parenting education, but also tried to instill more independent adult life skills in both parents. The foundation even paid for father's car repairs and insurance. At one point,

three different visitation supervision and parenting education programs, PEAS, Northwest Center and Delta-T, all referred by the department, were working with the parents at the same time. Despite its reservations, the department also permitted mother and father to attend counseling services together, although its preferred approach would have been a singular focus on each of them individually. Without success, the department did everything possible to properly assess the parents' deficiencies and address them. Unfortunately, the parents never bought into the process. They would refuse to participate at all, or begin a service, only to be discharged for lack of progress and/or attendance. They were unable or unwilling to benefit from reunification efforts, an attitudinal stance that worsened, rather than improved, over time.

4

The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.

Prior to October 2008, the children, then ages 3 and 2, had regular, frequent visitation with the parents. Joseph, and Daniel, to a lesser degree, experienced behavioral issues surrounding visitation. After visitation was reduced and later terminated, the behavioral difficulties lessened and were gradually eliminated. The children reside with their two foster parents, older siblings and their biological half-sister, Kristina. They both have resided in this home since early infancy, so it is the only home they have ever known. They are thriving in this environment and dependent on their foster parents, who, as primary caregivers, have competently met and addressed their needs. The two boys call their foster

parents "Mom" and "Dad," and are very bonded to them. Neither child ever speaks of his parents or asks about them. Although both boys realize their foster parents are not their biological parents, being apprised of that fact did not unduly affect them. They appear to be unaware of the extensive legal prolongation of their status as children without an established, permanent home.

5

The age of the child—General Statutes § 17a-112 (k) (5).

Joseph, born on July 18, 2005, is seven years old. Daniel, born on July 20, 2006, is six years old.

6

The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.

The parents have failed to sufficiently adjust their circumstances, conduct or conditions to make it in the best interest of the children to be reunified with them in the reasonably foreseeable future. Although the parents consistently visited their children until the fall of 2008, they have been unable or unwilling to adequately address their housing, employment, mental health, medical and parenting issues. Consequently, their requests to renew contact with the boys were denied by the court in 2008 and 2011. Their level of cooperation in the time periods between pending appeals has been

almost nonexistent. There is no indication that they have sent the children any cards, gifts or letters since their visitation ceased in 2008. The level of "adjustment" achieved by mother and father can only be considered chronic maladjustment, nowhere close to the level each would have to achieve to make it in the best interests of Joseph or Daniel to return to the care of either parent in the foreseeable future.

### 7

The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.

Neither parent has been prevented from having or maintaining a meaningful relationship with their sons by any unreasonable act or conduct on the part of the department or any other third party. However, each parent, in failing to gain insight into his or her problems, and in failing to fully encourage the other to participate in and make progress in recommended treatment and programs, has contributed to preventing the other parent from maintaining such a relationship. Their pathological interdependency has harmed both of them, as they each continued to support their mutually unfounded positions that they already are perfect parents and there is no need for improvement.

There is no evidence that the economic circumstances of either parent affected his or her ability to have a meaningful relationship with Joseph and Daniel. Programs and services to progress toward reunification were available, for the most part, at no cost to both, and both were offered regular visitation. Both have been provided with a number of attorneys to represent them at state expense, having been, at some point, found indigent. Both are capable of employment if they care

to be employed, and father receives disability benefits. Father also owned, and possibly still owns, a condominium in Waterbury and part of a house in Thomaston.[21] The parents' loss of a meaningful relationship with both of their children is attributable only to their own actions and inactions.

B

Best Interests of the Children

Having made the written findings regarding the seven factors delineated in § 17a-112 (k), the court must now determine whether termination of parental rights is in the best interest of each child. The final requirement of the termination statute, § 17a-112 (j), is that, before granting a petition for termination, the court must find "by clear and convincing evidence . . . (2) that termination is in the best interest of the child . . . ." In making its best interest determination, the court can consider all events occurring through the close of the dispositional hearing. Practice Book § 35a-9. The best interest standard is inherently flexible and fact-specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare. In determining whether terminating the parental rights of the respondent parents would be in Joseph's and Daniel's best interests, the court has considered various factors, including the children's interest "in sustained growth, development, well-being, and in the continuity and stability of [their] environment"; see *Capetta* v. *Capetta*, 196 Conn. 10, 16, 490 A.2d 996 (1985); their age and needs; the length and nature of their stay in foster care; their contact with their birth parents and the potential benefit or detriment to them of retaining a connection with their biological parents; their bond, or lack thereof,

---

[21] Father never listed his ownership of either of these real estate parcels on any of his sworn applications for the appointment of counsel.

with each parent; *In re Savanna M.*, 55 Conn. App. 807, 816, 740 A.2d 484 (1999); and the seven statutory factors and the court's findings thereon. The court also has balanced the children's intrinsic need for stability and permanency against the potential benefit of re-establishing a connection with their biological parents. See *Pamela B.* v. *Ment,* 244 Conn. 296, 313–14, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against interest in preserving family integrity). Other significant factors considered here are the children's interests in sustained growth, development, well-being and continuity and stability of their environment and their need for supportive, safe, predictable, structured, stable and nurturing caretakers, as well as their relationship with their biological and adopted siblings and foster parents.

The petitioner has established by clear and convincing evidence that it is in Joseph's and Daniel's best interests to terminate the parental rights of both respondents. In deciding the issue of best interests in these cases, the court has considered the adjudicatory and dispositional evidence in its entirety, and has concluded there are no other credible or realistic permanency plans proposed less restrictive than termination of parental rights that would secure and protect the boys' best interests within a reasonable time.

Joseph and Daniel are thriving in a loving home with two foster parents, the only consistent, full-time caretakers they have ever known, apart from Joseph's first six weeks of life. The foster parents, who adopted the boys' older sister, Kristina, are eager to adopt them. The two boys are very attached to their siblings and their foster parents, whom they call "Mom" and "Dad." They are still small and their needs must be met by nurturing, stable, competent and reliable caretakers. With neither biological parent willing or able to assume adequate responsibility for them, clear and convincing

evidence proves that it is in the children's best interests to terminate parental rights and free these children for permanence and stability elsewhere. Neither parent has achieved the ability to provide even minimally adequate care for the children and there is no evidence either has successfully parented any other children. Both parents have diagnosed, untreated personality disorders which negatively affect not only their ability to provide safe and nurturing parenting, but also the parents' ability to lead well-adjusted, stable and independent lives of their own. Their histories of angry or bizarre displays of temperament, failed relationships, lack of steady employment and considerable dependence on others suggest a need for a support system not only for parenting, but for their own individual basic functioning. Mother's rights to her older child were previously terminated for many of the reasons termination is now justified in her sons' cases. Both parents' coping and decision-making skills are negligible and their judgments are poor. If the children ever were to be returned to them, there would be a very real risk of flight from the state, which would prevent the effectuation of a well-supervised plan for reunification that would not harm the children physically or emotionally. There would be serious risk factors for successful reunification in a stable, nurturing home environment given the parents' steadfast rejection of the usefulness of therapeutic and parenting interventions, which they and the boys would require for a prolonged period of time. If parental rights are not terminated, the department's struggle to engage these two defiant and uncooperative people would undoubtedly drag on. There is nothing in the evidence that instills any confidence in the court that the parents are prepared to do what it takes to successfully rehabilitate within a reasonable time in the future.

As our Supreme Court has noted, because of the psychological effects of prolonged termination proceedings on young children, "time is of the essence

. . . ." *In re Juvenile Appeal,* *(Docket No. 10155)*, 187 Conn. 431, 439, 446 A.2d 808 (1982); see also *In re Alexander V.*, 25 Conn. App. 741, 748, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992). These two little boys have remained in the limbo of foster care all of their lives, about one-third of their childhoods. Their need for stability and continuity of care far outweighs the extremely questionable benefit of resuming a connection to two recalcitrant parents they no longer know.

## VI

## RULINGS ON PARENTS' MOTIONS FOR VISITATION AND FATHER'S MOTION TO VACATE ORDERS OF TEMPORARY CUSTODY

In view of the above rulings on the neglect and termination petitions, the issue of vacating the orders of temporary custody for Joseph and Daniel is moot. Having decided to terminate father's parental rights, this court cannot afford him the remedy of returning custody of the children to him. Even if father's parental rights had not been terminated, he has not met his burden of showing a substantial change in circumstances since the courts' findings the children were in immediate danger of physical harm from their surroundings in 2005 and 2006, which led to vesting temporary custody of each child in the department. Given father's own parenting deficiencies and his inability to recognize mother's, there is no basis to conclude that the children would no longer be at imminent risk of physical harm if returned to father's care. In fact, the picture is currently bleaker than ever. The court, accordingly, denies the father's motion to vacate the OTCs.

Based on the above rulings terminating parental rights, the evidence presented, particularly with respect to the parents' lack of any contact with the children since 2008 and the parents' failure to re-engage in any

programs or services to address their parenting deficiencies, the court finds by a fair preponderance of the evidence that resuming visits between the children and their parents at the present time is not in the boys' best interests. In these cases, the court has decided to terminate parental rights and therefore, the parents have no right to visit at this time. When the parents had visitation, they both demonstrated a lack of judgment and poor parenting skills. When made aware of more appropriate approaches in light of the children's developmental needs, the parents often ignored advice. Dr. Humphrey indicated that even if the court was contemplating further reunification efforts, just imposing renewed contact on the children without psychotherapeutic intervention could prove to be an emotionally and psychologically disruptive event. Reinstating visits may cause the children emotional trauma and a reoccurrence of behavior problems. At the end of 2007, when the parents last had visitation, after the number of visits per week was increased due to the parents' breakup, the children, especially Joseph, experienced behavioral problems surrounding visits. These behavioral issues were not typical and lasted for a significant period of time. The behaviors improved after visits were reduced and later eliminated. Moreover, neither parent is amenable to psychological recommendations or interventions. At this time, there is no legitimate justification for ordering visitation that may unjustifiably and needlessly undermine the children's sense of security and stability.

## VII

### CONCLUSION

The petitions for termination of parental rights are granted, and judgment may enter terminating the parental rights of Karin H. and Joseph W. in Joseph W., Jr. and Daniel W.

Pursuant to General Statutes § 17a-112 (m), it is ordered that the Commissioner of the Department of Children and Families be appointed statutory parent for Joseph and Daniel so that they may be placed for adoption.

Case status reports shall be submitted within thirty days of this judgment, on April 9, 2013, to the Superior Court for juvenile matters at Torrington, as required by law.

Additional quarterly reports and/or motions to review permanency plans for the children will be filed and heard in accordance with state and federal law until such time as the children's adoptions are finalized.

The department is also ordered to notify the clerk of the Superior Court for Juvenile Matters at Torrington in writing when any adoption is finalized if the adoption petitions are filed and heard in a probate court or another juvenile district court.[22]

Pursuant to an agreement between the Chief Court Administrator and the Chief Probate Court Administrator, the clerk of the Probate Court that may exercise jurisdiction over any subsequent adoption of either child is ordered to notify in writing the clerk of the Superior Court for Juvenile Matters at Torrington of the date when said adoption is finalized.

Judgment may enter accordingly.

---

[22] The state legislature recently enacted P.A. 12-82. After October 1, 2012, juvenile courts are permitted to hear adoption petitions connected to cases in which such courts have entered judgments terminating parental rights pursuant to petitions filed by the Commissioner of the Department of Children and Families.